# DECISIONS

OF

# THE COURT OF APPEALS

## OF KENTUCKY.

---

## SUMMER TERM, 1852.

---

Slack, &c. *vs.* Maysville and Lexington Railroad Company.

APPEAL FROM MASON CIRCUIT.

PETITION FOR INJUNCTION.

Case 1.

January 27.

13m 1
97 264
97 373
13bm 1
f104 264
13bm 1|
e113 618|
13bm 1
123 198

Judge MARSHALL delivered the opinion of the court, January 27, 1852—Judge HISE dissenting.

1. The city of Maysville, under the act authorizing subscription to stock in the Maysville and Lexington Railroad Company, had a right to vote jointly with the county on the question of the propriety of making the subscription, and the call for the vote by the president and directors of the railroad company was authorized by the statute.

2. "A demonstration of the evil consequences to flow from the abuse of a particular power, does not demonstrate the non-existence of that power." The thirty-sixth section of the sixth article of the present constitution can have no application to debts of counties created before its adoption. The distinction taken in the new constitution between debts of the commonwealth and debts of a county or counties is broad and palpable; though the question, whether that section does or not, in its spirit, apply to counties as well as the commonwealth, is not decided; as, if the act in question was valid under the old, it is not invalidated by the present constitution.

3. Principles of justice and general expediency required that the provisions of the new constitution should have a prospective and not a retroactive operation, unless otherwise clearly indicated, which is not the case here; and the case is to be decided upon the principles and provisions of the old constitution.

4. The act of February, 1851, amendatory of the act for organizing the railroad company, conferred no new authority upon the county court, and if valid under the old is not invalidated by the new constitution.

VOL. XIII. 1

5. All the legislative power of the commonwealth, is, by the constitution, vested in the legislative department of the government, subject to no restraint except such as is imposed by the fundamental law, its own wisdom and responsibilities. It carries the law into effect by extrinsic agencies, by the executive alone, or in conjunction with the judicial; or it may create other agencies, as is done when the object is to accomplish local or individual purposes—as county courts, trustees of towns, &c.

6. Legislation is sometimes mandatory, sometimes permissive. The act done by permission is as valid as if done in obedience to a command, having all the sanction which legislative power can give; and rights acquired under the one, just as much entitled to protection as those acquired under the other.

7. Legislative acts giving the power to create corporations upon the performance of particular acts by individuals, when those acts are performed, assume the character of binding contracts, which the legislature cannot impair.

8. The power of the legislature to impose local taxation for the accomplishment of local purposes cannot now be denied. It is deducible from the general powers of the government, not however to be exercised by any portion of the people without legislative consent, and except under legislative authority; and it is no objection to the mode of exercising that power that it is referred to the consent of those to be affected by its operation.

9. Where a decision of a question is referred to the popular vote, it is fair to take the decision of the majority of those who do vote as decisive of the question, and that those who did not vote acquiesce.

10. It is no objection to the validity of a vote for imposing a railroad tax, that the power was given to the president and directors of the company to designate the time of taking the vote, instead of the county court.

11. It is not a valid objection to a railroad tax, otherwise legally imposed, that the tax-payers are made stockholders to the extent of the taxes paid by them. (11 *B. Monroe*, 143; 9 *Ib.*, 526.)

12. The power of the legislature to impose local taxation for local purposes is fairly recognized, and its abuse consists "in a palpable and flagrant departure from equality in the burthen imposed upon the persons or property bound to contribute; or it must be apparent that persons or their property are subject to a local burthen for the benefit of others, or for purposes in which they have no interest and to which they are therefore not justly bound to contribute." ( 9 *B. Monroe*, 330 *to* 341.) This court cannot say that there has been any such abuse of power in the present case; nor that "there has been any greater abandonment of legislative will," than if the question as to the imposition of the tax had been referred to the county court.

Case stated.

The twenty-eighth section of the act of March, 1850, incorporating the Maysville and Lexington Railroad Company, enacts, "That the cities of Maysville and Lexington, and the counties of Mason, Nicholas, Bourbon, and Fayette, and any other city, county, or corporation, be and they are hereby permitted to hold stock in the corporation created by this act, upon the same terms, on the same conditions, and

subject to the same restrictions, with other stockholders." It then fixes the maximum of stock which may be subscribed under this authority, as follows, viz : by Maysville, $150,000; by Lexington, $150,000; by Maysville and Mason county jointly, $150,000; by Nicholas county, $100,000; by Bourbon county, $150,000; by Fayette county, $200,000; and by any other city, county, or corporation, any sum not exceeding the largest of these amounts; and the president and directors of the company are authorized, after giving six weeks notice by advertisement, in the manner prescribed, "upon a day named in said advertisement, to take the sense of the qualified voters of said cities or counties, or of any one or more of them, as to the policy of said cities and counties, or any one of them, becoming subscribers to the stock in said railroad company, to any amount which may have been proposed in said printed notice, not exceeding the respective sums above specified." It is then made the duty of the mayor and council of the cities of Maysville and Lexington, and the duty of the county court in each of the counties above named, to open columns in the various precincts, &c., and take all necessary measures to ascertain the sense of the qualified voters of their respective cities and counties at the polls thereof, as aforesaid; "and, provided a majority of all the qualified voters of any of said cities or counties, who shall have cast their votes at said election, shall be in favor of said several subscriptions of stock as proposed to such city or county, it shall be the duty of the mayor and council of every such city to pass an ordinance directing the mayor to subscribe for any amount of stock provided for in the ordinance, not exceeding the amount in the said printed notice; and it shall be the duty of the county court of every such county, in like manner, to empower and direct their clerk to subscribe for the amount of stock authorized by the voters of the county, not exceeding the sum specified in said printed notice; and it shall be lawful for said cities and counties, so authorizing

subscriptions, &c., to raise the amount of their separate subscriptions, as the same shall be called by the president and directors of said road, by a tax on the real and personal estate of the said several cities and counties subscribing, or by borrowing the amount thereof, payable in the way, and on the terms, the said several mayors and councils and the said several county courts may deem most advisable; and the interest on all such sums borrowed may be provided for in such manner as to them seems best; and, provided, that all sums paid by any citizen on account of such subscription, or of the interest thereon, shall entitle him to a certificate thereof, and when such certificates amount to fifty dollars, shall entitle him to one share in the stock subscribed by said city or county for every fifty dollars so held by him—the shares in the capital stock being fifty dollars each."

Towards the close of the year 1850, the president and directors of the railroad company gave notice, by advertisement in the newspapers as required, for taking the sense of the voters of Mason county, including the city of Maysville, on the fourth Monday in January following, as to the policy of a subscription of stock by that county to the amount of $150,000, under the foregoing provisions of the charter. The county court of Mason, at its December and January terms, made a provision for taking and returning the vote, and at its February term, 1851, being on the 10th day of February, the votes from the several precincts being returned, and it being ascertained that the whole number of votes cast was 2,113, of which 1,328 were given for and 785 against the subscription, making a majority of 543 in favor of it, the court made an order directing its clerk to subscribe, on behalf of the county, $150,000 in stock in said company, and to issue the bonds of the county for that sum, payable in thirty years, in bonds not exceeding $1,000 each, bearing six per cent. interest per annum, payable annually, and to be delivered to the president and directors as called for, not exceeding $50,000

per year; which course had been indicated by the order of December, 1850. On the 17th of February, 1851, the legislature, by amendment to the charter of the company, authorized the county court of any county, or the city council of any city, who shall subscribe stock in said company under the provisions of the original act, to execute bonds of the county or city to the president and directors for the amounts severally subscribed, payable at such times as the county courts and city councils may deem best; and authorized and required them, severally, to levy and collect upon the real and personal property of said counties and cities, assessed for state taxation, an amount in money sufficient, annually, to pay off the interest on said bonds. This act also provides for the mode of levying and accounting for the tax; also, for the negotiability and transfer of the bonds by indorsement of the president, countersigned by the secretary, and for the transfer of certificates given to tax-payers; and that the stock issued on such certificates shall not be deducted from the county or city stock. Other minor provisions need not be stated.

Prior to this enactment no bonds had been issued by the county court of Mason. And although a general order had passed for their being issued by the clerk, yet, as the mode of executing them had not been prescribed, we suppose he had no authority without the further order of the court. At the May term, 1851, however, an order was made, that the senior justice should sign bonds to the amount of $20,000, to be countersigned and sealed by the clerk, and delivered to the company in payment of so much of the stock subscribed. At the same term an order was made for the levy and collection of a tax of 3½ cents on the $100 worth of real and personal property in the county assessed for state taxation, for the purpose of paying interest on the bonds. And at the same time the court recommended that the bonds to be issued should be made payable in New York, and should

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

bear interest payable semi-annually in the same city. This was the last session of the old county court.

In August, 1851, the presiding judge of the county court, acting under the present constitution, adopted the recommendation of the former court, revoked and canceled the bonds for $20,000 before referred to, and provided that bonds to the amount of $50,000, payable in the city of New York, with coupons for interest payable semi-annually in the same city, should be issued to the company by the presiding judge, to be countersigned and sealed by the clerk, the coupons to be signed by the clerk.

On the 29th day of September, 1851, the tax levied in May of that year being in the course of collection, Jacob Slack, and one hundred and fifty other citizens and tax-payers of Mason county, owning taxable property to the value of more than $900,000, and more than one-tenth of the entire taxable property of the county, and who had been opposed to the subscription, filed their petition complaining of the tax as oppressive, illegal, and unconstitutional, and praying for an injunction against the sheriff, the railroad company, and the county court of Mason, to prevent its collection from such of them as had not already paid it. The railroad company, by its president, answered the bill, maintaining the validity of the charter and of the proceedings under it, and the legality and constitutionality of the tax. And it having been agreed that the case should be finally disposed of upon the motion of the complainants for an injunction, the court, on the hearing, overruled that motion and dismissed the bill. From this decree the complainants have appealed to this court.

I. It is objected in the bill, and has been urged in argument, that the proceedings of the county court were not conformable to the prescriptions of the statutes which have been referred to, and were therefore unauthorized by them. But we perceive no material discrepancy, nor in fact any discrepancy at all, in the performance of the acts required to be done in or-

der to authorize the subscription, which, if valid and obligatory, imposed necessarily a debt of serious magnitude upon the county. The subscription itself, and the duties of the court preparatory to its being made, were ministerial acts, prescribed particularly by the original statute, without leaving any discretion to the court. In providing for taking the vote, in ascertaining the result, and in making the subscription in obedience to it, the court followed the plain mandates of the statute. If that is authoritative, the subscription is valid and binding. And if the court, in any matter not affecting these preliminary steps, made orders in anticipation of the result, or in any manner exceeded their authority, such excess is simply void, and can have no effect upon the validity of the subscription, or upon the subsequent rights or powers of the court. The orders by which, before the subscription was voted for, the court laid down the form or mode in which the bonds should or ought to be executed, or disposed of, are of no consequence, unless in the effect they may have had in determining votes in favor of the subscription by pointing out the mode in which it was to be paid; and as this mode was afterwards substantially carried out, and was, as will be shown, authorized by the original charter, it cannot be admitted that they were either deceptive, or that they proposed to the voters a question which the charter did not authorize them to determine. The only vote authorized by the charter, was upon the single question, whether the county should subscribe to the amount proposed. As to the mode of payment, the county court had a broad discretion. And if the mode pointed out by anticipation, before the vote was taken, would not of itself have been afterwards obligatory upon the court, the fact that it was made the basis by the company upon which the question was voted on, and that it was intended by the court so to operate, should have made it obligatory. And as it was actually followed out, the validity of the subscription cannot, in our opinion, be impeached

on any ground growing out of these anticipatory orders.

The orders respecting the bonds made after the subscription, were, so far as they were unexecuted, unobligatory upon the court. And as the bonds for $20,000, executed under the order of May, 1851, were canceled before they were negotiated, the whole subject of the bonds was, at the August term, completely in the power of the court, unaffected by the former orders, except as above indicated. And although no bonds had actually been executed when the tax for payment of the interest was levied at the May term, 1851, yet, as the subscription creating the debt had been made some months before, and the bonds might be required at any time, the tax was properly levied at the May term, if the court had power to levy it. If a majority of justices in commission was requisite for the purpose, there was a decided majority at that term, and in fact there seems to have been a majority on the bench at each of the previous terms at which orders were made in reference to taking the vote, or making the subscription, or issuing bonds. Nor do we suppose that, under the existing constitution and laws, the presence of all of the justices of the peace in the county, or of a majority of them, was requisite, to authorize the court, at its August term, to prescribe the form and terms of the bonds and the mode of execution and delivery. And even if it were conceded that the execution of bonds directly to the company in payment of the subscription of stock was not authorized by the original act of 1850, it was expressly authorized by the amendatory act of 1851. And there seems to have been a precise conformity with the original act in the mode of calling for and taking the sense of the voters on the question of subscribing the stock, which was done under the original act alone. It is true, the newspaper advertisement of the time of taking the vote is not copied in the transcript of the record, and is not otherwise actually before us, but as the order of the county court states that it was

proved, and as it was made a part of the agreed facts, and as neither its existence nor sufficiency has been questioned either in the pleadings or the argument, both are assumed as being sufficiently established or conceded.

Whatever reasons there may be in point of propriety and justice for not taking the joint vote of Maysville and the rest of the county upon the question—whether the whole county including Maysville should subscribe $150,000, it is entirely clear, that while the statute authorizes a separate vote of the citizens of Maysville for determining whether she would take $150,000 of the stock which she has done, it also authorized her to vote jointly with the rest of the county upon the question of the county subscription of which she is to bear her proportional burthen, in addition to that which she had imposed upon herself. The statute does not, according to our view of it, make any provision for taking the vote of Maysville and of the rest of the county of Mason as distinct communities upon the question of a subscription to be made by them. It certainly makes no provision for ascertaining their respective interests in a joint subscription for the benefit of each. Besides, the maximum of stock to be held by the city of Maysville is $150,000. As a separate community she cannot hold or subscribe for more. And it is only as an integral part of the county of Mason, that she may be interested in an additional amount of stock to be subscribed by the county, upon a vote of the county in which she is included. As Maysville had been separately mentioned and authorized to subscribe $150,000 for herself, she was again mentioned in stating the maximum for the county in order to show that she was not to be excluded from the county subscription. And whatever interpretation might be given to the words "by Maysville and Mason county jointly," if they stood alone, the context shows, in our opinion, that they were intended to mean by Mason county, including Maysville. There was, therefore, no departure from

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

1. The city of Maysville, under the act authorizing subscription to stock in the Maysville and Lexington railroad company, had a right to vote jointly with the county on the question of the propriety of making the subscription, and the call for the vote by the president and directors of the railroad company was authorized by the statute.

the statute in this respect. So, however ungraceful or disrespectful it may have been to the county court, or to the people, that the call for the vote should have been made by the president and directors of a road company, this too was prescribed by the statute; which, although it might and perhaps should have required the vote to be taken at a general election, when a fuller expression of the popular will or judgment might have been expected, yet left it to the president and directors to determine the time. It may be assumed that they fixed the day with a view to their own condition or necessities, and especially as it has not been shown that they did it for the purpose or with the effect of obtaining an unfair advantage. It might have been more discreet, too, for the legislature to have required the concurrence, by vote, of a majority of all of the qualified voters of the county to authorize the subscription. But if the election or vote was properly conducted under valid legal authority, the presumption of law is, that those who did not actually vote concur, or at least acquiesce in the decision of the majority of those who did vote. It does not appear that the opponents of the road were less able to get to the polls than its friends, or that more of them staid away.

II. In approaching the question of the constitutional validity of the legislative acts, under which this tax has been levied, we are met by the preliminary question made in argument, whether they are to be compared with the old constitution, or with the present one, adopted on the 11th day of June, 1850. The general principles and provisions of the two instruments, so far as they bear upon this subject, are substantially the same. But the thirty-sixth section of the second article of the present constitution contains a prohibition with respect to the contracting of a public debt, which, it is contended, is violated in its spirit and substance, if not in its letter, by one or both of the acts now in question.

The section referred to is as follows, viz : "No act of the general assembly shall authorize any debt to be contracted on behalf of the commonwealth, except for the purposes mentioned in the thirty-fifth section of this article, unless provision be made therein to lay and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect until it shall have been submitted to the people at a general election, and shall have received a majority of all the votes cast for and against it;" with a proviso that money may be borrowed to pay part of the public debt, without such submission or provision. It is argued with great force that this prohibition was founded on the fact that the state had incurred a large debt for internal improvements under the delusive expectation that the works erected would reimburse the expenditure, and might produce a large annual revenue; and that this clause of the constitution was intended to protect against similar delusions in future, and the extravagancies and disasters to which they would lead, not the commonwealth as a mere ideal abstraction unconnected with her citizens and her soil, but the commonwealth as composed of her people and their territorial organizations of towns, cities, and counties, which make up the state; that it intended to furnish this protection by commanding that every legislative act which authorizes the incurring of a public debt, of the character described, shall contain the stern requisition of a tax which will extinguish the debt and interest in thirty years, so that the people to whom it is to be submitted at a general election, may, and must see the full extent of the burthen they are called on to assume; and that, although in terms, the mandate applies only to such legislative acts as authorize a debt on behalf of the commonwealth as an entirety, it embraces in principle every legislative act which authorizes a debt to be contracted by any of the local organizations of which the commonwealth is composed. It is contended, that

the object of the constitution is not merely to guard the commonwealth from the name of a debt unnecessarily created, but to protect the property and citizens of the commonwealth from the burthen of such a debt, contracted under legislative authority, unless sanctioned by the consent of a majority of those who are to bear it, given at a general election, and under circumstances which must apprise them of the consequences; that the burthen is the same to the citizen, whether imposed by a debt contracted on behalf of the whole state of which he is a citizen, or by a debt contracted on behalf of the local organization of which he is a member; that there is at least equal necessity for guarding him from the imposition of such a burthen by legislative authority, and without his consent, in this last relation as in the first, and indeed that it is much greater, since the representative principle, which of itself affords a most valuable guaranty against the unnecessary imposition by the legislature of a burthen which is to fall upon the whole state, affords practically none, or none that is appreciable, against a legislative act authorizing the imposition of a local burthen upon the local community, that all the dangers to be apprehended from the imposition of unnecessary and extravagant local burthens are immeasurably enhanced, if the legislature, following in part only the spirit of this clause of the constitution, may relieve itself from the responsibility of direct and peremptory action, by devolving upon the majority of the local community, acting merely as individuals, and under no responsibility, the power of determining whether the burthen shall be imposed upon all, and of thus, by their will, giving effect to the legislative act; and that if, in partial conformity with this clause, the minority of the local community is thus to be subjected to an extraordinary and onerous taxation by the will of the local majority, that minority, and every individual composing it, is entitled to the full application of the entire provision, as furnishing some check to the unwise and

precipitate action of the majority itself, and as affording to the minority this single shadow of security against the oppressive abuse of irresponsible power.

It is therefore claimed, that whatever protection this provision of the constitution intended to provide against the imposition, by legislative authority, of a general burthen upon the citizens of the whole state, the same protection must, according to the spirit and object of the provision, be extended to the citizens of each and every local community, to the majority of whose citizens the power of imposing a local burthen is committed by legislative act; that the protection of the whole implies necessarily the protection of all of its organized parts, and that the whole cannot be safe, while all or any of its parts are exposed to danger; that it is in vain to say that the legislature shall not authorize a debt on behalf of the state, except under certain restrictions intended as a security against imprudence and extravagance, involving necessarily oppressive taxation, if it may authorize a debt on behalf of every county in the state without regard to this restriction; that when every county shall, under such authority, become indebted, the whole state, not in its corporate capacity, but in its real and substantial body, as composed of citizens and their local communities, will, in substance and in fact, be indebted, and that the power to involve a single county, and each in succession, in debt, being a power to involve every county, and therefore the whole state, in debt, the restriction upon the power to authorize a debt on behalf of the state wholly fails of its purpose of protecting the state and its citizens from unnecessary and oppressive burthens, and becomes utterly vain and nugatory, unless it be applied to the power of authorizing a debt on behalf of the local communities, as well as on behalf of the whole state; that the facility with which a legislative act deferring to the majority of the local community, the question of imposing a local debt may be obtained, the great number of such acts recently passed, the strong feel-

ing already extensively manifested, and every day increasing, to extend this species of legislation to every county, any portion of whose citizens may expect advantage from its exercise, and the powerful motives and obvious opportunities which are necessarily offered for deluding, or at least misleading, a portion of those who are to pass upon the question, evidence a rapid progress towards the involvement of a large portion, if not the whole of the state, in a debt more extensive, and in taxation more burthensome and oppressive, than any which even without this restriction would probably be imposed by direct legislation upon the whole state, and certainly more so than could be expected to be sanctioned by a majority of the voters either of the whole state or of the several counties, under a certain prospect of immediate and continued taxation, by which the debt should be discharged in thirty years; that this progress cannot be checked, nor its ruinous consequences avoided, unless the constitution can be interposed to protect the commonwealth and her citizens and their property against this species of legislation. And it is claimed, that in order to protect the rights of the citizen from this power of local taxation, authorized by the legislature without actual responsibility, and exercised, in fact, by an irresponsible local majority, every provision and principle of the constitution which can reasonably be brought to bear upon the subject, should, instead of being strictly construed, be construed liberally, according to its true spirit, and for the effectuation of its real objects; that every citizen has a right to such a construction of the constitution under which he lives, and may demand such a construction from this court as the ultimate expounder of the constitution and the final arbiter and guardian of the rights which it secures; and that as the provision in question, if confined, according to its letter, to a debt to be contracted in the name of the state, would fail to effectuate its manifest and substantial objects, and would be subject to evasions which reduce it to a mere shadow,

this court is bound to give it a substantial operation by applying it to such legislative acts as authorize the creation of a debt by any organized portion of the state, as well as to such as authorize a debt to be contracted on behalf of the state itself. And it is urged in behalf of this construction, that if the legislature may, under the specious form of referring the question to a majority of the voters of a county, authorize a county debt for a work of internal improvement, as in this case, there is nothing to prevent the exercise of such a power for the promotion of every object which a majority of the county may be persuaded is advantageous to them, and the property of the minority may be thus subjected, without restriction or control, to the will and the interest of an irresponsible majority.

We have stated this argument fully and in all its strength, because all of us regard it as entitled to the gravest consideration in a case coming up properly within the operation of the present constitution; because, independently of its direct bearing on the constitutional question, it exhibits most forcibly the objections to a species of legislation peculiarly liable to abuse, and to an unjust and oppressive operation upon portions of the local communities to be affected by it; and because it shows that, if carried to excess, this legislation may produce an indebtedness as burthensome to the citizens of the whole state as that against which the thirty-sixth section certainly intended to guard the commonwealth.

But all power is subject to abuse. A demonstration of the evil consequences to flow from the abuse of a particular power does not demonstrate the non-existence of that power. And the fact that, if the legislature may authorize any one county to contract a debt, it may give like authority to every county in succession, whereby all parts of the commonwealth may be involved in debt under legislative authority, does not prove either that such consequences will follow, or that a debt contracted on behalf of any one

2. "A demonstration of the evil consequences to flow from the abuse of a particular power, does not demonstrate the non-existence of that power." The 36th section of the 6th article of the present consti-

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

tution can have
no application
to debts of coun-
ties created be-
fore its adop-
tion. The dis-
tinction taken
in the new con-
stitution   be-
tween debts of
the   common-
wealth    and
debts of a coun-
ty or counties is
broad and pal-
pable; though
the    question,
whether   that
section does or
not in its spirit,
apply to coun-
ties as well as
the    common-
wealth, is not
decided; as, if
the act in ques-
tion was valid
under the old,
it is not invali-
dated by the
present consti-
tution.

county or on behalf of any number of counties in
succession, each acting for itself and on its own re-
sponsibility, will constitute a debt contracted on be-
half of the commonwealth. If the thirty-sixth sec-
tion applies to a debt to be contracted on behalf of a
county, then no future legislative act could authorize
such a debt for the erection of a court house, or bridge,
or for any other necessary local object, unless upon
the conditions prescribed in the section. And if it is
to be applied to future action under the authority of
legislation prior to the adoption of the new constitu-
tion, then, as no prior legislation conforms to the re-
quisitions of the thirty-sixth section, no county debt,
for any purpose however pressing, could be contract-
ed without new legislation conforming to those requi-
sitions. But the clause in question applies in terms
to a debt contracted on behalf of the commonwealth
as a distinct corporate body. And the distinction be-
tween a debt on behalf of the commonwealth, and a
debt or debts on behalf of one county or of any num-
ber of counties, is too broad and palpable to admit of
the supposition that this latter class of debts was in-
tended to be embraced by terms specifically desig-
nating the former only. And while the past experi-
ence, which is referred to in the argument, may have
indicated the necessity of imposing a check upon the
facility of contracting debts on behalf of the com-
monwealth, it may well have been deemed unneces-
sary to place a similar restraint upon the legislative
power of authorizing a county debt, from the past ex-
ercise of which no great evil had been experienced,
and for the future exercise of which there would be
no probable motive on the part of the legislature, but
in view of the manifest wishes, or obvious necessities
of the local community to be affected. The journal
of the debates of the convention, pages 786–7, adds
some corroboration to the inference that the thirty-
sixth section was not intended or supposed to embrace
counties.

We do not, however, regard it as necessary now to decide, and we do not decide, whether the thirty-sixth section of the second article might not be construed as embracing in its spirit a county as well as a state debt; because that section refers plainly to future and not to past legislation, and the act authorizing the subscription to this railroad by the county of Mason, was passed before the adoption of the present constitution. If the act was valid under the former constitution, it was not invalidated by the subsequent withdrawal or restriction of the power to pass similar acts in future. A mere restriction upon the future exercise of an acknowledged legislative power does not of itself affect any act already done under a valid exercise of that power, nor necessarily impair any right or authority conferred by it. Such restriction operates upon the legislative power as afterwards to be exerted, and not upon any past exertion of it; and certainly it should not be made, by construction, to defeat any valuable right or interest previously vested under a valid legislative act. If it were even conceded that the thirty-sixth section does not merely restrict the legislative action, but might be understood as also prohibiting the future creation of a debt under legislative authority conferred by valid act prior in date to the new constitution, still it could not be admitted that, in the absence of express terms to that effect, such construction should be made in a case in which rights vested under the previous law would be defeated by such construction; and especially when the new constitution itself (first section of schedule,) expressly saves not only all existing laws not inconsistent with itself, but also all existing rights and contracts of individuals and corporations. Whatever then might be the case with respect to a mere naked power or right conferred upon the citizens of a county to create a county debt by vote of a majority, which, until exercised, would probably be subject to revocation even by the legislature, the twenty-eighth section of the act incorporating the Maysville and

Lexington railroad is not to be regarded as a separate and independent act, having for its only object the granting of this power, but as part of a charter containing the terms on which individuals and communities are invited to become members of the proposed corporation, and to invest their funds and incur liabilities for the construction of a road which the legislature considered as an object of great utility and importance. And the power conferred upon counties and cities by the twenty-eighth section is not only one of these terms, but must have been intended to operate, as it must in fact have operated, as an essential inducement to individuals to subscribe for stock in the corporation, which would probably have been deemed wholly incompetent to the accomplishment of its proposed object, and would, therefore, have attracted no individual subscriptions, and would have thus failed *in limine,* had it not been for the prospect of aid from city and county subscriptions under the authority conferred by this twenty-eighth section of the charter. Before any actual interest was acquired under this charter, the whole and every part of it was subject to repeal or modification. But as soon as individuals had subscribed and expended their money on the faith of the charter, valid at the time, and of this twenty-eighth section as a part of it, and at any rate as soon as by these means the company was organized in pursuance of the act of incorporation, there was an interest in the execution of the power which made it irrevocable by mere legislative act; and the entire charter assumed the character of a contract, conferring rights which, if not protected against impairment even by an express provision of a constitution subsequently adopted, are protected by the first section of the schedule, which, expressly declaring that all rights and contracts of individuals and corporate bodies shall continue as if the said alterations and amendments (of the former constitution) had not been made, repels every unnecessary construction and implication to the contrary.

True, it is not expressly shown, nor is it denied, that prior to the adoption of the present constitution in June, 1850, private subscriptions, without which the company could not have been organized, had been made on the faith of this charter; yet, as it seems probable that this was the case, and because it may have been the case, it should not in the absence of allegation and proof be assumed that it was not so, if the validity of the charter and of acts done in pursuance of it, were to be thereby subjected to a test which did not exist when it was enacted, and to be defeated because they did not conform to a requisition not existing at the date of the act of incorporation, and which, at most, is of doubtful application to that act. Upon principles of justice and general expediency all laws, including constitutional, should be prospective. They are presumed to have been so intended, and are construed accordingly, unless a retrospective operation is clearly indicated.

There is no such urgent reason for giving to the provision a construction which shall make it overreach and repeal acts previously passed, or invalidate rights acquired under them, as there might be for construing it to apply to all future acts which come within its principle, though not within its letter. And as the constitutional provision plainly refers to future and not to past legislation, and as the subscription for the county of Mason, which imposed the debt on that county, was made under a prior law and in pursuance of it, the validity of the debt is not to be tested by the constitutional provision referred to, but by the principles and provisions of the former constitution under which the act authorizing it was passed.

The amendatory act of February, 1851, though passed after the adoption of the new constitution, does not come within the provision which has been noticed, because the debt had already been created and was obligatory upon the county, if the first act was valid, and it was too late, and in fact was not proposed, to put the question to the vote by the new

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

3. Principles of justice and general expediency required that the provisions of the new constitution should have a prospective and not a retroactive operation, unless otherwise clearly indicated, which is not the case here; and the case is to be decided upon the principles and provisions of the old constitution.

4. The act of February, 1851, amendatory of the act for organizing the railroad company, conferred no new authority upon the county court,

SLACK, &o.
vs.
MAYSVILLE AND
LEXINGTON R. C.

and if valid un-
der the old is
not invalidated
by the new con-
stitution.

law. Moreover, the first act under which the debt
was created, gave full power to the county court to
provide for its payment either by taxation or by bor-
rowing the money, which, of course, implied the pow!
er as it did the necessity of furnishing some evidence
of indebtedness; and the court might, doubtless, have
issued the bonds of the county in some form to the
lender. If, without the amendatory act, the court, in-
stead of borrowing the money upon these bonds in
order to pay the subscription to the company, had,
with the consent of the company, transferred them to
it at once in payment, we do not perceive that the
original power would have been thereby materially,
if at all, departed from, or that the proceeding would
have furnished any just ground of complaint to the
citizens of the county, and much less a ground of
constitutional objection. And this conclusion can-
not be affected by any opinion which the company
which procured the amendatory act may have had on
the subject. That there might be a question as to the
power, sufficiently accounts for the passage of the
second act. It is difficult to see that the amendatory
act confers any new substantive power upon the
county court. And its passage, if necessary for con-
ferring power, seems rather to have been necessary
to authorize the company to receive the bonds in pay-
ment, than to authorize the court to make payment
of the subscription in that way. It seems to us, that
instead of being injured, the county and its citizens
were obviously benefitted by the arrangement, which
enabled them to pay off the county subscription at
par in bonds payable in thirty years, leaving them in
the meantime subject to the payment of the interest
by such taxation as might be necessary. Whereas,
without such arrangement the county must have met
the current calls upon the stock by heavy taxation,
or the money must have been raised upon its bonds
on whatever terms it could be done. In that case,
too, any loss upon the bonds must have fallen upon
the county, which must have made up full payment

of the stock subscribed; whereas, now, the loss falls on the company alone, and the county and its citizens will only feel it as stockholders in the retardation of the work, or in the ultimate profit to be derived from the stock, which, however, seems to be counted as nothing by the complainants. It is to be observed, too, that if there is no guaranty against the sale of the bonds at a sacrifice by the company, neither was there any in case of a sale by the court—that it cannot be assumed that the company, having an actual interest to the whole extent of the bonds, will be more willing to sacrifice them unnecessarily than the county court would have been; and that the bonds will probably be more vendible with the indorsement of the company, rendering liable all their means, than they would be if standing on the credit of the county alone. The idea that the county bonds might command a premium in the market had not then been conceived as probable, nor is it yet sanctioned by experience. And whatever repugnance the complainants may feel to becoming stockholders in this corporation, we suppose the certificates for payment of the tax will not prove actually injurious, and they may at some time, if not now, command a value in the market, which will aid in making future payments, or in reimbursing those previously made. There is no complaint with respect to the slight difference between the original and amendatory act, with regard to the stock acquired by tax-payers being or not being taken from that subscribed by the county. And upon the whole, we are satisfied that if the original act is valid, and the subscription of stock by the county court obligatory, no substantial objection can be made to the amendatory act. And being of opinion that, even if the twenty-eighth section of the original charter might have been deemed a violation of the thirty-sixth section of the present constitution, if it had been enacted since its adoption, it was not, as a pre-existing law, abrogated by that instrument, we proceed to consider the question, whether the

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

5. All the legislative power of the commonwealth, is, by the constitution, vested in the legislative department of the government, subject to no restraint except such as is imposed by the fundamental law, its own wisdom and responsibilities. It carries the law into effect by extrinsic agencies, by the executive alone, or in conjunction with the judicial; or it may create other agencies, as is done when the object is to accomplish local or individual purposes— as county courts, trustees of towns, &c.

twenty-eighth section of the charter violates the constitution existing at its date, either in the nature and extent of the power assumed or granted by it, or in the manner in which it was directed to be exercised.

III.  It would be difficult, perhaps impossible, to define the extent of the legislative power of the state, unless by saying that so far as it is not restricted by the higher law of the state and federal constitutions, it may do every thing which can be effected by means of a law.  It is the great supervising, controlling, creative, and active power in the state, subject to the fundamental restrictions just referred to.  Whatever legislative power the whole commonwealth has, is, by the constitution, vested in the legislative department, which, representing the popular majorities in the several local divisions of the state, and under no other restraint but such as is imposed by the fundamental law, by its own wisdom and its own responsibilities, may regulate the conduct and command the resources of all, for the safety, convenience, and happiness of all, to be promoted in such manner as its own discretion may determine.  The legislative department performs and finishes its office by the mere enactment of a law.  It does not of itself carry the law into operation.  This is necessarily done by extrinsic agencies.  The law being made known, may be universally observed or obeyed.  It may be carried into operation by the executive alone.  It may be enforced by the judiciary, or by the co-operation of the judiciary and the executive.  These are the regular agencies provided by the constitution for the execution of the laws.  But the legislature is not restricted to these agencies.  It may select or appoint others, as is often done, when the object of the law is to accomplish local or individual purposes.  The agency generally employed for applying the legislative will and the power of the government to purposes merely local, has been that of county courts for counties, and of the trustees of towns or the municipal authorities of cities for towns or cities; which, to the

extent of the powers permanently or temporarily vested in them, and whether allowed a discretion or not, do but carry into effect the legislative will and power. But these local agencies are selected and some of them created by the legislature itself, for the purpose of carrying its power into all parts of the commonwealth, or into such parts as require its application for their benefit or coercion. And the legislature may select other agencies for particular purposes, having in view, as it must be presumed to have, the nature of the object to be accomplished and the fitness of the agency selected.

It is not essential to the character and force of a law, that the legislative enactment should, itself, command to be done every thing for which it provides. The legislative power to command a particular thing to be done includes the power to authorize it to be done. The act done under authority conferred by the legislature, is precisely as legal and valid as if done in obedience to a legislative command. Each is entitled to the same force and efficacy, and each must be followed by all the consequences which, either by the general laws or by the particular statute, are annexed to the particular act, because each is done in effectuation of the legislative will, and each, when done according to that will, has all the sanction which the legislative power can give. Each is, therefore, entitled to the aid of the whole power of the government to uphold it, and to maintain the rights flowing from it. A peremptory statute is at once mandatory and requires obedience, and thus is at once a perfect law in all respects. A statute giving authority and discretion to do or not to do, and prescribing the consequences of the act when done, has not, until the act is done, any mandatory effect requiring immediate obedience, except so far as it regulates the time and manner of doing the act, and expressly or impliedly commands that the agent shall not be prevented from doing it according to the discretion allowed. Beyond this it has not a mandatory effect un-

6. Legislation is sometimes mandatory, sometimes permissive. The act done by permission is as valid as if done in obedience to a command, having all the sanction which legislative power can give; and rights acquired under the one, just as much entitled to protection as those acquired under the other.

til the act is done, and therefore is not, until then, a perfect law as to all the purposes provided for. In other words, it does not take its final effect as a mandatory law until the discretionary act is done upon which it is to have its final and peremptory operation. So far as such a statute confers authority and discretion, it is as obligatory from the first as the legislative power can make it. And although its further practical efficacy may depend upon the discretionary act of some other body or individual, it is not derived from that discretion, but from the will of the legislature which authorized the act and prescribed its consequences. The constitutional validity of a statute, whether peremptory or otherwise, does not depend upon the form of the enactment, nor, as we suppose, upon the particular agency to which authority is given, where none is prescribed by the constitution, but altogether upon the nature of the act authorized to be done, upon the mode in which it is to be done, and upon the effect which the act itself, or the manner of doing it, and its prescribed consequences, may have upon the rights of individuals or corporations.

In enacting a statute which merely authorizes a particular thing to be done in a particular manner, and prescribes the consequences, the legislature determines peremptorily the manner of doing the act and its consequences when done. It determines conditionally, and upon such information as it possesses that the act is in its nature proper and convenient, and the prescribed consequences such as ought to attend it. But as there may be circumstances known to those concerned, which would render the act, in its consequences, oppressive or otherwise unacceptable, the legislature defers to them or to their agents, or to such agency as it may select, the right of determining, in view of all the facts, whether the act shall or shall not be done. Instances of legislation of this character, which, as it is not altogether peremptory, may be called conditional, are too nu-

merous in our legislative history, and as we suppose in that of every other government, to require or admit of particular enumeration.

The legislature of this state has habitually passed statutes either requiring the county courts of all the counties, or of some designated county or counties, to do a particular act—as to levy a limited tax for a certain purpose, or authorizing them to do it—and the validity of the statute has never been supposed to depend, in any degree, upon the question whether it was mandatory or merely gave authority. The same may be said of the legislation with respect to the municipal corporations of towns and cities. With respect to private corporations, also, there may be and has been permissive legislation, to become peremptory upon acceptance of the statute by the corporation, or upon its performance of some act as to which it has a discretion. And the same may be and has been done in cases of authority given to individuals by legislative act. It is no objection to the constitutional validity of such statutes that they depend, for their final effect, upon the discretionary acts of individuals or others. The legislative power is not exercised in doing the act, but in authorizing it and in prescribing its effect and consequences. The case of an ordinary act incorporating a private company fully exemplifies these positions. The legislature determines that a corporation, for the accomplishment of a particular object or the performance of particular operations or business, would be beneficial or expedient. It provides for the manner in which such a corporation may be brought into existence, prescribes the terms on which there may be a corporation, its mode of organization, and its rights, powers, and duties, when organized. But whether the corporation shall ever actually exist, and whether the statute, so far as it prescribes its rights, powers, and duties, shall have any practical operation according to its terms, depends wholly upon voluntary acts of individuals in subscribing stock or performing such other acts as

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

7. Legislative acts giving the power to create corporations upon the performance of particular acts by individuals, when those acts are performed, assume the character of binding contracts, which the legislature cannot impair.

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

may be necessary to bring the corporation into existence. And yet, when the requisite acts are done, the statute is absolutely obligatory not only upon those who have complied with its terms, and thus formed the corporation, but upon all others. And it is even more obligatory upon the legislature than ordinary statutes, because, when subscriptions are made under it, or other requisites performed whereby it becomes a corporation, the charter becomes a contract, the obligation of which the legislature cannot impair. Then a statute is not the less a law, emanating from the legislative power, and clothed with all the sanction which legislative authority can give, because its final effect or efficacy may depend upon the discretionary act of an individual or individuals. And so far as the legislative power extends to the imposition of local burthens, we do not perceive that the mere form in which it is exerted in the particular case, as being peremptory or in part permissive only, can affect the validity of the statute, unless the legislative power be in fact exceeded, or the rights of individuals be violated in its exercise.

8. The power of the legislature to impose local taxation for the accomplishment of local purposes cannot now be denied. It is deducible from the general powers of the government, not however to be exercised by any portion of the people without legislative consent, and except under legislative authority; and it is no objection to the mode of exercising that power that it is referred to the

That the legislative power of the commonwealth is competent to the imposition of local burthens or taxation, for the accomplishment of local purposes, has not been and cannot now be denied. There is and must be a power in the state competent to coerce the contribution of local means to objects of local necessity and convenience, or the local community must do without them, or must depend upon individuals for them, or they must be provided for by the general resources of the whole state. The power to coerce local contributions for such objects being established by general usage, and by the apparent justice and propriety of the thing, and being deducible from the general powers and duties of the government, it belongs primarily to the commonwealth as a legislative power inherent in it, and which cannot be exercised by any portion of the people, whether in an organized or unorganized form, without the consent of all who

are to be subjected to it, except so far as such portion of the people may be authorized by the legislative power of the commonwealth to act upon the subject with obligatory effect. The majority of the local community having no inherent right to bind the minority with respect to these local impositions, can communicate no power on the subject to the legislature. But the legislative power might, in any particular case, be invoked, and actually exerted upon the statements of the representative from the particular county, or upon the petition of any number of the citizens of the county; and an enactment peremptorily ordering the contribution or tax, and providing for its application, would not depend for its constitutional validity upon the question whether it had been passed upon the petition of a majority or of less than a majority of the citizens to be affected by it, or without a petition from any, and upon the statements and solicitation of the county representative, or merely upon the general knowledge and judgment of the legislature. It is, indeed, scarcely to be apprehended that the legislature, unless in some case of most obvious necessity and propriety, would ever, upon its own mere will and judgment, against the consent of the local representative and without petition from the community to be affected, impose an onerous tax for new and extraordinary purposes. When the object to be accomplished by a local tax is one of mere convenience, or which, though obviously promotive of the general advantage and prosperity of the local public, is not one of absolute necessity or of pressing importance, there is an obvious fitness in providing, before the legislative act should become imperative and the imposition be irrevocable, some means by which the general judgment of the legislature, as to its importance and as to the propriety of accomplishing it by a local tax, should be confirmed by that of the local community which is to receive the advantage and to bear the burthen. But if the legislative power be competent of itself to impose the lo-

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

consent of those to be affected by its operation.

cal burthen, such reference to the local will or judgment, though a fit measure of precaution in point of expediency and discretion, cannot be essential to the constitutional validity of the legislative act by which it is done. And, therefore, it can be no valid objection to an act making such reference, that it has not adopted the very best means of ascertaining the will and judgment of those who are interested in the subject.

9. Where a decision of a question is referred to the popular vote, it is fair to take the decision of the majority of those who do vote as decisive of the question, and that those who did not vote acquiesce.

If because, in such a case, the final efficacy of the legislative act, and the actual levy of the tax, depend upon the result of this local reference, it may be said that the tax is in fact levied by those who make the decision in favor of it, and that in this instance it should have been determined by a majority of all the qualified voters, and not merely by a majority of those who voted; it is answered, that when the question is submitted to the majority of those who vote, and full opportunity of voting upon it is given to all, it is in fact submitted to all; and if the reference be otherwise valid, the decision of a majority of those who vote is the decision of a majority of all who are entitled to vote. This is the governing principle in all popular elections under both the old and the new constitutions; and would govern this question in the case, even if the thirty-sixth section of the new constitution were applicable to it. And although that section requires that the vote to which it refers shall be taken at a general election, there is nothing in the former constitution which can be construed as making a similar requisition. We have already said that it is not shown that there was any unfairness in taking the vote, or any advantage sought or obtained in fixing the time for it. The length of time for which notices were required and given, and their publicity, the small size of the county of Mason, the density of its population, the number of its towns and roads, and the convenience of voting afforded by its precincts, leave no room to doubt, and especially in the absence of all evidence to the contrary, that full opportunity was

intended to be given, and was in fact given, to every voter to know of the time of the election, and to go to it if he chose.  The fact that there was a large opposition to the tax, on the ground that it was oppressive and unconstitutional, strengthens the presumption that all were apprised of the intended vote who felt, or could be made to feel, any interest in it, and that all voted who desired to do so.  We may add, that the new constitution itself, in providing for its own adoption or rejection by the people, did not require either that the vote should be taken at the time of the usual elections, or that a majority of all the qualified voters in the state must vote for it in order to secure its adoption.  But it assumed, as we do in this case, that the majority of the actual voters expressed the will of the majority of all entitled to vote, and was therefore sufficient to determine the question for the entire state.

The considerations which have been mentioned bear also upon the objection that the call for the vote was made by the president and directors of the railroad company, and the day fixed and the notices advertised by them and not by the county court, or some other body or officer whose duty it was to guard the interests of the county.  We remark further, that the notice being authorized by the statute, and advertised as directed, must have been as effectual for the purpose of diffusing a knowledge of the time and subject of the vote, and of its consequences, as if made by the clerk or court of the county; that it was not the intention of the legislature to subject the county of Mason to the burthen proposed, or to authorize the majority of the voters to subject it, unless it should be necessary for the construction of the road—of which the officers of the company would be the best judges—and that there is no substantial difference between requiring the county court to fix and advertise the time of the vote upon application of the company, and authorizing the company to do it themselves, unless it may be in regard to fixing the time;

<div style="margin-note">
SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

10. It is no objection to the validity of a vote for imposing a railroad tax, that the power was given to the president and directors of the company to designate the time of taking the vote, instead of the county court.
</div>

and that it is not shown that any injury accrued to the complainants, or to any others, by allowing the company to fix the time, or by the time being fixed as it actually was. It may be that the vote would have been larger than it was, if it had been taken in May or August. But we cannot assume that the result would have been different, or more satisfactory to the complainants. And we do not understand that any of those who did not vote complain that they had no opportunity of voting.

11. It is not a valid objection to a railroad tax, otherwise legally imposed, that the taxpayers are made stockholders to the extent of the taxes paid by them. (11 *B. Monroe*, 143; 9 *Ib.*, 526.)

With regard to the mode in which this contribution is to be made—viz: by the subscription of stock in a private corporation—the question of legislative power, and of the validity of such subscription, and of the tax levied for its payment, are settled by numerous legislative precedents under which many counties have, through their county courts, subscribed and paid for stock in turnpike companies making roads through their counties, and which were sanctioned, directly, by the opinion of this court in the case of the *Justices of Clarke county* v. *The Paris and Winchester Turnpike Road Company*, 11 *B. Monroe*, 143, and, substantially, in the case of *Talbot* v. *Dent*, 9 *B. Monroe*, 526; which last case also meets the objection that the complainants are made stockholders individually against their will. If the legislature could direct or authorize a coercive contribution from the county of Mason for making the railroad which runs from Maysville to the opposite limits of the county, and thence to Lexington, there must of necessity be agents to receive and disburse the money, lay out the road, make contracts for its construction, and superintend the work. And the principle of this feature of the act and of the precedents of a similar character is, that the legislature adopts for this purpose the agency of a corporation created by itself for the very purpose of making the road, under such guards as were deemed necessary for the safety of its funds and the due execution of the work, and which, by having invested its own funds in it, has an interest as well as

a duty which entitles it to a reasonable degree of confidence. Though the corporation is technically a private one, the work in which it is engaged may be one of public utility and importance. It is upon this ground that turnpike and railroad companies are authorized to take, upon making compensation, the land of individuals for the use of the road, as for a public use. And we do not doubt that the legislature may use their instrumentality for the application of such local contributions as may be properly coerced for the construction of the works in which they are engaged. And although there is no express provision in the original or amended charter requiring the $150,000 subscribed by the county of Mason to be expended within her limits, it appears that it is not nearly enough to complete the road to that extent, and there is a sufficient guaranty in the interest and influence of Maysville, which seems to be the principal seat of the company, and in the interest of the company itself, that a sum more than equal to the county subscription will be expended within the county. If it be essential that the same, or an equal sum be there expended, it cannot be essential that it be the identical money drawn from the people of Mason.

Whether this road is an object of such a character as that the legislature may constitutionally require a tax or contribution in aid of its construction from the counties through which it passes, or from the county of Mason at whose county-seat it commences, is a question on which, as on every question involving the exercise of the taxing power undoubtedly belonging to the legislature and scarcely capable of definite limitation, a judicial tribunal must, as this ever has done on similar questions, feel great embarrassment. It is essentially a question of fact and opinion, referring itself in a peculiar manner to the discretion and judgment of the legislative department, to which alone the power of taxation belongs, and by whose will alone its coercive exercise can be authorized. We avow, as this court has heretofore done, that

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

12. The power of the legislature to impose local taxation for local purposes is fairly recognized, and its abuse consists "in a palpable and flagrant departure from equality in the burthen imposed upon the persons or property bound to contribute; or it must be apparent that persons or their property are subject to a local burthen for

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

the benefit of others, or for purposes in which they have no interest and to which they are therefore not justly bound to contribute." (9 B. Monroe, 330 to 341.) This court cannot say that there has been any such abuse of power in the present case; nor that "there has been any greater abandonment of legislative will," than if the question as to the imposition of the tax had been referred to the county court.

we regard the power of local taxation, and especially when exercised or controlled by the local majority, as one eminently subject to abuses involving injustice and oppression. But now, as heretofore, we find no clause or principle in the constitution which can be brought to bear directly in restraint of this power, but that which declares that no man's property shall be taken for public use without his consent, unless just compensation be first made. This principle of the constitution may be violated under the pretence of levying a tax, and under color of the taxing power. But it is not every inequality which may occur in the operation of a tax apparently equal, nor every difference of opinion upon the question whether a particular tax should be local or general, or whether it has been confined to too small or extended over too large a portion of people and territory, or whether the object to be accomplished by the tax is one of local or general importance, or whether the tax will fall upon individuals in the proportion in which they are actually interested in its object: it is not every difference, nor, where there can be an honest diversity, is it any mere difference of opinion upon these points, that will justify the interposition of the judiciary to arrest the operation of a legislative tax on the ground of this principle of the constitution. If it would, the discretion and substantial power of taxation, properly inherent in the legislature, would, in effect, be transferred to the judicial department, or be so subjected to its control, as to change the character of the power itself, and defeat the ends for which it was invested in the representatives of the people. Perfect equality of taxation is unattainable, and could not be secured even if the judiciary were to take part in forming the laws which impose it. And the other points above referred to, are so emphatically and exclusively the subjects of legislative judgment and discretion, that when it may be assumed that these have been fairly or actually exercised in the imposition of a tax,

there can scarcely be a possible ground for judicial interposition.

For a fuller statement and illustration of our views upon this subject of local taxation, and of the application to it of the constitutional principle which has been stated, than can be made in this opinion already greatly protracted, we refer to the case of *Chaney* v. *Hooser*, 9 *B. Mon.* 330, and especially to that part of the opinion extending from page 341 to page 346. In that opinion, the court, referring to the wide range of legislative judgment and discretion on the whole subject, say that, with respect to the objects for which the tax, local or general, may be enforced, it would seem to be conclusive. (*p.* 344.) And on page 345, it is said that the limit imposed by this clause of the constitution "can only consist in the discrimination to be made between what may, with reasonable plausibility, be called a tax, and for which it may be assumed that the objects of the taxation are regarded by the legislature as forming a just compensation, and that which is palpably not a tax, but is, under the form of a tax, or in some other form, the taking of private property for the use of the public, or of others, without compensation." That "there must be a palpable and flagrant departure from equality in the burthen as imposed upon the persons or property bound to contribute, or it must be apparent that persons or their property are subject to a local burthen for the benefit of others, or for purposes in which they have no interest, and to which they are therefore not justly bound to contribute;" and that "the case must be one in which the operation of the power will be, at first blush, pronounced to be the taking of private property without compensation, and in which it is apparent that the burthen is imposed without any view to the interest of the individual in the object to be accomplished by it."

These positions rest upon the assumption that the legislature, in imposing or authorizing local taxation, exercises its own judgment and discretion, and ex-

presses its own will under its own proper responsibilities; and resting upon that basis, we are still of opinion that they should not be departed from. Indeed, they may be said to have been sanctioned by the convention which formed the new constitution, if not by that instrument itself, since although they were announced before that body met or was elected, and under an avowal of the dangerous tendency of the power of local taxation, the new constitution contains no new restriction upon it, unless it be contained in the thirty-sixth section of the second article to which reference has already been made.

But other principles of the constitution are invoked, and especially the great principle upon which the whole fabric of our government and laws is based: that our government is a regularly organized representative republic, of which every department has its own proper functions which it is bound to perform upon its own proper responsibility; that the great security which the people, and especially the minority, have against the oppressive abuse of power, consists in the regular action of each department in its own sphere and under its own appropriate responsibilities; that under this constitution and frame of government, a majority of the whole people cannot act upon a single individual, but through the regular organs appointed for the exercise of the governmental power; that a majority even of the whole, and consequently and more certainly a majority of any of its organized parts, have no power, except through a legislative enactment, to impose a tax or any burthen upon the minority, or any individual, without their consent; that every individual in the state has a right to look to this principle, and to the regular action of the government, for the protection and security of his rights; and it is contended, that in the act in question, in referring the imposition of the tax to the will of a majority of the county, the legislature has violated this principle, has surrendered its own discretion and judgment, and thrown off or evaded its own responsibility, and

has invaded and destroyed the rights of individuals and of the local minority, by subjecting them to the will of a local majority, acting under no responsibility but such as their own interest may impose; and that the obvious and necessary tendency of such legislation, is to change and pervert the whole character of our government, to destroy its unity, to overthrow its guaranties and barriers against oppression, to erect the several counties into absolute and unrestricted democracies, and thus to subject the citizen to an arbitrary power unknown to the constitution, at war with its principles, and utterly destructive of the rights which it intended to secure.

We admit the general correctness of the principles thus stated as applicable to the assumed character and spirit of this legislative act, and none can deprecate more than we do the character and consequences of such legislation. But were it admitted that, in case of such reckless legislation as is supposed, this court could apply the corrective to a wanton disregard of duty and responsibility, and thus check an evil, the permanent existence of which, to any great extent, in the representative body, would demonstrate a fatal degeneracy in the constituency by which it is chosen, still we could not assume, upon the face of this statute, that the legislature did not exercise its own discretion and judgment under a proper sense of responsibility, and that it did not determine for itself, and upon due deliberation, so far as such determination was necessary to justify the authority given by the act, both as to the character and importance of the road, as justifying the local burthen imposed, and as to the just extent to which the burthen might be imposed. And under the principles settled in the cases above referred to, and adopted in this opinion, we cannot say that there is such a flagrant abuse of legislative discretion on these questions, or such a flagrant departure from equality or justice, as would authorize the court, on these grounds, to pronounce the act unconstitutional. The reference of

the question, as to the execution of the authority giv-
en and the consequent imposition of the tax, to the
popular majority of the county, may have been, and
as we should in deference to the legislature assume,
in fact was resorted to as a means of ascertaining
with greater certainty, and in a more satisfactory
manner, the expediency, in point of time and circum-
stances, of giving final effect to the legislative act.
And although such legislation may be resorted to as a
means of evading the responsibility of direct and
peremptory action, and of surrendering or avoiding
any exercise of the legislative judgment and discre-
tion with respect to the objects to be accomplished,
and the manner of accomplishing them, we are not
authorized to assume as the ground of judicial action,
that it was so in this case.   Nor do we perceive that
there is any greater abandonment of the legislative
will and discretion, necessarily to be implied, in re-
ferring this question, as to the execution of the au-
thority and the final imposition of the tax, to the ma-
jority of those who are to bear it, than in referring it
to the county court, or the trustees or council of a
town or city.  In the case of the *Justices of Clarke Coun-
ty, supra,* the objection was, that the authority to im-
pose the tax was given to a body which was not elect-
ed, and did not represent the people of the county.
In this case it is contended that the reference should
have been made to the county court, and that the dis-
cretion as to the execution of the law should have
been confided to that body.   And it is contended,
that this case is materially different from that, and also
from the case of *Talbot* v. *Dent,* in which the charter
of the Louisville and Frankfort railroad, and the au-
thority therein conferred to levy a tax, came in ques-
tion, in the fact that, in each of those cases, a discre-
tion was vested in the regularly constituted local au-
thorities to execute or not to execute the law.   To
this we answer, in the first place, that it was by virtue
of legislative enactments that these local tribunals
had any authority on the subject, and the question to

what body such authority may best be committed is primarily and chiefly a legislative question; and in the second place, that although, in the charter of the Louisville and Frankfort railroad, there is an apparent discretion in the council of Louisville to submit or not to submit the question of the subscription and consequent tax, to the voters of the city, yet, as the city council was in fact a body annually elected by the same voters, and must, in a short time, have been coerced into an exercise of discretion conformable to the will of their constituents, there is scarcely a shade of distinction between that case and this on the ground of the discretion vested in the city council. And further, we may again refer to the thirty-sixth section of the second article of the present constitution, as sanctioning the principle that the final effect of a law imposing a public debt, and consequent taxation, may be referred to the qualified voters who are to bear the burthen, without violating the principles of the government. And it is to be remarked, that it does not secure those who may be opposed to the imposition, either from the votes of those who have greater or less interest in the object to be accomplished than themselves, or of those who, having no property, may be supposed to have no interest in the question of taxation; nor does it secure any from the delusive expectation that the profits of the proposed undertaking will soon equal or exceed the tax, or make the burthen insignificant in comparison with the advantage to be expected in the enhancement of their property and business. In addition to this, there are numerous examples of legislative acts, by which the power of determining upon local taxation has been communicated substantially to portions of the local community, to be exercised by a certain majority of those who are interested, and to become compulsory upon others. We refer to the cases in which a certain portion of the owners of lots in any square are authorized, through the agency of the town or city authorities, to have the adjacent streets and side-walks graded and paved

at the cost of the lot owners, which has been sanctioned by this court. The powers originally given to the inhabitants of school districts to vote a tax, is another example; to which we might add, though bearing more remotely on the subject, the various acts which have referred to the popular vote, questions as to the boundary or creation of counties, and the removal of seats of justice, involving more or less directly an increase or diminution of taxation.

Decree affirmed.

The objection that the city of Maysville, having a peculiar interest in the subject, and a controlling influence by the magnitude of her vote in the determination of the question submitted, ought not to have been united with the rest of the county in submitting the question of the county subscription, is, as we think, covered and met, so far as it is intended to be a constitutional objection, by the views already taken in this opinion. And although in this and some other respects, we greatly doubt the propriety and justice of the act in question, and of the proceedings which it authorizes, yet, in view of the precedents to which we have referred, of the indefinite character of the taxing power, of the right of the legislature to change and regulate the local organizations of which the state is composed, and to judge of and provide for their local interests and necessities; and in view of the respect necessarily due to the legislative department, forbidding the assumption that it has acted without a proper consideration of its own duties and responsibilities, we are not prepared to decide that this act is unconstitutional.

Judge Hise dissents from this conclusion, and will prepare a statement of his own views. But by the concurrence of a majority of the court, the deree is affirmed.

☞ This opinion, as originally written, having been published in the newspapers, it is deemed proper to state that the judges who concurred in it, have, upon consideration, thought it right, before its publication in the regular reports, and, in

order to prevent misconception, to enlarge some of the statements and modify some of the positions pertaining to the preliminary points in the case, but not affecting the conclusion nor the argument upon the question as presented under the former constitution.

*H. Taylor*, *Tho. F. Marshall*, *Chas. Marshall*, and *Menzies*, for appellants; *Robertson*, *Waller*, *Hord*, *Payne*, and *Harlan*, for appellees.

Judge HISE's dissent to the foregoing opinion, entered in Court, June 28, 1852.

1. The twenty-eighth section of the act of incorporation, of the 4th March, 1850, "did not give authority to the company, the county " court, or to a majority of the voters of Mason county actually " casting their votes, either separately or collectively, to execute " and deliver to the company $50,000 annually, or as called for, " in the bonds of the county, in payment of the subscription of " stock." But Maysville and Mason county could only subscribe their stock and pay $2 on each share as other stockholders, and pay the balance as called for, as provided in the fourteenth section of the act of incorporation, by taxation or short loans. This rendered the amendatory act (passed February 17, 1851,) necessary, to authorize the execution of bonds by the county court, payable to the company, and to levy and collect taxes to pay the interest.

2. The twenty-eighth section of act of 1850, contemplated the creation of no permanent indebtedness of the cities and counties named, but that the installments of stock, as the same might be required, should be paid in cash, to be raised as necessary, by taxation, or by loans at short periods. This is manifested by the second section of the act of 1851.

3. Previously to the passage of the amendatory act, the county court had made no order for imposing a tax upon the property of the county, to raise money to pay interest upon thirty-year bonds, to be issued and transferred to the company in payment of stock; and any order of the county court directing the issue of bonds to the amount of $150,000, to run thirty years, was unauthorized by the act of 1850.

4. It does not appear that the requisitions of the twenty-eighth section of the act of 1850 have been complied with, in giving notice of the election, (*see* 4 *Dana*, 433-4,) and consequently the orders of the county court, based thereupon, were invalid.

5. The proposition voted upon was not the true proposition stated in the notice, and consequently any subscription under the vote taken under that notice is invalid.

6. The people have no power, in primary assemblies, to pass any law, unless submitted by special constitutional provision or by legislative authority, when the same must be strictly pursued.

7. If the authority given to Maysville and Mason county *jointly*, to subscribe not exceeding $150,000, is not understood as conferring authority to subscribe *together* the sum of $150,000, or *inclusively*, then the subscription by the county court is not authorized.

SLACK, &c. .
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

8. The authority to subscribe was joint, and in no other way, and the authority of the mayor and council was as necessary to make the subscription as that of the county court; this course not having been pursued, the subscription was invalid.

9. No authority is given by the amendatory act of 1851 to make the interest on the bonds payable in New York, or semi-annually, but yearly.

10. The act of 1851, authorized the issual of bonds by those who should subscribe stock under the act of 1851, and not those who should subscribe under the act of 1850; and as the county of Mason had subscribed seven days before the passage of the act of 1851, it has no authority to issue bonds.

11. Acts of the legislature conferring upon corporations extraordinary and unusual powers, &c., should be strictly construed, and rigidly pursued. (2 *Marshall*, 102; 4 *B. Monroe*, 123.)

12. An act of the legislature conferring the power of taking a vote of counties or cities for the imposition of a tax for railroad purposes, is in conflict with both the constitutions of 1799 and 1850, sections one and two of article one. *It is not a legislative act possessing vitality in itself, but a transfer of the power of giving to it vitality, to a corporation, which cannot be done.*

13. The legislature may not require a citizen to become a stockholder in a corporation against his consent.

14. The distinction between this case and the cases of the *Clarke County Court* v. *The Paris and Winchester Turnpike Road Company, Talbot* v. *Dent, City of Louisville* v. *Hyatt, City of Lexington* v. *McQuillan's heirs*, is this—that in the cases cited, the power to levy the tax to pay debts was delegated to the *regularly constituted local authorities*, not railroad companies, private corporations, or the qualified voters of cities or counties; in this case the power to make the subscription, and levy and collect the tax, or issue the bonds, was delegated to the railroad company and the voters of Mason county.

15. The power of taxation conferred upon local authorities has been extended to its utmost allowable limits.

16. The act of March, 1850, does not stand out as a binding statute, or as having the obligation and force of law, passed from the hands of the legislature; but is a most striking attempt to delegate legislative power to a railroad company, and to a popular majority, unwarranted by the constitution.

17. The twenty-eighth section of the act of March, 1850, is believed to be in conflict with the fourteenth section of the thirteenth article of the present constitution, which prohibits the taking of "any man's property for public use, without the consent of his representatives, and without just compensation being previously made to him.".

18. Private property can no more be taken for private use than for public use. (1 *J. J. Marshall*, 566–9; 7 *B. Monroe*, 167.)

19. The money to be collected under the twenty eighth section of the act of March, 1850, does not assume the character of a tax in any of its ordinary forms.

20. The acts of the railroad company and the voters of the county of Mason, in attempting to pursue the acts of 4th March, 1850, and the 17th February, 1851, are illegal and in violation of the constitution of 1850, which was in operation with full effect before either the acts of the company or voters had the force of law.

21. The power of the agent ceases with the power of the principal. The constitution of 1850 would have been *violated by the legislature assuming to do that which they delegated the Mason coun-

ty court to do; so the acts of the Mason county court are in violation of the constitution.

22. The twenty-eighth section of the act of March, 1850, gave no vested right to the company: First, because no company was then organized, and second, if organzed in January, 1851, by acceptance by the voters, the rights claimed are in conflict with the constitution of 1850.

23. The powers and privileges claimed by the company are inconsistent with the first, second, and third sections of the thirteenth article, and the thirty-third, thirty-sixth, and fortieth sections of the second article, of the constitution.

24. To impose upon the people of a county a debt, (for purposes not named in the thirty-fifth section of article second of the constitution,) by the vote of a majority of the qualified voters of such county, is in violation of the spirit of the thirty-sixth section of article second of the constitution, which requires that it shall be voted for at *a general election,* and that provision shall be made for the annual payment of the interest and the extinguishment of the principal within thirty years, by the imposition of a tax.

Judge Hise's statement of the case.

On the 4th of March, 1850, the legislature passed an act, which, by its provisions, constructs the frame work of a charter for the contemplated organization of a railroad company, and prescribes and defines the rights, immunities, and exclusive privileges to be held and enjoyed by it, after its organization as a corporate body, forever, to be styled the "Maysville and Lexington Railroad Company." Amongst other privileges conferred upon the company, when organized, are the following :

1. A corporate and perpetual existence, with all the legal functions, privileges, and exemptions from personal and individual responsibility, which are legally incidental to, and characteristic of the most favored corporations.

2. The right to construct a railroad, with a double or single track, from Maysville to Lexington, with all its appurtenances; and to take from individual proprietors, for that purpose, all the land and materials required, with or without their consent, upon the terms and conditions (easy for the company,) as prescribed in the charter.

3. They and their successors (having a perpetual existence,) to be forever the owners of the contemplated railroad and its appendages; holding it, not as public agents for and on behalf of any government

or political community, whether composed of a city, county, or the state, but holding it as private property, subject only in its control and management, within the limitations of the charter, to the company, or its officers and agents.

4. The perpetual privilege, within certain limits, to make private gain and profit in the form of tolls and charges for the travel and transportation of persons and property by means of their railroad, on which the company have *forever* the exclusive privilege of conveying passengers, merchandise, and property, upon their own terms, within the limits referred to.

From an attentive examination of the act of incorporation, authorizing the organization of this company, it will be seen that the said company, when organized, with their property and privileges, as secured, does not present one single feature of a public or political institution, unless its dependence upon public patronage for its profits and the nature of the business in which the company will be engaged, (to-wit: the transportation of persons and property on their road,) should be so regarded; but were it yielded, that because of the character of the business and employment of the company, and the influence which its operations would have upon the commerce and trade of the country through which their railway may pass, and upon the growth and prosperity of the cities of Maysville and Lexington, the points of its termination, that it therefore was a public institution, and its creation and protection by the government would be justified or recommended by public policy, then it would result, that every chartered association and incorporated company created by the legislature for banking or manufacturing purposes, or to carry on any other branch of business, being also dependent on public confidence and patronage for gain and profit, and having a like influence, to a greater or less extent, upon the agricultural and commercial interests of the community, might also claim to be a public institution; and as such they would have an equal

right to demand of the government its interference for the adoption of measures by which the inhabitants of the towns and counties in their vicinity should, through some indirect instrumentality, be compelled, against their own will, to become tributary to the accomplishment of the objects of such incorporated companies.

There is nothing, amounting to the dignity of a principle, to distinguish this railroad company or its charter from any other chartered association, so that by reason of such distinction it may have granted to it power and dominion over the property or wealth of the people, which could not be constitutionally granted to other private corporations, or to individual citizens, or to partnership associations voluntarily formed without being incorporated by law.

1. The stock of this company belongs to the members of the company, not to the state government, nor to the municipal governments of the towns and cities, as such, nor to the counties as such.

2. The railroad is to be built, if at all, not by any government, state or municipal, through the instrumentality of public agents and employees acting under public responsibility and under public control, or with the public revenues, but by the company with their own private funds, through their private agents and under their private control.

3. The railway, when constructed, with all its appendages and appurtenances, its uses and profits, belongs exclusively and perpetually to this private corporation, and remains forever subject exclusively to its management and control. Neither the municipal governments of the towns and cities, as such, nor the counties as separate political organizations, as such, nor the government of the state having any authority whatever to interfere with the rights, powers, and privileges of the company, as exercised in conformity with the provisions and grants contained in the charter.

4. The company are not required to perform any service, of any sort whatever, for the government of the state, or of the United States, or of the towns, cities, or counties in which their road is situated.

For these reasons, it is assumed that this is a private incorporated company ; that their road is not a public road, but wholly a private way and the private property of the company, upon which no persons, whether government officers or agents, or private citizens, have any right to go or travel, unless with the consent of the company's agents, and for a consideration exacted by them.

. The conclusion, therefore, is justly deducible, that no exclusive privilege—such, for instance, as the right to have levied, in any way, forced contributions from the citizens, of money or property, for its uses—can be granted to this railroad company, which, if conferred upon any other private incorporated company, or individual or voluntary association of individuals, would be so contrary to every principle of justice, to the principles on which, and the purposes for which our republican and representative system of government was created, and to the natural, if not unalienable, rights of man, as that such grant would, in such cases, without hesitation, be judicially pronounced invalid and unconstitutional.

The twenty-eighth section of the statute by which this company is chartered contains the following *remarkable* provisions, in substance, to-wit :

1. This railroad company is authorized, through its officers, *in their own discretion*, by giving a prescribed printed notice of six weeks, to have the sense or votes of the qualified voters of certain cities and counties (including Mason) taken, upon the proposition, as to whether the cities and counties named shall become subscribers for any given amount of stock in said railroad enterprize, proposed by the company's officers in their printed notice, within certain stated limits, they having the power to fix the time of holding such election in their notice, and to propose the amount of

stock to be subscribed in their discretion, so they do not exceed the limits stated.

2. Such notice having been published, and time fixed for the election, by the company, the city authorities and county courts of the designated cities and counties, (having no discretion whatever,) are imperatively required to make all the necessary preparations, and to adopt all the requisite measures to bring on the election at the various precincts or voting places established in their cities and counties, on the day named in the printed notice of the company, in order to correctly ascertain the sense of the qualified voters, who may cast their votes.

3. After such election shall have been held as required by the company, although not more than one hundred voters, and even they all members of this corporate association, may have voted, yet, upon the condition only that a bare majority, (not of *all the voters* of the cities and counties, but) of the qualified voters of said cities and counties, whose votes were actually cast and taken at such election, shall be in favor of subscribing the amount of stock in said company, as proposed in the company's 'notice as published, then the county courts of the counties and the mayors and councils of the cities named, are commanded to order and ordain that the subscriptions shall be made, and directing it to be done by the county clerks and city mayors. This requisition upon the county courts and city authorities is imperative and mandatory, not merely permissive, or left in any degree to their discretion.

4. After the amounts designated are authorized to be subscribed in the manner stated above—that is, by the majority of the qualified voters of the said cities and counties whose votes are actually cast—the cities and counties, so authorizing subscriptions to the capital stock of said company, are empowered to raise the amount of their several subscriptions, AS THE SAME SHALL BE CALLED *by the president and directors of the company,* in either of two modes specially designated

in the law, but in no other way. The amounts subscribed may be raised by a tax on the real and personal estate of the several counties and cities subscribing, or otherwise by borrowing the amount thereof on such terms, and payable in such way, as may be deemed most advisable by the city and county authorities. But whether the amount is raised in the one mode or the other, in either case, as the law is understood or construed by me, it is to be raised either by taxation or by loans, *only*, as the same shall be called by the president and directors of the railroad company. If the money is borrowed, the interest to be provided for as may be deemed best; and the taxes imposed to pay principal and interest of the sums borrowed, to be held as sacredly pledged to the purposes designated.

5. The cities and counties, (including Mason,) when required by the majority of qualified voters actually voting at an election, to be called by the company as herein above stated, to take stock in this company, are permitted to hold such stock only, *upon the same terms, upon the same conditions, and subject to the same restrictions* with other stockholders; and the amount of stock which Mason county, JOINTLY, with the city of Maysville, through the agency of the public authorities thereof, may be compelled to subscribe, is limited to one hundred and fifty thousand dollars.

6. It is provided that the citizens of the cities and counties subscribing shall be entitled to certificates of the amounts which they shall severally be required to pay on account of the said stock subscriptions; and that, when they amount to fifty dollars, they will entitle him or those holding the certificates, each, to one share of the stock subscribed by his city or county, for every fifty dollars paid.

Such is the substantial import of the twenty-eighth section of the act incorporating this railroad company, passed on the 4th of March, 1850, which was, after the existing constitution had been framed, published, and presented to the people of Kentucky for their

ratification or rejection, but three months and seven days before it was actually proclaimed as the adopted constitution of the state, which was done on the 11th June, 1850, by the convention which formed it, and which had re-assembled for that purpose.

No steps were taken or measures adopted by either the railroad company, the city council, county courts, or the majorities of the qualified voters, who might cast their votes in the county of Mason and city of Maysville, to give binding effect and legal efficacy to this twenty-eighth section, or to compel the county and city to take stock, or to force the minority of the citizens of Maysville and Mason county to make involuntary contributions to the capital stock of the concern, or for the payment of the interest of a city or county debt to be contracted for the purpose of paying for such stock, until some time subsequent to the adoption of the constitution of June, 1850.

On the 9th day of December, 1850, some six months after the adoption of the constitution of June, 1850, the county court of Mason county, a majority of the justices of the county being upon the bench, made of record the following orders, to-wit:

"*Ordered*, That an election be held at the county seat and the several precincts for holding elections in Mason county on the fourth Monday in January next, (in 1851,) to take the sense of the qualified voters of said county as to the policy of said county becoming a subscriber to the stock in the Maysville and Lexington Railroad Company to the amount of $150,000—the president and directors of said company having given notice thereof in the several newspapers published in *said* COUNTY, according to the provisions of the twenty-eighth section of the act" of incorporation; "and all the officers of elections of this county as heretofore appointed, or such as may be appointed in the room of *such* as may be absent, are hereby ordered to conduct said election according to law.

"*And it is further ordered*, In the exercise of the discretion allowed the court by said act of assembly, if

SLACK, &c.
  vs.
MAYSVILLE AND
LEXINGTON R. C.

the majority of the qualified voters of Mason county, who shall cast their votes at said election, shall be in favor of the policy of subscribing the $150,000 of stock in the said railroad company, that the clerk of this court shall subscribe the same agreeably to the provisions of the said charter; and it shall also be the duty of said clerk to issue bonds according to the said charter for the said sum of $150,000, payable thirty years after date, bearing interest at six per centum per annum—the interest payable annually—which bonds shall be *delivered* to the PRESIDENT and DIRECTORS of said company as they may be called for, not exceeding $50,000 per year, in bonds not exceeding $1,000 each."

On the 13th January, 1851, the county court orders the sheriff to return to the court, at its next ensuing term, the lists of the votes cast at the election held on the 4th of January, 1851, which had been called by its previous order of the 9th December, 1850; and the clerk is prohibited from subscribing for any stock, or issuing any bonds therefor, until the further order of the court.

On the 10th of February, 1851, the said court made the following order, to-wit:

"By the charter of the Maysville and Lexington Railroad Company, the citizens of Mason county are permitted to hold stock in said corporation, including Maysville, not exceeding $150,000. The president and directors of said company having given six weeks' notice in the three newspapers printed in Maysville, as proved in open court, and by bills and circulars, to take the sense of the qualified voters of this county, on the fourth Monday in January, 1851, as to the policy of this county becoming a subscriber to the capital stock of said railroad company to the amount of $150,000; and this court, in pursuance to said notice and the charter of the company, having ordered an election to be held at the county seat and several precincts for holding elections in the county, to take the sense of the qualified voters of said county

upon the said proposition; and the vote having been taken in said county on the day named in said notice, and the order of this court in pursuance of said notice and order, and having resulted as follows, to-wit:

|              | For subscription. | Against. |
|--------------|-------------------|----------|
| Maysville,   | 989               | 39       |
| Washington,  | 39                | 156      |
| Orangeburg,  | 99                | 32       |
| Mayslick,    | 150               | 78       |
| Sardis,      | 10                | 159      |
| Germantown,  | 5                 | 145      |
| Minerva,     | 12                | 78       |
| Dover,       | 24                | 98       |
|              | 1328              | 785      |

"By the vote thus cast it appears that 2113 of the qualified voters of Mason county voted at said election on said proposition," &c., "making a majority of 543 in favor of the policy of subscribing $150,000 in the capital stock of the Maysville and Lexington Railroad Company. This court now, in pursuance to said charter, and the expressed will of the qualified voters of Mason county, thus expressed at said election, do order and direct John James Key, the clerk of this court, to subscribe for and on BEHALF of MASON COUNTY the sum of $150,000 in stock in the said company; and it shall be the duty of said clerk to issue the bonds of the COUNTY of MASON, according to said charter, for the sum of $150,000, (for the stock thus subscribed,) payable thirty years after date, bearing interest at the rate of six per cent. per annum, and the interest payable annually—which bonds shall be *delivered to the president and directors of said company, as they may be called for*, not exceeding $50,000 per year, in bonds not exceeding $1,000 each; which bonds are to be accepted by the company in full payment of the amount subscribed by the county in the stock of said company."

It seems that it was seen and believed, after the orders above recited had been made and proceedings

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

had, that they were unauthorized by the twenty-eighth section of the company's charter; therefore, it is supposed, the act amending the same was passed on the 17th of February, 1851, subsequent in date to all the orders referred to, and some eight months after the adoption of the constitution of June, 1850.

The twenty-eighth section of the charter had not been pursued, in its requisitions, to-wit: that the stock subscribed by Maysville and Mason county, *jointly*, should be "*held upon the same terms, on the same conditions, and subject to the same restrictions, with other stockholders;* and that the cities and counties subscribing, *might "raise the amount of their separate subscriptions, as the same should be called* by the president and directors of said road, by a *tax* on the real and personal estate of the said several cities and counties subscribing or by borrowing the amount thereof."

These provisions, in my judgment, did not give authority to the company, the county court, or to the majority of the voters of Mason county actually casting their votes, either separately or collectively, to execute and deliver to the company $50,000 annually, or as called for, in the bonds of the county, in payment of subscriptions of stock.

A law constituting such extraordinary agencies, and conferring such extraordinary powers upon them, to be exercised, as against the minority of the citizens, in a manner apparently so arbitrary, and in opposition to their wishes, should, were it even not subject to any constitutional objections, be construed with great strictness; and in its attempted execution, its provisions should be literally pursued.

By the fifth section of the charter, the subscribers of the stock, at the time of their respective subscriptions, were required to pay to the commissioners or agents who were authorized to open books, &c., in money, or in a negotiable note payable at some bank, &c., the sum of two dollars on each share of stock subscribed—preparatory, doubtless, towards the organization of the company. With respect to the

1. The twenty-eighth section of the act of incorporation, of the 4th March, 1850, "did not give "authority to "the company, "the county "court, or to a "majority of "the voters of "Mason county "actually cast-"ing their "votes, either "separately or "collectively, "to execute and "deliver to the "company "$50,000 annu-"ally, or as call-"ed for, in the "bonds of the "county, in "payment of "the subscrip-"tion of stock." But Maysville and Mason county could only subscribe their stock and pay $2 on each share as other stockholders, and pay the balance as called for, as provided in the fourteenth section of the act of incorporation, by taxation or short loans.— This rendered the amendatory act (passed February 17, 1851,) necessary, to authorize

residue of the shares subscribed, by the fourteenth section of the charter the president and directors of the company (after its organization, of course,) are authorized to require payment of the sums due, at "such times and in such installments as they shall see fit;" and after the requisitions are made, should the subscribers fail to pay them, for sixty days, the company may collect by suit the unpaid stock, or sell it at public sale upon due notice. Now, in virtue of the provisions of the twenty-eighth section quoted above, Maysville and Mason county, and the other cities and counties subscribing, were placed precisely upon the same footing of other subscribers—to have the same privileges, to be under the same duties and obligations, and to pay up their subscriptions in cash, as required by the officers in the same way, or to be subject to suit, and to have the stock of the delinquent counties and cities sold; and it appears manifest to me, that it was the intention of the legislature that the cities and counties should provide the money by temporary and short loans, or by taxation on the property of the inhabitants to pay in cash the amounts of the calls or requisitions upon their stock subscriptions, as they should be made by the company; and consequently, under the twenty-eighth section referred to, the county court of Mason had no authority to deliver the bonds of the county to the company, or the company to receive them in payment of the stock subscribed. Wherefore, as is supposed, on the 17th of February, 1851, the charter of this company was amended by an act of the legislature, which provides that the county courts of the counties, and the city councils of the cities, named in said twenty-eighth section, having taken stock in this company, "shall be authorized to execute bonds of the county or city, payable to the president and directors of said company, for the amounts severally subscribed by said counties and cities, payable at such times as may be deemed best by the county courts and city councils; and said courts and city councils, respectively, shall

SLACK, &c.
vs.
MAYSVILLE AND LEXINGTON R. C.

the execution of bonds by the county court, payable to the company, and to levy and collect taxes to pay the interest.

have power, and it shall be their duties, severally, to levy and collect upon the real and personal property of said counties or cities, an amount, in money, sufficient, ANNUALLY, to pay off the interest on said bonds, which interest shall be levied and collected as other taxes are collected in this state," &c. By this act alone can any authority whatever be found or derived for the county court of Mason to issue thirty year bonds, payable to this company for stock, or for the company to receive them as payment therefor. And it is by this act, and this alone, as I conceive, that the county court of Mason had any authority to impose upon the inhabitants of the county a tax to pay the interest upon such bonds. The twenty-eighth section of the charter, passed in March, 1850, only authorized a tax for the one or the other of two purposes: (1) To raise all the money required by taxation to pay the calls upon the county stock; or (2) to pay the interest and principal due by the city and county for money actually borrowed to pay those calls in cash to the company. The twenty-eighth section required the stock to be paid in cash. The act of 17th February, 1851, authorized the payment in bonds, upon such time and terms as deemed proper by the county courts and city councils; thus authorizing onerous, if not perpetual county and city debts to be created, evidenced by bonds having thirty years to run, payable to the company, and negotiable and transferable at its pleasure, and thus laying a foundation for gambling and speculating in these county and city securities, if they may be so called—a practice so much fraught with corruption and fraud, and other mischievous consequences to the community. There is, in my mind, a substantial distinction between the provisions of the twenty-eighth section of the charter passed 4th March, 1850, and the first section of the amendatory act passed 17th February, 1851—the first enacted before, and the second after the adoption of the constitution of June, 1850. What was authorized by the former, is not authorized by the latter;

and what is permitted or commanded by the latter act, could not be done by authority of the former. A payment in cash is one thing, and a bond given for payment is a very different thing, in reference to the parties, to-wit, public bodies, as counties and municipalities, and private corporations, and to the subject matter in question; for charters of private companies are to be strictly construed, and the doctrine has been long favored and approved, that such corporations have no powers or immunities but such as are expressly granted in their charters; and they can only do such things, and enter into such contracts and dealings, as their charter authorizes, and none others. So, also, it is a sound and approved doctrine, that where extraordinary powers are conferred upon local organizations, corporate towns, cities, and county courts, such as to contract public debts, or to impose additional burthens and taxes upon the persons or property of the inhabitants, the acts by which it is done should be construed with strictness, and carried into effect with fidelity, in precise conformity with its provisions; and when empowered to borrow money or impose taxes in a prescribed mode and manner, and for a prescribed purpose, they should not be allowed arbitrarily to resort to a different mode to effect the object, or to impose such taxes for a different purpose.

The twenty-eighth section contemplated the creation of no permanent indebtedness of the cities and counties in question. It provided that the installments of stock, as they were required, should be paid in cash, to be raised as fast as necessary by taxation, and by loans, to be re-paid with the interest, (doubtless within short periods,) out of the resources to be raised, without delay, by adequate taxation. That the construction placed by me upon the twenty-eighth section of the charter is correct, and that it did not authorize the issue and delivery to the railroad company of thirty-year bonds in payment of the stock subscribed by the Mason county court, is evidenced

2. The twenty-eighth section of act of 1850, contemplated the creation of no permanent indebtedness of the cities and counties named, but that the installments of stock, as the same might be required, should be paid in cash, to be raised as necessary, by taxation, or by loans at short

periods. This
is manifested by
the second sec-
tion of the act
of 1851.

by the fact, that the railroad company, the legisla-
ture, and all concerned, so construed it, and for that
reason saw the necessity of additional legislation on
the subject, and had the act of the 17th February,
1851, passed, to accomplish thereby the very purpose
which they believed could not be accomplished by
the act of the 4th March, 1850; or otherwise, why any
such additional legislation at all? The correctness
of this construction is further made manifest by the
provisions of the second section of the act of 17th
February, 1851, which is as follows:

"That said levy of tax, to raise the interest, *to be-
come* DUE YEARLY, shall be made on the real and
personal property, as assessed for taxation for state
purposes, in each county and city; and if any county
court and city council, in the *discretion* given them in
the twenty-eighth section of the act to which this is an
addition, decide to raise the amount, or any part
thereof, *in* MONEY, *to pay the subscription made to the cap-
ital stock of said company*, a tax for that purpose may
be levied and collected," &c.

Now, in referring to the twenty-eighth section, it
will be perceived that the county courts and city
councils were to pay the subscriptions of the coun-
ties and cities, (in cash, of course,) just as other stock-
holders, "as the same shall be called by the president
and directors of said road;" and that they had a *dis-
cretion* to resort for means to pay the money either to
taxation, or to loans to be re-paid by taxation; hence
the legislature say, in the second section of the act
of 17th February, 1851, as above quoted, in sub-
stance, that by the twenty-eighth section of the char-
ter the county and city subscriptions of stock were
to be *paid in money*, and that the courts and councils
had a discretion, (not that the stock subscribed
should be paid with any thing besides money,) but
that *the money* to pay with, might be raised by taxation
or by borrowing it.

The third section of the act of 17th February, 1851,
provides "that the bonds authorized to be executed

by the first section of this act shall be negotiable and transferable by the order of the president and directors of said company; and the indorsement of the president, countersigned by the secretary, shall be the form of transfer. And all certificates given to taxpayers of interest on county or city bonds, shall also be negotiable by the indorsement of the payer of the said tax; and the stock issued upon any such certificates shall not be deducted from the city or county stock."

Previous, and up to the period of the passage of this act of February 17, 1851, the Mason county court had made no order imposing any tax upon the property of the inhabitants, to raise *thereby* the means to pay the six per cent. interest upon thirty-year bonds, to be issued and delivered to the railroad company in payment of stock subscribed for by said court—for the reason, doubtless, that the imposition of a tax for that *specific purpose* was not authorized by the twenty-eighth section of the charter, or by any law then in existence, and could not have been authorized by the majority of the qualified voters of Mason county, who had actually voted at the election, held on the 4th of January, 1851, because the proposition upon which they were authorized to vote, and the project of a law which they were empowered to adopt or reject at their discretion, was contained in the twenty-eighth section of the charter passed in March, 1850, and not in the act which passed after the said election had terminated, to-wit, on the 17th of February, 1851; and which proposition and project, as presented in the former act, was materially different from that authorized by the latter. By the twenty-eighth section the company had no authority, by their notice and their call of an election, to submit a proposition to the people of Mason county, whether separately or in connection with those of Maysville, that any given amount of stock, not exceeding $150,000 should be jointly or severally subscribed by said city and county, upon any other project or plan, or which

*Margin notes:*

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

3. Previously to the passage of the amendatory act, the county court had made no order for imposing a tax upon the property of the county, to raise money to pay interest upon thirty-year bonds, to be issued and transferred to the company in payment of stock; and any order of the county court directing the issue of bonds to the amount of $150,000, to run thirty years, was unauthorized by the act of 1850.

should be paid in any other mode, than as provided in that section.

A vote deciding in favor of the policy of making a county subscription of stock in the said company of $150,000, to be paid for *in cash, as calls thereon might be made by the company's agents*—the cash with which to make such payments, to be raised, as required, by taxation, or to be borrowed, and repaid by taxation —cannot be regarded as a decision in favor of the policy of making such subscription, if to be met in a mode unauthorized by any existing law, substantially variant from that to which alone the minds of the voters should have been directed, and which was only attempted to be legalized by an act passed after the election had been held. I regard, therefore, that even were it conceded that said twenty-eighth section was in conformity with, or not in violation of the constitution of 1799, so much of the orders of the county court of Mason of 9th of December, 1850, and of 10th of February, 1851, as directs their clerk hypothetically and imperatively to issue county bonds to the amount of $150,000, to run for thirty years, to bear six per cent. interest, and to be delivered to the said company in payment of the stock which the county clerk was directed to subscribe, as unauthorized by the twenty-eighth section, and consequently as wholly null and void. If, however, the twenty-eighth section of the said charter be *valid*, and if the company's notice, and the subsequent election held upon its requisition, and the proceedings had under the said section, were all regular and in conformity with its provisions, then the Mason county court order of the 10th of February, so far only as it may have authorized and directed its clerk to subscribe on behalf of the county, jointly with the city of Maysville, $150,000 of the capital stock of said company, would have been valid and binding; and the county court of Mason then would have had authority to borrow the money upon the best terms possible, or to raise it by taxation on the real and personal property of the inhabitants, to

pay up the installments on their stock, as called for by the company. But it seems to me that then, and in such case, the questions involved and presented in the record, and the whole case, would have turned upon the validity or invalidity of the act of the 17th of February, 1851, and of the county court orders made, and the steps taken subsequently to its passage —all of which occurred after the present constitution went into operation. A consciousness on the part of the Mason county court, and of the members of this company, that the previous act (the twenty-eighth section,) had not been pursued, and that the county court orders of the 9th December, 1850, and the 10th February, 1851, authorizing the bonds to be issued to the company, were, in that respect at least, null and void, led, no doubt, to the passage of the act of 17th February, 1851, and to the orders of the Mason county court subsequently made under and by authority of its provisions. For near three months after the passage of this act, on the 5th of May, 1851, the Mason county court, (acting as though there had been no previous order made for the purpose, or upon the presumption that such previous order having been made before the act of seventeenth February had been passed, was unauthorized and void,) enter up their order to the effect—"That David Bronaugh, as senior justice of the court, sign, and the clerk of the court countersign and affix the seal of the county to twenty bonds for $1000 each, numbering from one to twenty, and deliver the same to the president and directors of the Maysville and Lexington Railroad Company, in part payment of the subscription of $150,000 of stock taken in said company on the part of the county of Mason.

"*Ordered*, That a levy be and is hereby made on the real and personal property of this county assessed for taxation for state purposes for the year 1851— a tax of 3½ cents on each $100 of value of said taxable property, for the purpose of paying one year's interest on $50,000 for which bonds have been order-

ed to be issued by this court on behalf of this county, in part payment of $150,000 of stock held by *said county* in the Maysville and Lexington Railroad Company, agreeably to the charter of said company, and to be paid to the president and directors of said company, and for which they shall return an account of the actual amount received on said tax, and the amount paid for interest on the bonds of the county.

"*Ordered*, That in the opinion of this court, it would be to the advantage of the county, by enhancing the value of her bonds to the Maysville and Lexington Railroad, that the interest thereon should be paid semi-annually, and in the city of New York, and so expressed on the face of the bonds; and that such an arrangement between the company and the county court hereafter to come into office, would be fully in accordance with the views of this court."

On the 11th day of August, 1851, the presiding judge of the new county court, as organized under the constitution of June, 1850, acting alone and without associating with himself any of the Mason county justices, made of record the following orders:

"*It is the desire of the Maysville and Lexington Railroad Company*, that the bonds of the county, and the interest thereon, to be paid semi-annually, should be paid in the city of New York; and the court is of the opinion that it will be *for the interest* of said company, and for the credit of the county, to make the interest payable semi-annually in the city of New York. It is therefore

"*Ordered*, In accordance with the previous orders of this court, that the judge of this court issue the bonds of the county to the Maysville and Lexington Railroad Company, to the amount of $50,000—which bonds are to be countersigned by the clerk of the county court—the bonds to be paid in thirty years in the city of New York, and the interest to be paid semi-annually in the city of New York; which bonds are to be under the seal of the court, in the printed form, prepared with the coupons thereto annexed,

signed by the clerk; which bonds will be filled up, signed and sealed, and delivered to the Maysville and Lexington Railroad Company.

"*It is further ordered,* That the $20,000 of bonds, which have been heretofore filled up and signed, be cancelled, and they by this order are cancelled and destroyed."

Under and in pursuance of this order last above recited, county bonds of the amount of $50,000 were issued to be due at the end of thirty years, to bear six per cent. interest, payable semi-annually, and the principal and interest made payable in the city of New York to the officers of the railroad company; which bonds, executed in the form and upon the terms prescribed in the said order, were delivered to and received by the officers of the company as payment for an equal amount of the stock, which the clerk of the Mason county court, on behalf of Mason county, had been directed to subscribe by the order of the 10th of February, 1851. And the tax collector was proceeding to enforce the collection of the tax imposed on the property of the inhabitants of the county of Mason, by the order of the 5th May, 1851, to procure the means to pay the interest upon the bonds issued, when about one hundred and fifty of the citizens of Mason county, whose taxable estates, collectively, were of the aggregate value of upwards of $900,000, considering themselves aggrieved, and concurring in the opinion that their rights had been disregarded, and in the determination to demand redress from the judicial branch of the government, instituted their suit in the Mason circuit court, by petition in equity, under the provisions of the code of practice lately adopted by the legislature of this state, in which they give a concise history of the facts as above related, with others not now necessary to be stated, and charge and insist that the acts of the legislature herein referred to, are in violation of both the former and present constitutions of the state, and that all the acts of the company and orders of the

Mason county court, done and rendered under color or in pursuance of said acts, are illegal, arbitrary, unauthorized and void, not only because the acts of the legislature are condemned by both the constitutions of 1799 and 1850, but because the acts themselves have not been pursued in some of their material provisions, but exceeded and violated by the county court, and by the company, in several important particulars specified in the complainants' petition. The prayer of the petition is, that the enforcement of the county court orders, authorizing the subscription of stock, the issue of the bonds, and the imposition of the tax upon their property, be prohibited forever, and that the collection of the principal and interest of the bonds issued, and also of the amount of tax imposed, be perpetually enjoined.

The president of the railroad company, responding for the company, denies the soundness of the positions assumed in the petition of complainants, resists their deductions, controverts some of the facts as charged, and demands that the prayer of the complainants be rejected, and their petition dismissed. The parties upon an agreed case, in writing, as exhibited on the record, consented that the suit should be heard and determined upon its merits on a given day. The circuit court having heard the case, rendered a decree against the complainants, by which their application for an injunction was overruled, and their petition dismissed with costs. From this decree the complainants have appealed to the court of appeals; it being the supreme appellate judicial tribunal of the state, and a majority of the judges of that court, four in number, concurring in opinion with the judge of the circuit court, have affirmed this decree; and their written opinion, presenting the facts, arguments and reasoning somewhat at length, and in detail, upon which it is based, as delivered by Judge Marshall, has been already presented to the profession, and to the general community, by publication in some of the public journals. I do not concur with;

but dissent from the opinion of the majority of the court, both in respect to some portion of the reasoning and argumentation, as well as to the general conclusion of the opinion; and under the circumstances, I believe it is my duty, as it is my privilege, to write down and to have published also the considerations and reasons by which I have been constrained to dissent reluctantly from the views and conclusions of the majority of the court, upon the important legal and constitutional questions involved in the case under consideration. The case is one of great magnitude, on account of the principles involved, and because of the momentous consequences, which, in my judgment, will ensue to the injury of the community, if the power and policy brought into review by the questions made in the record, shall continue to be exercised and pursued by the legislative branch of the government, and sanctioned by the supreme court of the state.

1st. The question is presented, and should be, perhaps, first considered, as to whether the proceedings of the company and of the Mason county court are in conformity with and authorized by the twenty-eighth section of the charter of the railroad company, and with the amendatory act of the 17th of February, 1851. If not, those proceedings are, of course, invalid and void, and the decree of the circuit court consequently erroneous on that ground, though the constitutionality of the acts referred to be admitted. The orders of the Mason county court have been literally transcribed, in order that the style in which they have been drawn, and their true and full import may be appreciated and understood, and because it is believed, that when particularly examined in connexion with the acts in question, it will be manifest that the agents of the company and the justices of the Mason county court, either misapprehended, or otherwise disregarded, some of the material requisitions or provisions of those acts.

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

4. It does not appear that the requisitions of the twenty-eighth section of the act of 1850 have been complied with, in giving notice of the election, (see 4 *Dana,* 433-4,) and consequently the orders of the county court, based thereupon, were invalid.

The first objection which occurs to my mind, to all the proceedings, including the election held on the fourth Monday of January, 1851, in Mason county, and to all the orders of the county court from first to last, is this : It does not appear that there has been a compliance with the requisitions of the twenty-eighth section of the charter, in the publication, by the company, of the six weeks' notice, in *conformity* with those requisitions. It is true that it is alleged in the company's response, that a notice, in full conformity with the act, had been published ; and it is also true, that, amongst other things, it is stated, in the agreed case, as presented in the record, that "a copy of the notice for taking the vote, with the terms of submission and the pamphlet address published by the company, was made part of the statement" of facts agreed, yet it does not appear that the pamphlet address and notice, or either of them, had been copied into, or otherwise furnished with the record before the appellate court. The agreed case admits merely that some sort of notice and address should be taken and regarded as part of the statement of facts concurred in by the parties ; but it does not admit that any such notice, though given, was in conformity with the twenty-eighth section, or such as the company by that section were authorized to publish.

There could be no valid election of the qualified voters of Maysville and Mason county called at the instance of the railroad company, except upon such notice as that required by the twenty-eighth section ; for if the notice was insufficient and unauthorized by law, the voters, especially those opposed to the object intended, might, and probably would, disregard such notice, and refuse to attend and cast their votes at such unauthorized election, which would, in such case, if held and regarded as valid and obligatory by the Mason county court or the city council of Maysville, amount to a fraud practiced upon the opponents of the scheme submitted, they constituting, perhaps, a majority of the voters of the county. Under the

twenty-eighth section, the qualified voters of Mason county had no power or authority whatever, upon their own volition, and without any notice at all, to hold an election on any day they themselves might choose to designate, to take the sense of the majority upon the question of incurring a county debt of any amount, or upon the question of authorizing a county subscription of $150,000 of stock in this railroad company, so as to bind the county court or the minority of the voters. If such an election would be a mere farce and nullity, if held without notice, then to give it force and validity, a sufficient notice, as required by the twenty-eighth section, should have been given by the party alone authorized to give it; should have been published in the manner required, given for the period named, fixed the time when the election should be held, presented the question truly and fairly upon which the sense of the voters was to be taken, and designated the amount of the stock proposed to be subscribed by Maysville and Mason county jointly, and not by Mason county singly. The notice and address not having been copied in the record, or furnished with it, as composing a part of it, the legal sufficiency of the notice under the act, and the fact of its due publication as required, cannot, I think, be assumed and taken for granted upon the mere assertion of the respondent contained in the answer filed or upon the vague recitals in the orders of the Mason county court, which should not thus be allowed, in my opinion, to be substituted in lieu of the notice itself, or received as evidence of its sufficiency, of its conformity with the act requiring it, or of its due publication. I hold it to be a sound and approved rule of law, that where a power is to be exercised or an act to be performed only upon a specific and defined notice having been previously given, if the validity of the exercise of the power, or of the performance of the act, shall be questioned judicially, then a legal obligation rests upon the party interested to sustain their validity, to show that the required notice had

been given, by its actual production and by satisfactory legal proof of its due publication or delivery; otherwise the party authorized to raise the question of validity would not at all be bound, or his rights and interests be prejudiced, by such void proceeding. In the opinion of the appellate court, delivered by Judge Robertson, in the case of *Bustard* v. *Gates and wife*, reported in 4 *Dana*, 433–4, it is very distinctly intimated that a notice being required by law, the notice itself, and actual legal evidence of its service, should appear in the record, that its absence cannot be supplied by mere assertions of the party in the pleadings or the recitals in the orders or judgment of the court, and that a judgment would be erroneous and reversable for want of such notice, though it should aver that a legal notice had been "*filed and proved.*" These remarks are made and the authority noted for no other purpose than to show that the court of appeals would not be bound or authorized to conclude that the company's notice was sufficient, or that it was duly published, according to the requisitions of the act, upon the allegation in the company's answer or the recitals in the county court orders. But this question may be waived, because, although the notice was not filed with the papers in the court below, when the record was copied, nor copied in the record itself, or furnished with it, yet, at my request, the clerk of the Mason circuit court has procured and forwarded to me the printed notice and address of the company to the voters of Mason county, and the Mason county court order of 9th December, 1850, composing, altogether, a single printed document, and published, doubtless, in that form. And although there is no proof in the record of its publication, in the manner and for the time specified in the twenty-eighth section, this defect may also be overlooked; and I am constrained to believe that the notice, taken together and in connection with the county court order of 9th December, 1850, which was referred to and made part thereof, and published with it, and taken in connec-

tion with the printed circulars of the company, was unauthorized and insufficient, and that, therefore, the election held on the fourth Monday in January, 1851, was invalid, as also the several orders of the county court previously and subsequently made, and that the subscription, the bonds, and the tax directed by those orders, are all illegal and void. For the election would be a nullity unless required to be held by the company, upon *due* and *sufficient notice;* and it follows that without such valid election there could be no valid subscription of stock made by the county court of Mason, or the municipal council of Maysville, for the power to subscribe is hypothetical. If the subscription was invalid, no power or authority existed to issue the bonds to the company, or to impose the tax, to pay their interest, upon the people. On the first page of the circular address published by the company, the voters are informed that "this notice having been given, the county court, as required by law, have ordered the vote to be taken ; and they have also, in the exercise of the discretion vested in them by the charter, determined, that if the majority of the votes cast in the county be in favor of the subscription, the *bonds of the county shall be issued in* DISCHARGE *of the* SUBSCRIPTION, in preference to any other mode of redeeming the obligation. Copies of the notice of the directory, of the order of the county court, and of the section of the law, in virtue of which they have been issued, are appended hereto."

The notice published with this address is as follows :

"PUBLIC NOTICE—RAILROAD ELECTION.—Notice is hereby given, that in pursuance of the provisions of the twenty-eighth section of an act of the general assembly of Kentucky, entitled, "an act to incorporate the Maysville and Lexington Railroad Company," approved March 4th, 1850, the president and directors of said railroad company will take the sense of the qualified voters of the county of Mason, at the court-house and several precincts of the county, on the fourth

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

5. The proposition voted upon was not the true proposition stated in the notice, and consequently any subscription under the vote taken under that notice is invalid.

Monday in January, 1851, as to the policy of said county becoming a subscriber to the stock of said Lexington and Maysville Railroad Company, to the amount of one hundred and fifty thousand dollars."

Had this notice contained but this and nothing more, and had it not been qualified by the above passage and other passages contained in the circular address with which it was published, it would have been in strict conformity with the twenty-eighth section of the charter, except in this, that it proposes a several subscription for Mason county of $150,000, instead of a *joint subscription* for Maysville and Mason county, jointly, as alone authorized by the act. But the notice does not stop here, and the voters are further notified thereby, that "in furtherance of this object, the worshipful, the county court of Mason county, have made the order subjoined, which is referred to as a part of this notice." The order of the Mason county court of the 9th December, 1850, is then embodied and copied into the notice, and composes a part of it, and was thus published in and with the notice and circular address. By turning to that order, already copied herein, it will be perceived that if the majority of voters approve the proposition submitted, it directs the *subscription of* $150,000, *to be paid in thirty-year county bonds, bearing six per cent. interest, payable annually; and that the bonds shall be delivered to the president and directors of said company, as called for by them, not exceeding* $50,000 *per year, the bonds not to exceed* $1000 *each, in amount.*

The response of the company filed in this cause contains the following allegation : "That a printed notice was given for a vote of the qualified voters of Mason county, to be taken on the fourth Monday of January, 1851, *upon the proposition* that the said county should subscribe" (not that Maysville and Mason county *jointly* should subscribe) "stock in said company, to the amount of $150,000, *to be paid by the bonds of the county,*" (not by the joint bonds of the city and

county;) "payable in *thirty years, upon certain conditions set forth in the notice.*"

On the thirteenth page of the company's address, the voters are informed that "under the charter, the company are authorized to raise the adequate means of construction, by subscriptions of stock from individuals or corporations. Cities and counties are authorized, on their citizens sanctioning by vote the policy of subscribing stock, to raise the amount *either by taxation direct, or by the issue of their bonds, negotiable in the money markets.* So far as corporations will be appealed to by the Maysville and Lexington Railroad Company, it will only be for their aid in the form of bonds, bearing six per cent. interest, payable annually, having thirty years to run, one-third only of the whole issue to be issued in each of three years. The county of Mason is asked for her bonds to the amount of $150,000, only issuable in three annual installments of $50,000 each; to meet the interest on which a small tax will be levied upon the taxable property of the county for three years."

The county court order composing a part of the notice was made on the 9th December, 1850. The notice is dated tenth of the same month and year. It will be noticed that this order was rendered, notice published, and that the election was held, in pursuance of such notice, all before there was any act passed, or any law in existence, which authorized the bonds of the cities and counties named in the twenty-eighth section, to be issued and delivered to the company in payment for subscriptions of stock, or to authorize them to be negotiated and transferred at the pleasure of said company. The only act from which, as I think, any such authority could be derived, was passed not until the 17th of February, 1851, when the present constitution was in full force. This company and the justices of the Mason county court, seemed to think that if a majority of the voters approved the subscription, that the twenty-eighth section of the charter gave the county court a discretion to pay the

subscription in cash or in county bonds, and to raise the means to pay it by taxation in cash as required, or not to pay cash at all, and to substitute thirty-year six per cent. bonds for money, and pay them directly to the company, in lieu of cash. I do not so understand the twenty-eighth section, and do not think it conferred any such discretionary power upon the company or the Mason county court. The notice, therefore, I deem to be insufficient and unauthorized, and the election consequently invalid. Neither, as I conclude, was authorized by the twenty-eighth section, nor in conformity with it; and it was from this section alone, that any power to give any such notice, or to call any such election was derived. Now, I think that the twenty-eighth section did not authorize the sense of the voters of Mason county, including the Maysville municipality, as part of the county, to be taken upon the proposition submitted to them in the company's notice; because the act only authorized the sense of the voters to be taken upon a proposition materially different from that which was submitted to them, and upon which their votes were actually cast. The proposition authorized by the act, was, whether a sum not exceeding $150,000 should be, by Maysville and Mason county "jointly" subscribed as stock in this company, *to be paid for in actual cash as the same should be called by the president and directors of said road, the amount to be raised to pay* the several installments by *taxation,* or by *borrowing it;* and if borrowed, the principal and interest to be provided for by taxation.

The proposition submitted and voted upon was for *Mason county* to subscribe $150,000, to be paid by the bonds of the county, payable in thirty years, bearing six per cent. interest, to be paid *annually.* Now, it is not difficult to perceive the reasons which brought the company's agents to the conclusion, that a majority of the voters of Mason county, who should actually cast their votes, might be induced to support the affirmative of the unauthorized proposition in fact sub-

mitted, and that the very same majority would reject, without hesitation, the only proposition which the company was by the said twenty-eighth section authorized to submit. The voters might say to the agents of the company, very well, we will take $150,-000 of your stock, if you will take our notes for it, payable in thirty years, at par, and only require us to pay the interest, and let the principal provide for itself, or the burthen of paying it be imposed on a future generation. But if you require us to pay up the money to you for the whole amount of the stock, in such sums, and at such periods, as you, in your discretion, may require, and if we shall be compelled to raise it by taxation, or to borrow it, at a great sacrifice or discount, at a high rate of interest, and upon short time, and tax ourselves to pay up the principal and interest both, in such case we will not take your stock.

The company's notice, the election as held, and the orders of the Mason county court, up to and including that of 10th February, 1851, were based, it seems, upon the idea, that although not authorized by any existing legislative act, yet that all their previous proceedings would be legalized by the subsequent passage of the act of 17th February, 1851, though enacted after the adoption of the present constitution, whereas in my opinion those previous steps could not have been legalized or made valid, by the act referred to, because it does not profess to make valid previous proceedings which were before invalid, because the latter act was not itself pursued correctly, and because, if strictly construed, it did not authorize Mason county, or any other county, to issue bonds in payment for stock subscribed before its passage; but this authority to issue bonds was only given to the cities and counties who should thereafter subscribe for stock. Is it not a legitimate presumption, that if it had pursued the act of March, 1850, the printed notice would have been filed in the cause by the company, and it, together with the proof of its required publication,

would have composed a part of the record? If not, yet the company are concluded by their own response as to the character of the notice, and of the question therein submitted to the voters. The argument, that the proposition as submitted, to pay the stock subscribed with thirty-year county bonds, was more favorable to the people or to the county, than the one which would require the stock to be paid for in cash, and that the plaintiffs had no ground of complaint, because the company received the bonds at par for the stock, and because any sacrifice incurred in negotiating them would fall upon the company, and not upon the county, is not satisfactory to my mind, and cannot affect the question with me; for to assume that the one proposition and arrangement is more favorable to either party or to both parties, than the other, amounts to an admission, most obviously to be implied, that they are not in substance the same, but materially different; otherwise the one could not be more favorable than the other. It matters not, then, if the proposition submitted by the company and approved by the majority of the qualified voters who voted, be more or less favorable than that which, by the twenty-eighth section, was attempted to be authorized. The said section did not confer power upon the company to submit it, or the voters to adopt it, and give it thereby the force and effect of a binding statute. This company, I suppose, could not claim the right to exercise the high powers conferred upon it by the twenty-eighth section, if it were not for that enactment. I have never yet learned that a chartered company have the power, as matter of right, to give notices, to convene the people in primary assemblies, and to require the courts to order elections. If private corporations do exercise such powers, it must result, not from any principle of natural or political right, but by virtue of some special authority conferred upon them by the government; and if this could be constitutionally done, yet there must be a strict pursuance of *the authority granted*, and the ac-

tion must be according to it. This has not been so in the case in question, and their action was consequently unauthorized and void.

In our representative system of government, the people of the state, collectively, or of the counties severally, unless by the entire overthrow and utter subversion of the existing government, cannot hold meetings, and pass, by majorities, upon projects of laws, enact them, and give them binding force and efficacy.

This cannot be done unless in virtue of some special constitutional provision, or by authority derived from the legislative power of the State. If, then, by such authority the people of the State, or of some section of it, are allowed to enact or pass a law, a precise draft of which has been prepared and submitted, it must, to have any effect, be passed precisely as it is submitted. Amendments cannot be added or substitutes adopted, if they are authorized to pass upon and make binding as law a given project. They have, therefore, no power to adopt any other or different scheme than the one legally submitted to them; and if they do, their action must be held to be invalid, notwithstanding the scheme adopted may be the most favorable one for their interest. But I do not admit that the scheme in question, as adopted, was either more just, politic, or favorable than that presented in the twenty-eighth section.

It is not just or liberal to impose the burthen of a large debt upon our posterity, incurred to promote the interests of a railroad company. It is, in my opinion, the wisest policy both for individuals and for governments to improve as they are able, to pay as they go, and to avoid the curse and all the annoying, hampering, and protracted burthens incident to a galling indebtedness. The political evils proceeding from public debts, numerous and obvious as they are, should superinduce a determination, if possible, to avoid their creation.

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

6. The people have no power, in primary assemblies, to pass any law, unless submitted by special constitutional provision or by legislative authority, when the same must be strictly pursued.

But if the scheme submitted was the most favorable and advantageous to the county of Mason, or rather if it was less disadvantageous than the one authorized, yet the one presented in the twenty-eighth section could alone have been submitted by the company's notice to the people; and had it been so done, a majority of the qualified voters may have rejected it, the burthen of a heavy county debt have been thus avoided, and the people of Mason county might have rid themselves of both schemes—the one presented in the twenty-eighth section by voting it down, and the one presented in the notice of the company by not voting upon it at all.

But, as before remarked, I do not admit that the proposition submitted to the vote of the people by the company in their notice, was the most favorable for the county. For if, for argument sake merely, it is conceded that the counties and cities named derived the power from that provision of the twenty-eighth section which authorized them to borrow the money to pay up as called for their subscriptions of stock to issue such bonds as those specified in the company's notice, yet I deny that it conferred upon the people, the county courts, or city councils, the power to deliver them to the company in PAYMENT for the stock; and it does not therefore follow that such power is properly deducible from the provision referred to; and it seems, therefore, that the company are driven to the necessity of attempting to legitimate the scheme proposed in the notice, and adopted, by the vote and the power as exercised, not by assuming that the law, as written, so provides, but by assuming that, which amounts to an implied admission that the law does *not so provide;* to-wit, that the arrangement, as made, is more favorable for the cities and counties than the one prescribed in the act of the legislature—an assumption of fact, which is itself not admitted, but controverted, and about which intelligent men may well differ in opinion. For, as before said, let it be assumed, by way of argument, that the

county court of Mason had, under the said twenty-eighth section, authority to issue thirty-year bonds, the principal and semi-annual interest payable in New York. If the bonds be valid, and if the subscription of $150,000 of stock as directed by the order of the Mason county court of 10th February, 1851, be valid, then the bond-holders would have a lien upon all the taxable property in the county of Mason and city of Maysville belonging to the inhabitants, now or hereafter, to secure the payment of the principal and interest; they could coerce the payment by suit, and thus compel, by an appropriate legal proceeding, the county court to levy and collect the requisite tax upon all real and personal property of the county, to meet their demands. The rate of tax to be imposed by the county court, under the twenty-eighth section, to pay principal and interest of the debt they may incur for borrowed money, to pay for their stock, is unlimited. If required, the whole of the hard earnings of the inhabitants must be swallowed up, and even their estates reduced, if necessary, to pay the county creditors. The capitalist, therefore, being informed of the adequate and undoubted available security provided for their payment, would purchase these bonds, if fairly and publicly sold, with avidity, at a premium, doubtless, of eight or ten per cent. as a valuable permanent investment of his capital, for a period of thirty years, and the more valuable on that account. The bonds of the state of Kentucky are readily sold now at a premium of from six to eight per cent. The holders of these state bonds are dependent for the payment of their interest and the ultimate redemption of the debt upon the faith and confidence reposed in the honor and integrity of the government—a faith and confidence never yet betrayed; honor and integrity never yet, and, I fully believe, never to be sullied or shaken; for hitherto the public creditors have not suffered; the interest upon the public debt has been uniformly and promptly met, and the public faith been fully preserved. But

the state creditors cannot sue the commonwealth or force the collection of their demands by any kind of legal proceeding against the government, in either the courts of the state or United States ; and although that public faith is sound, yet it is public faith alone which constitutes the security for the payment of the bonds of the state and the interest upon them.   Now, if these state bonds, redeemable in about fifteen years from this time, having not more than half the time to run of the county bonds, being a less permanent, and consequently a less valuable investment, will command a premium of about eight per cent., then the conclusion is authorized by reason and common experience, that the Mason county bonds, possessing the advantages of security, enforcibility, and permanency, as above stated, would command a premium of at least eight or ten per cent. over the par amount, by a fair and open public sale thereof in any market where public stocks and government securities are usually bought and sold.   Such being the case, the arrangement to make the bonds payable to the company, and to actually deliver them at their nominal amount to the company in payment for stock, was not the most favorable for the county ; because, by it, the railroad company, or some of its officers or agents, would not only be selling their stock at par, but would pocket the premium realized from the sale of the bonds, or keep them themselves as most secure, permanent, and valuable investments ; whereas, by the arrangement as prescribed by the twenty-eighth section, if any authority can be derived therefrom at all to issue such bonds, the premiums thereon would have gone into the county treasury, subject to be applied, not to the purposes of a railroad company, but to the public purposes of the county.   That the construction which has thus been given to the twenty-eighth section of the act of March, 1850, is correct, is shown by the fact that the legislature gave to it the very same construction, as appears from the act of 17th February, 1851, which provides that "if any

county court or city council shall, in the discretion given them in the twenty-eighth section of the act to which this is an addition, decide to raise the amount, or any part thereof, in MONEY to pay the subscription made to the capital stock of said company, a tax for that purpose may be levied," &c. Believing, therefore, that the legislative act of 4th March, 1850, has not been pursued in its provisions, by the notice of the company, and by the vote taken upon the proposition as submitted in that notice, it follows that the county court subscription was unauthorized, and that the bonds issued are invalid; and, upon this ground, it is my opinion, that the decree of the circuit court is erroneous, and should have been reversed.

The imposition of the tax, as it is, I think, improperly called, and the issue of the bonds to the company, were both unauthorized; and the orders of the county court directing these things to be done, are held to be invalid, because the voters must certainly either be regarded as voting for the subscription of stock, to be made upon the terms proposed by the company—to-wit: that the stock should be paid for with the bonds of the county, payable in thirty years—or upon the terms prescribed in the twenty-eighth section itself; that is, that the installments upon the subscription should be raised by taxation, or by borrowing the money to pay them as they should be called for by the company. If they are regarded as only approving the company's proposition, as stated in the notice, then the decision of the voting majority amounts to nothing at all, because such decision was not authorized by the twenty-eighth section; and the subscription, tax, and bonds all fall to the ground as unauthorized. If, however, it is assumed that by the vote, the voters decided in favor of the subscription, to be made upon the terms prescribed in the twenty-eighth section, then the bonds issued to the company, and the burthen attempted to be imposed on the people to pay their interest, falls also to the ground, because the twenty-eighth section did not authorize such

bonds to be issued or paid to the company, or the im-
position of any tax to pay the interest thereon ; and
the act of 17th February, 1851, subsequently passed,
could confer no such authority for the precedent ac-
tion of the county court. · The twenty-eighth section,
in my opinion, gave no authority to issue any bonds ;
and such authority, if not expressly given to the coun-
ty court, cannot be claimed as a necessary or proper
incident to the power to borrow the money as requir-
ed to pay installments of stock.  This power could
be exercised and carried out in the only mode by
which county courts can act, (*except in special* cases
expressly provided for,) to-wit: through *the instru-
mentality* of county court *orders*, first authorizing and
afterwards accepting proposals for loans to the coun-
ty, and pledging the county, and providing the means,
for their payment.  All could be accomplished by
county court orders, and in no other way, unless
some other way is expressly provided by law.  For
authority on this point, and also to show that county
court orders directing a subscription of stock in road
companies, (and, as I infer, though prescribing its
terms and conditions,) cannot be revoked or annulled,
(and as I infer) or altered, by a subsequent order of
the same court, made at a subsequent term, I refer to
the Clarke county case reported in 11*th Ben. Monroe*,
146.

In the opinion in that case, it is declared that a
county court order declaring "that the court thereby
subscribes the shares which it is authorized to sub-
scribe, evidences the *highest* obligation which the court
can impose on itself."    And again—"the county
court acts, and can only act, through its orders made
of record."   Now, if a debt, in the form of a stock
subscription, can only be imposed upon the county
by a mere county court order, and such order is the
highest and most solemn obligation which can be as-
sumed by the court, must not a loan be authorized, be
accepted, the county pledged, and means provided
for its payment, all by county court orders only, they

constituting not only a sufficient, but the very highest obligation upon the county? And can a county court incur any other form of obligation, in the nature of thirty-year bonds or otherwise, unless by express permission given by a constitutional law? I am bound to answer in the negative.

The next objection taken, which will be noticed, is this: That the county court orders directing the subscription of the stock, by Mason county alone, and the execution, issuing, and delivery of the bonds of the county alone to the company, are invalid, because no other than a *joint* subscription, to be made by the county court of Mason for the county, and by the city council of Maysville, on behalf of the city as a municipal corporation, as *joint* obligors, was authorized by the twenty-eighth section of the charter.

At the date of the act in question, Maysville was an incorporated city, having a local municipal organization and council, was vested with those powers and privileges which usually appertain and belong to a municipal government, and had a local magistracy of its own, and the power of local legislation within the limits of its charter. It is styled a city in the act itself, and as such is authorized, exclusive of Mason county, to subscribe not exceeding $150,000 of stock in this company. Mason county is not authorized separately to subscribe at all, as I understand the act. The authority is for Maysville and Mason county, "*jointly,*" to subscribe, not exceeding $150,000. The road company insist that the word "*jointly,*" in the connection in which it is used in the act, is synonymous with the word "*together*" or "*inclusively.*" The plaintiffs insist that the act requires that Maysville in her municipal character as a corporation, by her mayor and council, and Mason county as a separate local community, through the county court, should have both concurred and *jointly* directed and executed the subscription; or otherwise, a subscription by either separately, would not bind the other or either. If this is the true meaning of the act, according to

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

7. If the authority given to Maysville and Mason county *jointly,* to subscribe not exceeding $150,000, is not understood as conferring authority to subscribe *together* the sum of $150,000, or *inclusively,* then the subscription by the county court is not authorized.

the strict rule of construction, which should be applied to such acts, it follows that the subscription in question is invalid, because it was made by the county alone, without the concurrence of the mayor and council of the city of Maysville, and in which Maysville, as a municipal corporation, did not join. It follows, also, that the bonds are illegally executed and invalid, because they are the bonds of the county alone, executed and delivered by the county court alone, and not the *joint* bonds of the city and county, the mayor and council not having concurred officially either in ordering them to be issued, or in their execution or delivery. It would, moreover, follow, that the election as held, and as it resulted, was unauthorized; because, where cities, as corporations, are authorized to subscribe stock by the act, whether, as is contended, it be *jointly* with the county in which it is situated, or severally, the act requires the subscription to be voted for and approved by a majority of the qualified voters of the city, exclusive of the county, of course. If the requisite notice has been given, the act then provides "that it shall (in the imperative) be the duty of the *mayor and council* of each of the *cities of Maysville* and Lexington, and of the county courts of the several counties, upon the day named in the printed notice, to open columns," &c., and provides for holding the elections in the cities apart from the counties, and in the counties as distinct local communities. There was no notice at all given to hold an election to take the sense of the qualified voters of the city of Maysville as a political community, distinct from the county of Mason, as to this joint subscription. No such election was called by the company or ordered by the *mayor and council*, in reference to this joint subscription; for none such was proposed. That which was proposed by the company was, that the county alone should subscribe $150,-000. It is true it appears, by way of recital, in the order of the Mason county court, rendered on the 10th February, 1851, that in obedience to a previous order

of that court, (in which, however, there was no official concurrence of the mayor and council of Maysville,) an election was held in Mason county on the fourth Monday of January, 1851, at which the citizens of Maysville voted, as being included within the county limits. It is true, also, that said order recites that there was a majority of five hundred and forty-three of the votes cast at that election in favor of a separate county subscription of $150,000 of stock in said company; but the remarkable fact also appears, that this majority was procured by the addition of the almost unanimous vote of the one thousand voters and upwards, living within the corporate limits of the city, to that cast by the county. It appears that the whole number of votes cast by the city was 1028. Of that number 989 voted for (not a joint subscription of city and county, but for) a several county subscription and debt of $150,000; thus giving in the city a majority of 950 votes for the railroad company's project. The whole population of the city is stated in the agreed case at 3607. It is remarkable that a city in a slave state, out of such an aggregate population, should be able to furnish 1028 qualified voters. It is supposed that, at least, all the voters of the city must have been brought into requisition. The whole number of votes cast in the county, exclusive of the city, was 1085. Of this number 746 cast their votes against the proposition submitted by the company; making a majority of 407 against subscription. So the county rejects by a large majority a proposition for a county subscription of $150,000 of stock, or to create a county debt of that amount; and the deeply interested city of Maysville, neither joining in the subscription, or in the bonds to pay for the stock in her corporate capacity, as the act seems to require, attempts to force the subscription and the debt upon the county, if she can, against the expressed will of a majority of 407 of the qualified voters of the county, and against the will of at least 746 citizens of said county, who gave their votes against

the company's proposition, and who doubtless are the proprietors of more than half of the entire taxable property of the county.

Now, the grounds are assumed—

1st. That as only a joint subscription was allowed by the act, that to authorize it to be made it was necessary for the company to have notified the qualified voters of the city, by a sufficient printed notice, to hold a corporate city election, to be ordered and provided for by the city mayor and council to pass upon the question, which was not done.

2d. To make the subscription valid, it was necessary that a corporate city election should have been actually held, to pass upon the question, and that it should have been ordered and provided for by the mayor and council of the city according to a previously printed and sufficient public notice to be given by the company, neither of which things were done.

3d. That even if the election as held could be taken as a sufficient expression of the sense of the majority of the qualified voters of both the city and county, who actually voted, as to the proposition submitted; yet, as the record exhibits the fact that this majority cast their votes for the company's proposition, which was unauthorized by the act, no subscription could be made, either joint or several. It could not be a joint subscription, because neither city nor county voted for it. It could not be a several subscription of the county alone, because the act did not authorize the voters to vote for it at all.

4th. The county alone could not bind the city, in its character as a municipality, nor could the city alone bind the county to make this joint subscription, much less to make a several one to bind the county alone.

5th. The subscription and the bonds executed and delivered in payment thereof, to be valid and binding, should have been joint, not several; that is to say, the municipal corporation of Maysville and the county of Mason, as distinctly organized local com-

munities, should, in relation to the railroad company, have been equal *joint obligors*, and, as such, jointly bound for the subscription and for the payment of the bonds that might be issued in liquidation of the stock; and as between themselves they should have been mutually and reciprocally bound each to the other to contribute and furnish the means to discharge one half of their joint engagements.

The views thus presented and the positions thus assumed, result and follow necessarily, if the construction given to the twenty-eighth section be correct—and is it not correct? Would it not be unreasonable to contend that a joint obligation to be incurred by city and county, is created by the several obligation of the county alone, the city not having joined in it at all? Assuming Maysville to have been at the time, as was the fact, an incorporated city, would it not be equally absurd to contend that the several subscription, made by the Mason county court *alone,* is in accordance with the act which only allows a *joint* subscription to be made by the city and county, simply because the city is within the limits of the county, and because the citizens thereof are also inhabitants of the county? Would it be proper to convict the legislature of being guilty of the folly and absurdity of requiring, in most unequivocal terms, a joint subscription to be made by two local communities, with distinct territorial limits, and with distinct organizations, powers, public functionaries, magistrates and officers, when they meant it should be severally made by one only of those communities? It was not only not necessary, but wholly improper and misleading, to insert the words *"Maysville"* and *"jointly"* in the act in connexion with the words, *"and Mason county."* If it was intended only to authorize a several subscription by the county, it was not requisite or proper that Maysville should have been mentioned or named in the act at all, in order that the citizens thereof, as being also inhabitants of the county as well as of the city, and that their property

should be subject to a tax laid by the county court of Mason, to raise the means to pay a county subscription or a county debt. How would it do to say, for instance, that the north-east section of Mason county, with a specific boundary given, AND Mason county, *jointly*, may or shall subscribe, &c.? In such case, unless the north-east section, as bounded, possessed a distinct and separate local organization, the expression would be simply absurd and ridiculous; and, as the major includes the minor and the *whole* includes all the parts, if Mason county, as a distinct organization, through its organ, the county court, is authorized to subscribe stock, the whole county, as a unit, including all its parts, without the use of other superfluous words, would be bound by such subscription, if otherwise legitimately made. The copulative conjunction "AND" is used to connect distinct persons, communities, things, or ideas together in the same sentence; such is its office, grammatically and by universal usage, and when such expression is used as that in the act in question, to-wit: that "*Maysville* AND *Mason county*, JOINTLY," may subscribe, &c., it necessarily and imperatively means nothing else than that Maysville and Mason county are distinct and separate organized bodies, and it must be the conclusion that such is the fact, unless the contrary should be established by incontrovertible proof. If it were not so, the conjunction "*and*" does not perform its proper office; and such expression would be about as absurd as to say, Mason county *and* a part thereof, jointly, may subscribe; or Mason county and the county of Mason (being the same county) may *jointly* subscribe, or that Richard Roe and Roe Richard, (being the same person, the christian and surname being only transposed,) shall *jointly* subscribe.

Maysville, an incorporated city, situated at one end of the contemplated railroad, having a much deeper interest, therefore, in the subject than a majority of the inhabitants of Mason county, is first named in the act, and Mason county follows. The two are

8. The authority to subscribe was joint, and in no other way, and the authority of the

connected as distinct bodies, by the conjunction "AND," and they authorized to subscribe, "JOINTLY," and in no other way.

I entertain no doubt, therefore, that it was the legislative intent, as I believe it to be the true import of the act itself, that the city of Maysville, because of her vastly superior interests in, and the vastly superior advantages to accrue to her citizens from the proposed railway, should not only be also expected to make a several subscription of stock in this company, not exceeding $150,000; but that she should be equally bound, as a joint subscriber, with the county of Mason for any additional sum that should be subscribed, not exceeding the amount specified; and that, to make the subscription valid, if not impracticable on other grounds, it should have been ordered both by the mayor and council of the city of Maysville and by the Mason county court. The subscription should have been executed as joint; and jointly, upon the books of the company, as joint stock belonging equally to both parties, each to contribute one-half of the capital necessary to purchase the stock, each to execute the subscription on the company's book by their respective political organs, to-wit, by the mayor and council of the city and the county court of the county; and the bonds should have been joint obligations of the city and county, ordered and executed by both as joint contracting parties; which not having been done, the subscription as made and the bonds as issued should, in my opinion, if upon no other, be, on this ground, held to be invalid.

The views thus expressed of the import of the legislative draft of a law contained in said twenty-eighth section, is, I think, not only in accordance with the rules of philology as established by the schools, but with the legal rule of RIGID construction, which I would RIGIDLY apply to such legislative acts as the one under consideration. I think, therefore, that the subscription, as severally made, was invalid.

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

mayor and council was as necessary to make the subscription as that of the county court; this course not having been pursued, the subscription was invalid.

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

9. No authority is given by the amendatory act of 1851 to make the interest on the bonds payable in New York, or semiannually, but yearly.

The next objection which occurs is, that the requisitions of the act of February 17th, 1851, by which alone the authority, if any at all, existed to pay the company in city or county bonds for stock previously subscribed "under the provisions of the act to which this is an addition," has in some particulars not been pursued, but disregarded, and in other particulars its provisions unwarrantably exceeded. For instance, the act of February, 1851, provides that "the county court of any county, and the city council of any city, (who shall subscribe, &c.,) shall be authorized to execute bonds of the county or city, payable to the president and directors of said company, for the amounts severally subscribed by said cities and counties, *payable at such* TIMES as may be deemed best by said county courts and city councils." It will be perceived that the courts and councils are allowed a discretion only as to the TIME when the bonds shall be paid; from which it is *inferred* (as this act should be strictly construed) that the courts and councils had no right or discretion to make the bonds payable at any other PLACE than that which the law fixes as the place of payment, to-wit, the city and county treasuries, if any they had; or otherwise, the place where the bondholders might find the agents or collectors employed by the courts and councils to collect the taxes imposed to raise the means to pay the interest and principal due on the bonds, and to disburse the same for that purpose. The bonds actually issued are made payable in thirty years, *in the city of New York*. Now, does the power to fix the *time* of payment, when the act gives no express authority to fix any place of payment, (or does the general power conferred to issue bonds to the company) authorize the court to make them payable in *New York?* or was it not the legislative intent that, as to the *place* of payment, and the rate of interest, the general law of the land should govern the court in the execution of the bonds?

It is further provided by the first section of the act of February, 1851, that "it SHALL be their duties (to-wit, of the courts and councils) severally to levy and collect upon the real and personal property of said counties or cities an amount in money sufficient ANNUALLY to pay off the interest on said bonds." And the second section provides that the "interest to become DUE YEARLY," shall be raised by taxation, &c. The bonds issued, however, have dividend warrants or coupons attached for the semi-annual installments of interest, and that interest upon the bonds is thus made payable *half-yearly*, and not yearly as the act provides. The expression in the act "to become due *yearly*" is understood to mean that the accruing interest of the whole year shall be paid when due at the end of the year. It cannot certainly mean *to become due half-yearly*. Now say, for argument sake, that the people of Mason county agreed to take stock to the amount of $150,000 in this railroad company, the company to take in payment county bonds payable in thirty years, with legal interest from date, payable *annually*, and of course in the county of Mason, no other place of payment being stipulated or named in the acts; if the company procure county bonds to be delivered to them for the stock by the county court, (exceeding their authority,) stipulating for the payment of the interest half-yearly, and the principal in thirty years, in the city of *New York:*—Query, is or not the whole arrangement vitiated by fraud, or made invalid by a departure from its terms? Would or not the county be bound by the bonds, or entitled to the stock? If not, the company should have been required to yield up the bonds, and to take back their $150,000 of stock, so that then the 989 voters of the city of Maysville, and the 339 voters of the county of Mason, (who united to force the plaintiffs and others, amounting in number at least to 746, to become involuntary stockholders in this company,) might have the opportunity, if they chose, to take all this stock themselves, or so that the company might have sold

Slack, &c.
*vs.*
Maysville, and
Lexington R. C.

the stock to those only, who, in the exercise of an indefeasible right to buy or not to buy it, which the legislative power cannot rightfully or constitutionally abridge or destroy, were, in fact, willing to become stockholders and purchasers of such stock.

10. The act of 1851 authorized the issual of bonds by those who should subscribe stock under the act of 1851, and not those who should subscribe under the act of 1850; and as the county of Mason had subscribed seven days before the passage of the act of 1851, it has no authority to issue bonds.

But if even the bonds, in their terms and stipulations as to amounts, time and place of payment, and rate of interest, did not exceed or expressly violate the provisions of the act of 17th February, 1851, they would, nevertheless, be invalid and void, unless there had been previously authorized by the vote of the people, and ordered and directed by the Mason county court, a valid subscription for the $150,000 of stock in this company; because it should be particularly observed, that by the act of February, 1851, only those counties and cities that should actually subscribe stock in this company, "UNDER THE PROVISIONS OF THE ACT (to-wit, said twenty-eighth section,) TO WHICH THIS IS AN ADDITION," and none others, had authority whatever to issue bonds *payable to this company* of any kind whatever, for payment of stock or anything else. The terms used in the act of February, 1851, to-wit, *"under the provisions,"* means in accordance with, or in conformity to the provisions of the act of March, 1850. If the subscription had not been so made, it could not be said with propriety, that it was made *"under"* *the provisions of the act;* but it would have been in part or altogether made under other and different provisions; and being so made, would be unauthorized by the act in question; and the act of 17th February, 1851, only authorizes bonds to be issued by which such cities and counties as *shall* (in the future tense) subscribe stock, &c. The language used does not include those cities or counties that had theretofore subscribed, according to its true grammatical purport. As the Mason county subscription, had been ordered on the 10th February, seven days before the act was passed, and never afterwards, the county of Mason had no authority, by that act, to issue bonds at all.

For the reasons already given, it is my opinion that no valid subscription had been made by the county of Mason at all; and that the orders of the court, conditionally and positively directing it to be made, were unauthorized and void; and it is a logical sequence upon this assumption, that therefore, no bonds could be lawfully issued under the act of February, 1851, even if that act itself was valid, and in accordance with the constitution of 1850, which I do not admit.

It is unnecessary to pursue further the inquiry upon the questions above considered, they being preliminary merely. So far, it will be perceived that the views as presented, except incidentally, do not touch the constitutional difficulties involved; but for the sake of the argument, the legislative acts in question have been regarded as constitutional, and the invalidity of the acts of the company, of the election held in Mason county, and of the various orders of the county court, have been inferred from their non-conformity to, and non-agreement with those legislative acts themselves. If I understand and construe their provisions correctly, they have not been pursued, but departed from, in several most important particulars. Doubtless, the construction which I have given to these acts of the legislature, will be regarded by very many persons, and by those especially interested in the affairs of this railroad company, as incorrect, rigid, narrow, and illiberal, as controlled by their mere letter, and as inconsistent with their general spirit and design. My answer would be, first, that I do not agree with them, that it is so—I think I have construed them correctly, according to their true intent and meaning, both by the rules of law, and of grammatical criticism; and next, if it be true that the construction given to them is unphilosophical, technical, and rigid, such laws I humbly conceive deserve to receive no other kind of construction. It is a reasonable and settled rule, amounting to an approved legal doctrine, that legislative acts providing

Slack, &c.
vs.
Maysville and
Lexington R. C.

11. Acts of the legislature conferring upon corporations extraordinary and unusual powers, &c., should be strictly construed, and rigidly pursued. (2 *Marshall*, 102; 4 *B. Monroe*, 123.)

summary, harsh, and speedy remedies, as adapted to particular specified cases, or requiring the forfeiture of private estates, or directing a summary disposition or *ex parte* appropriation of private property for arrears of taxes, or other public dues, or conferring upon private agents extraordinary and unusual powers and privileges, in the exercise of which private rights, whether of person or property, are liable to be infringed and violated, should receive a strict construction; and all action or exercise of power, especially by private agencies, or by corporations under their authority, should be closely scrutinized and vigilantly compared with their provisions, and held to be void and of no effect, unless those provisions have been specially and strictly pursued; and the same rule applies to the act which incorporates this railroad company, of which the said twenty-eighth section is a part, and to the action of the company under it, with all its force and vigor; and in this assumption I am fully warranted by authority of the case of the *United States Bank* v. *Norvell*, (2 *Marshall*, 102,) and the cases there cited. The opinion of Judge Mills in that case was approved by the appellate court, and the principle, as above stated, is also fully sustained, I think, by the opinion pronounced in the case of *Bishop* v. *Lovan*, reported in 4th *B. Monroe*, 120.— To the legislative acts, and to the proceedings under consideration, the application of that principle, in all its strictness, is peculiarly appropriate.

The constitutional validity of the twenty-eighth section of the act of 4th March, 1850, and of the act of 17th February, 1851, have been drawn into question. It is contended, on behalf of the plaintiffs, first, that those acts are unauthorized by, and violative of both the former and present constitutions of the state, and are null and void; and that the proceedings of the company, of the voters of Mason county, and of the Mason county court, (even if in strict conformity with those acts,) are nugatory and must fall as wholly unsupported by any valid law of the land. Second-

ly, if not in violation of the constitution of 1799, yet that the said acts and proceedings are in conflict with and prohibited by the present constitution of this state, adopted in June, 1850, and that by it their validity must be tested, because all of said proceedings, including the printed notice of the company, the election held in Mason county on the fourth Monday in January, 1851, and all the orders of the Mason county court, took place after the 11th June, 1850, when the present constitution was adopted; because the act of February, 1851, from which it is attempted to derive the authority to pay the company for the stock with county bonds, was subsequently passed, and because the twenty-eighth section of the act of 4th March, 1850, although written and published by authority of the legislature before the 11th June, 1850, was a mere dead letter, having then no binding effect or validity, as the railroad company and the voters to whom the legislature had transferred the legislative power to enact or reject the project, had not acted upon it in any way, until after our present constitution was proclaimed as the fundamental law of the state, and by which, it is contended, the said twenty-eighth section, as well as all other previous legislative acts, if inconsistent or in conflict with it, (especially if not *then* binding or executed,) was virtually, and, in fact, expressly repealed.

The responsibility of considering and settling these grave questions has been; by the proceedings instituted by some one hundred and fifty worthy citizens of Mason county, in this case, imposed upon the judicial department of the government; and a majority of the judges of the appellate court at the head of that department, have necessarily assumed that responsibility, and settled the questions presented, against the appeal of those citizens, sanctioning, upon the grounds and for the reasons set forth in their opinion, the legislative power as exercised in the passage of the acts referred to. In much of the reasoning, with many of the positions, and in the general

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

conclusion of that opinion, I do not concur, and will proceed briefly to present some of the reasons which influenced my mind to differ in opinion with the majority, and which induced me to arrive at a different conclusion.

In the first place, let the inquiry be made and answered, what is the simple purport of this twenty-eighth section of the act of March, 1850 ? Let it be stripped of its disguises, divested of the tautological verbiage with which it is cloaked and covered, and let it stand out in its true character, its genuine proportions, and its naked deformity—and what is it? It is a scheme and device by which a private corporation has been allowed the privilege, in its discretion, to use the machinery of an election to be held in Mason county, at such time as it may appoint, at which its own interested agents and members, together with all the non-tax-payers in the city of Maysville and county of Mason, may combine and vote down the disinterested property holders ; to force from an unwilling people contributions for the benefit of this company ; to take from them without their consent and against their solemn protestations, their private means or property, without any previous compensation whatever, not even, then, for "PUBLIC USE," but for the use of a private corporation. In other words, this company, upon the sole condition of their being able previously to get a majority vote in Maysville and Mason county, though made up of its own members, officers, and agents, and those qualified voters who own no taxable property at all, may proceed to force the county to contract a debt of $150,000, and to forcibly take the money and property of the citizens from them, and against their will, within certain amounts, and to use the agency of the sheriffs to make the seizures, and to apply the means thus procured to the private uses of the company.

This twenty-eighth section was not a law of itself;

12. An act of the legislature conferring the

it had no binding effect as a law ; the sovereign legislative power of the state did not enact it ; the action

of the legislature was confined merely to drafting it, as a project; their power was exhausted upon the scheme after they had it written, published, and submitted to the other most unusual and extraordinary, and private agencies appointed to pass it or reject it, to let it remain a dead letter, or to give it force and vitality, according to the discretion of those private agents. No election could be held, no stock subscribed, no county debt created, or special tax imposed to pay such debt, by virtue of this act, unless this company should consent to it, and decide that the steps necessary to give it force should be taken.— This company had the power to reject this twenty-eighth section, and it could not become a binding law without its consent; to that extent, at least, the legislative power of the state was delegated to a chartered stock company; for the company had the power to give or refuse to give the prescribed notice; if refused, there could be no election, and 'if no election, there could be no law, and the twenty-eighth section would have remained still as it came from the hands of the legislature, a dead letter, a mere draft or project, not to be enacted or executed because the company did not like it. But should the company conclude to withdraw its opposition, and permit it to be enacted, they could publish their six weeks' printed notice, for an election to be held in the midst of the winter, as was done, submit the project to the voters and permit them, if a majority could be procured at such election, to pass upon and adopt this project, as furnished and written out for them. Thus the legislature cast off from their own shoulders the responsibility of enacting this section, and thrust it upon this private corporation, as a quasi upper house, or house of lords, and upon Tom, Dick, Jim, &c., (if enough of them to make a majority of the qualified voters actually casting their votes, of Mason county,) as a sort of lower house, or house of commons. That is to say, when the legislative power was applied to and requested by the company to pass this law, they re-

SLACK, &c.
vs.
MAYSVILLE AND LEXINGTON R. C.

power of taking a vote of counties or cities for the imposition of a tax for railroad purposes, is in conflict with both the constitutions of 1799 and 1850, sections one and two of article one. It is not a legislative act possessing vitality in itself, but a transfer of the power of giving to it vitality, to a corporation, which cannot be done.

ply, no, we will not; but you and the voters may, if you think proper; and if you do pass it, then you may have the mayors and councils of the cities, and the honorable justices of the county courts of the counties named in the act, and the sheriff, officers of the said counties, and the said city collectors, at your service; they shall be *compelled* and *forced* to make and register the edicts required, and to give the bonds of the cities and counties to you, to collect and pay over the required tribute; and the stubborn and refractory voters who voted in the negative, when the yeas and nays were taken in this substitute for a lower house, shall be compelled, however contrary to their wishes, to contribute, to pay the principal and interest of the debts contracted, in spite of their opposition. Is this a valid act of the legislature? Is such legislation authorized by the constitution of 1799, or that of 1850, or by any written constitution of any other civilized state or nation in the world? I believe not; at least, I am sure it ought not to be.

If a government, according to its constitution, is republican in its principles, and representative in its form, there are many things which it cannot do, and many powers which it cannot rightfully exercise, although they be not even named, much less expressly prohibited in the constitution. It has no right to take from one citizen the honest earnings of his lawful industry, or to take his lawful property forcibly against his will, in whole or in part, and give it to another citizen, or to a corporation, (which amounts to the same thing,) or to authorize a corporation or any number of the people to do so. It has no right to force him to abandon his own lawful profession and business, pursued to promote his own happiness, and to earn his own subsistence thereby honestly, and compel him to adopt and pursue any other against his will. It has no right to compel a citizen, or to authorize others to compel him, to make a contract with a corporation, or another citizen, and to exchange his property, labor, or money, or any part thereof, for the

stock of such company, or for any other thing, upon arbitrary terms, contrary to his own will and to his views of his own duties and interest. It has no right to compel him to buy stock, employ a physician, fee an attorney, or hire a servant. He has a natural right of which no government can justly divest him, and of which he cannot legally divest himself, to be a free man and not a slave; to be his own physician, his own attorney; to be his own servant, and to employ all his own means and capital in such honest and lawful business as, in his own judgment, is best adapted to the promotion of his own well-being and happiness, always provided he does not interfere with, or encroach upon the equal rights of others. I do not concur in the opinion, therefore, entertained by some, that there is no limit to the legislative power of this government, except it be found in some express prohibition contained in the constitution itself. But even if this position be assumed as sound, yet I think that the acts in question and the power exercised in their passage, has been substantially prohibited in both the former and the present constitutions of Kentucky. It is substantially prohibited in the solemn declaration made in convention, as contained in the short but comprehensive preamble to the constitution of 1799, ordaining and establishing the same, as instituted expressly "to *secure* to all the citizens the enjoyment of the rights of life, liberty, and *property*, and of pursuing happiness." Now, the act in question defeats the purpose, as thus expressed, for which the government was formed; for, instead of *securing* to the citizen the enjoyment of the rights of property, &c., they destroy that security; not only so, but take it from him without compensation, against his will, to give it to a corporation. This preamble is also adopted in the present constitution. The legislation in question disregards, therefore, one of the most important objects for which the government was formed; that is, to secure the rights of property. If it is permitted that the citizen's property be taken

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

from him, against his will, and without compensation, and be given to others by any sort of device or indirection, however, it may be disguised or cloaked over by verbosity in language, complexity of machinery, and by the substitution of delusive and misleading terms and phraseology, for those which, if used, would more truly express the odious and arbitrary character of the policy sought to be riveted upon the people, then will the enjoyment of the rights of property, and, in fact, the satisfactory enjoyment of life itself, ("for you take away my life, if you take the means whereby I live withal,") be rendered insecure and worthless in this community.

I see a marked and very substantial distinction between the said twenty-eighth section and other legislative acts which confer authority merely upon subordinate public agencies, or county and municipal magistrates, to do or not to do certain given prescribed acts or things, in themselves legitimate. There are numerous instances of such acts, authorizing the circuit and county court clerks, the county court and circuit judges, and other public officers, as the auditor, register, and treasurer, to exercise certain powers, and directing them to perform certain duties; but they are not made dependent on their wills for their validity. Such acts are made to give such authority, and they do it; are mandatory and complete of themselves; nothing being left to be done except what is ordered or permitted by the binding statutes themselves, to give them force and effect as laws, whereas the said twenty-eighth section was not a binding law at all; it was only a legislative draft or published copy of a law, the adoption or rejection of which was left to the absolute discretion of a railroad company and the voters of certain cities and counties named therein. It was not an act of legislative power, actually exercised by the legislative branch of the government, in whose hands is lodged the whole law-making power of the state; but it was an act by which that department of the government attempted to assign

away, delegate, or transfer their legislative power and responsibility to a railroad company, and to private and irresponsible agents and deputies, wholly unknown to the constitution, and unauthorized by that instrument to receive or to exercise any such delegated powers. An act to make a thing lawful to be done, by authorized agents, requires nothing else to be done except its enactment by the legislature, to make it binding and efficacious, although the agency named may or may not, having a discretion, do the thing authorized. Such an act is very different from the twenty-eighth section, which was no law at all, having no force or efficacy for the purposes indicated, whatever, unless given to it by the company and the voters to whom the legislative power was transferred, to adopt or reject it, and which transfer of power was the only thing designed or attempted to be effected by the act itself. It is not analogous to legislative acts to be carried out and executed upon certain conditions specified in the acts themselves, as, for instance, an act authorizing a certain public improvement to be made, upon the condition certain real estate or certain materials could be purchased in a given time, at a fixed price; or an act authorizing the government to effect a loan of $1,000,000, upon the condition it can be effected within a given period of time, and upon prescribed terms; or an act making an appropriation of money for a geological exploration and survey of the state, to be applied upon the condition that the services of a certain named geologist of distinction could be procured at a stated compensation. Such acts can be made—are complete within themselves, and their force and validity does not depend upon the wills of any corporation or voting transferrees of the legislative power. But if the conditions fixed in the act, upon which, by its own terms, its binding effect as a statute or law is made to depend, is the mere volition of a corporation, or of the majority of certain voters, who, themselves, are authorized by the act to adopt it or reject it as a law,

*to say it shall be a law, or it shall not be a law,* I can regard this as nothing more nor less than an attempt to transfer the legislative power in the particular case to such corporation or voters, in violation of the first and second sections of the first article of the constitution of 1799 as well as that of 1850, wherein all the powers of the government are distributed. Thus, the legislative power is conferred wholly upon one separate body of magistrates, (subsequently created and regulated by the constitution,) to-wit, the legislature; the executive power to one, the judicial power to another; and neither of these departments or branches of the government can exercise any of the powers or functions belonging to either of the others, except in instances expressly directed or permitted by some special provision of the constitution itself, which may be searched in vain to find any provision transferring to or conferring upon any other than the legislative branch of the government, or upon any other civil officer thereof except the members of the legislature itself, any legislative power whatever, over any subject whatever, except in the single instance of the qualified executive veto, as lodged in the hands of the governor. Now is it not strange, notwithstanding this express constitutional prohibition, denying to either the executive or judicial branches of the government, or to any officer belonging to either, the right to exercise (and, of course, the right to have transferred to them by the legislature) any legislative power, except as expressly authorized, that such power should be transferred to a railroad company, and to a primary assembly of the people of certain cities and counties called together and convened by the company, and that too, as assumed, without a violation of that constitution, which contains such prohibition, and which confers no authority, direct or indirect, to make such transfer. I marvel why incorporated companies, and voting majorities of the people, to be authoritatively convened by such companies, were not included in the constitutional prohibition re-

ferred to. It is supposed, however, that it would have been so done, had it ever occurred to the members of the convention, that any attempt could ever be made to deposit any part of the legislative power in such irresponsible hands, especially the high power of taxation, or rather coercing involuntary tribute from the people under color of taxation, to be paid to private incorporated companies for their certificates of stock, which they did not wish to purchase.

I am well aware that in the case of *Talbot* v. *Dent*, (9 *B. Mon.*, 534) that this court, in their opinion, declare, that "the right of the legislature to delegate the *power* of *taxation* for *local purposes*, to the *regularly constituted local authorities*, is too well established both by legislative precedent and by judicial decisions to be now denied." And although, as an original question, I should by no means admit, but deny, with full confidence, the constitutionality of such legislation, and refuse to concur in a judicial decision by which the power or policy should be sanctioned, yet I admit the truth of the declaration as matter of fact, and would, at this day, feel constrained to yield my own convictions to the general usage, to the very frequent expressions of opinion, in the form of acts passed by the legislative branch of the government, and to numerous judicial precedents, and concur with the majority of the court, in their opinion in the present case, did I not believe that the principle as stated was inapplicable the facts thereof.

To bring this case within the principle of the acts and decisions referred to in the above declaration, it must appear, firstly, that the money to be coerced from the plaintiffs, or made from the seizure and sale of their property, against their wills, in virtue of the said twenty-eighth section, or act of February, 1851, is in fact *taxation*, and not mere licensed plunder; that it is actually a TAX, not merely in name, but in truth, which I do not admit, and will endeavor to show that it is not a tax.

Secondly, it must appear that it was not only in fact a *tax*, but that it was imposed by, and to be applied to the *public purposes* of the *local government*, whether of a town, city, or county; that, when collected, it should be the revenue of the local government, paid into the local treasury, subject to be paid out and disbursed by authorized public agents, under express appropriations made by the proper authorities. I do not perceive that the money attempted to be coerced out of the complainants, when collected, is to be applied to the public purposes of the local government, or of the county of Mason; or that the same is public county revenue; subject to be applied and appropriated by the public authorities of the county—to-wit: the justices of the county court—to any public object or public improvement, belonging to the citizens of the county as a subordinate political community, or to the local government as such. On the contrary, the money is to be forced out of the plaintiffs, not as county revenue, but to be paid to a railroad company—not for the construction of a public work belonging to the county, or its local government, but to aid in building a railroad as the private property of a corporation.

Thirdly, it must appear further, to bring the case within the principle as stated, that the power to impose the tax (if even it could, with truth, be so called,) was delegated "to the regularly constituted local authorities," which was not done in this case. On the contrary, the power was delegated to a railroad company, and to the voters of certain cities and counties, if the company thought proper to have them convened to get their co-operation in the exercise of this delegated power, *not of taxing*, but, as it seems to me, of plundering the citizens; and the regularly constituted local authorities—were in substance stripped of their local authority, and were made the subservient instruments of the company, and bound on its requisition to order and provide for an election, and also of the voting majority, being bound, on their will be-

ing made known in the form prescribed, to buy on behalf of the county $150,000 of stock from this company, and bound to impose a tax to compel the people, willing or unwilling, to pay for it. The *county authorities* had no discretion; they could not refuse to do the bidding of the company and the voters; they had no power delegated to them to impose, or to refuse to impose the tax in question; the act bound them to do as they were directed by the company and the voters.

In the case of the *Clarke County Court* v. *The P., W., and Kentucky River Turnpike Road Company,* (11 *B. Mon.,* 150,) it is also declared by this court that "the general question, whether the legislature may delegate the power of *local taxation for local purposes to subordinate local authorities,* is no longer an open one." And the court then proceed to say, further, that the county courts "have always (by legislative authority) had power to *tax* for *local purposes;*" "and among these local purposes, the erection of bridges and the repair of roads have been always recognized as prominent objects." So far, very well. I will not controvert this opinion, but the preceding remarks will also apply to it; that is, in the case under consideration, there was no legitimate *tax* imposed *by the local authorities,* to be applied to such local purposes as those defined above—to-wit: county roads and county bridges, repaired and built under authority of the county court, and belonging to the county, and under the jurisdiction of the said county court, as conferred by either the general or the special road laws hitherto enacted. But the court, in the opinion last cited, go on to remark: "Nor do we perceive any rational ground for saying, that, while the legislature may authorize the county courts to levy a tax for the purpose of building a bridge, or cutting down a hill, or making a causeway across a swamp, or of making other improvements in the roads of the county for short distances, and not coming up to the character of TURNPIKES, they have no power to authorize a tax for con-

structing, or aiding in the construction of a TURNPIKE ROAD within the county. We know of no principle in the late or present constitution which would authorize such a discrimination, whether founded upon a difference in the character of the roads or in the amount of tax requisite for constructing or repairing them, and as the legislature might, undoubtedly, authorize a county court to levy $5,000 for the purpose of building a bridge, we can find no ground for denying the power of authorizing a similar levy, for the purpose of constructing or aiding in the construction of a certain length of turnpike road in their county. Certainly the privilege of charging and receiving tolls for the benefit of the county, cannot affect the question of power."

Let all this be granted precisely as stated, and yet I do not perceive that the arguments presented, or positions assumed in either of the opinions last cited, meet the main questions presented therein; and I do not think that they justify the conclusions to which the court arrived in the Clarke county case, or in the case of *Talbot* v. *Dent*, from the opinions in which the preceding quotations have been extracted.

The position assumed by me, is this: That the legislature is not authorized by the constitution, to delegate the power to a private corporation, or to a majority of the voters actually voting, in any county or city, to create a county debt, in the form of a subscription of stock in a private railroad company, or in the form of county bonds to be issued in payment for such stock, or to have a tax (in name only) imposed upon the people to raise money to pay such debts. This position is not shaken at all, as I deem, by the admission that cities and counties, through the agency of their *public officers*, may have power delegated to them to levy taxes and collect county or city revenues to be appropriated by the proper authorities to works of public improvement, even though they be TURNPIKES or RAILROADS, and tolls exacted, which belong to the local public or the local government, and

which are under the local jurisdiction, ordered, controlled, and paid for, under the authorized political supervision of local public agents, and built by local government contractors. If the bridge or road, of whatever kind, or public improvement, is undertaken by, and belongs to the local government of the city or county, then I admit that the local communities, as such, may build it, and be taxed to pay for it; but if the road is the property of a company—*private property*—let the owners build it, and spend their own money to pay for their own work, and let those become owners of the company's stock who think proper. The plaintiffs cannot be forced to become owners by legislative power, and of course such power could not be rightfully conferred upon the company, or upon any number of voters. It is no answer to say, the plaintiffs are not compelled to receive the company's stock, for the money they should be forced to contribute towards building the road. True it is, they are not forced to receive any equivalent in stock, or in anything else, in exchange for their involuntary contributions of money; but if a citizen cannot rightfully be forced against his will to purchase stock or property from a corporation or another citizen at a fixed price, or forced to receive either, in exchange for his money against his will, much less can he be compelled to pay his money or surrender his property to another person, or to a private corporation, without any return or compensation; or otherwise, if it would be arbitrary, tyrannical, and unconstitutional for the government to compel a citizen to buy from another a certain article at a given price, it would be equally so to compel him, if he refused to make the purchase voluntarily, to pay to the vendor the price of his commodity at any rate, whether it was worth anything or not in his estimation, (he being the rightful judge of that matter,) or whether he chose to receive it or not. There are instances where governments have arbitrarily provided by law that certain commodities—as, for instance, some kinds of provisions—should be sold

only at very reduced, but fixed prices; but they could not *compel* the owners to sell at those prices. The consequence was, that the producer would not sell, unless for his own price, and the consumers must live, cost what it may; and thus the law of demand and supply repealed the arbitrary decree of the government, and controlled the prices in defiance of that decree.

Again: governments have resorted to the arbitrary measure of debasing the public coin, or. metalic currency, in order, by so doing, and by providing that the pieces, as debased, should, in the business and commerce of the country, and in payment of debts, still maintain their former value, to increase the total amount of the currency of the nation; but, (except as to creditors, who would be greatly injured,) the citizens could not be compelled to receive such debased coin in trade, except at their own estimate, and the actual diminution in the value of the coin received would be more than counterbalanced by enhanced price fixed upon the service or the commodity rendered or given in exchange for it.

13. The legislature may not require a citizen to become a stockholder in a corporation against his consent.

But the legislation now the subject of inquiry, it seems to me, is still more arbitrary and unjustifiable than the measures above referred to. It puts it in the power of a company and a majority of the voters in certain districts, to require the citizen to take the company's stock at a fixed price, and if he refuses, he is to be compelled to pay the price to the company at any rate. This policy addresses the citizen in this wise: "Sir, take this certificate of stock at par, and pay me the money for it." The citizen replies: "I don't want your stock, I believe it to be worthless, and wish to use my capital, or what little means I have, in another way." "Very well," says the company, through the mouth of the collector of this most extraordinary tax, "just as you please as to buying or receiving the certificate of stock; but as to the price demanded, that you must pay me in money, in certain amounts, once in every six months, or I shall

seize your property, and make sale of it to raise the sum required." And to this the citizens of Mason county, Ky., who are opposed to this arbitrary policy, are required, and I suppose will be compelled, to submit.

But suppose the previous legislation of the state, as approved by former judicial precedents, could be successfully arrayed and relied upon, as sustaining the positions assumed, and the conclusions deduced in the cases of the *Clarke County Court* v. *The Turnpike Road Company*, of *Talbot* v. *Dent, supra*, of the *City of Louisville* v. *Hyatt and others*, (2 *B. Monroe*, 176,) and the case of the *City of Lexington* v. *McQuillan's heirs*, (9 *Dana*, 513;) yet there are marked distinctions between all and each of those cases, and the one under consideration, which I hoped and believed were sufficient, in substance, to have prevented the necessary application of the legislative acts and judicial precedents referred to, to the facts as exhibited by this record, and which would have authorized, if not required, a different conclusion and decision of the constitutional question as now presented.

In all the cases referred to above, the legislative power of creating public debts of the cities and counties, or of imposing taxation upon the citizens of the local communities to pay city or county debts, was delegated to and conferred upon "*the regularly constituted local authorities*," to adopt the very language used by the court in its opinion in the case of *Talbot* v. *Dent;* not to railroad companies, private corporations, or to the qualified voters of the cities or counties. It is true that in the two former cases the tax was to be imposed for the purpose of paying subscriptions for stock in road companies; but the authority to subscribe the stock, and to levy and collect the tax, was vested in the regular public authorities. The analogy between those cases and the one now under inquiry, fails in the important particular that, in this case, the power to make the subscription of stock and to levy and collect the tax to pay it, or to issue the

---

SLACK, &c.
*vs.*
MAYSVILLE AND LEXINGTON R. C.

14. The distinction between this case and the cases of the *Clarke County Court* v. *The Paris and Winchester Turnpike Road Company, Talbot* v. *Dent, City of Louisville* v. *Hyatt, City of Lexington* v. *McQuillan's heirs,* is this—that in the cases cited, the power to levy the tax to pay debts was delegated to the *regularly constituted local authorities,* not railroad companies, private corporations, or the qualified voters of cities or counties; in this case the power to make the subscription, and levy and collect the tax, or issue the bonds, was delegated to the railroad company and the voters of Mason county.

bonds received for it, was delegated to the railroad company and the voters of Mason county. This is a most material distinction between the cases; for, I presume, it will not be contended that the railroad company, its officers or agents, or the voters of Mason county, are the "*regularly constituted local authorities*" of the said county, or of the city of Maysville.

In the cases of the cities of Lexington and Louisville, the analogy fails in two particulars, both of substance. In those cases the power to impose the tax was delegated to the *regular city authorities*, and the tax levied, when collected, to be applied to *public purposes*—to-wit: the improvement of the streets of the cities—and not to build a road belonging to a private corporation.

The courts sometimes declare in their opinions, that certain doctrines or principles of the law have been stretched and extended in their application as far as warranted by good authority or sound policy. So I think that the doctrine, that the legislative branch of the government may delegate their legislative power and authority, especially the very delicate and important power of taxation, to subordinate communities, and thus institute a swarm of miniature republics within the state—of little governments within a government—has already been stretched and extended as far, at least, as is warranted either by good policy or by the constitution. Take, for instance, a case of a citizen of either of the cities of Louisville or Lexington, who is the owner of city property. He must, of course, reside and have his lots or residence on some of the streets and squares of the city. According to the opinions of the court, in the two city cases previously cited, he may be regarded as a citizen of a small quasi local community, composed of the owners of the lots on his particular street or square, and be subjected even to enormous rates of tax, to be levied and collected from him and the other citizens of this particular quasi local community, exclusively, to grade and pave the public streets on

15. The power of taxation conferred upon local authorities has been extended to its utmost allowable limits.

which their lots are situated. He is subject, furthermore, as a citizen of the city generally, to all the burthens imposed upon the inhabitants by the city authorities, in the form of taxation to pay the interest and principal of city debts, and all the expenses of the city government, consisting of liberal salaries and fees to a host of city magistrates, mayor and council, and a swarm of officials, who protect him too much. He is also a citizen of the county, and subject to pay county levies and taxes assessed upon his property if allowed, to pay interest and principal of county debts, and to pay county officers their salaries and fees, and the expense of all public county improvements. He is, furthermore, a citizen of the state at large, and as such, he is to be required to submit to heavy state taxation, to assist in making up the aggregate of some $500,000 or $600,000 of state revenue annually, to pay the interest upon the state debt, to meet the expenses of the state government, and to sustain the public credit; and he is also a citizen of the United States, and as such, he must furnish and contribute his proportion of the $50,000,000 now annually required to sustain the government of the Union. Now, if he can be taxed as a citizen of as many as five (5) distinct communities, inferior and local, and superior and general, and in three of the cases by power delegated to the "*regularly constituted local authorities*," is he not taxed enough? Does he not pay for enough government protection, and perhaps a little too much? Is he, if such a thing can be true, not governed rather too much? Would it not perhaps be as well for him, if he could be permitted to dispense with some portion of the most abundant governmental protection which he pays for, and retain a part of the taxes imposed upon him and his property by *delegated authority*, and apply it to the better education and maintenance of his family? Some of the local governments would have to be dispensed with, but he might live the better for it. But if, after all this, there is to be a still further *delegation* of the tax-

ing power over him to popular majorities, composed of those who appropriate the proceeds of the tax to their own private use, or to the furtherence of projects to promote their own personal interest, and of others who have nothing to be taxed, and nothing to pay taxes with, or to a railroad company in connection with the popular majority, when such company is to receive the whole proceeds of such tax, to build its own road, and for the improvement of its own private property, the citizen may well complain of oppression, if he is thus to be subjected to the rapacity, often insatiable, of incorporated companies, and of the tax-gatherers of several inferior local governments, and of the state and federal governments. Besides, it would be apt to incline the understanding somewhat to the conviction that this doctrine of the right of delegating the legislative power of taxation to subordinate local governments, had been already extended far enough, as well as the practice under it.

Such is, however, the opinion I have formed, and which, with the reasons upon which it is founded, I have thought it my duty freely to express. It has grown into an accredited maxim that "the world is governed too much;" and the sketch presented, true to life, in some degree illustrates its truth.

The constitutional questions involved may be considered in another point of view, founded upon the position assumed by me, as incontrovertible, to-wit: that the act in review does not stand out as a binding statute, or as having the obligatory force and effect of law, from the exercise by the legislative or law-making department of the government of its own legislative power. No, indeed, it was not a statute—it was not a *law* when it passed from the hands of the legislature. As a binding and obligatory enactment it was not the result or production of the *will* or the *power* of the legislative body, in which alone that power is lodged by the constitution. On the contrary, it stands out in "*alto relievo*" as a most striking instance, amongst others, of an attempt upon the part of the legislature

16. The act of March, 1850, does not stand out as a binding statute, or as having the obligation and force of law, passed from the hands of the legislature; but is a most striking attempt to delegate legislative power to a railroad company, and to a popular majority, unwarranted by the constitution.

to delegate and transfer the legislative power to a railroad company, and to a local popular majority— thus, so far at least, creating a little local, pure, and unalloyed democracy, to legislate and tax others by themselves, and not by their representatives, and as thought to be requisite under our constitutional system of government. Was this twenty-eighth section a law when and as it came from the hands of the legislature? It was not. Would it have ever been a law, binding and effectual, for the purposes intended to be accomplished by it, if nothing more had been done to effect its enactment, and to give it the force of a law, than was done by the legislature? It would not. What was contemplated by the act? A subscription of stock in a railroad company, limited only in its extent to $150,000, in respect to Maysville and Mason county, jointly; the imposition of a tax upon the inhabitants to pay the debt incurred by such subscription, or by borrowing the money to meet the calls upon it. Now, did this act authorize these things to be done, as it was left by the legislature? It did not. Who could enact this twenty-eighth section so as to give it the force and effect of a law, authorizing those things to be done, as specified in the printed draft of what was a mere unadopted project? Not a subsequent legislature, but the popular majority of such of the voters of Mason county as should choose to cast their votes amongst the yeas and nays to be taken at an election, to be held on a day fixed, upon the requisition of a railroad company. What is legislative power? Answer, the power to make laws.— How is it exercised? Answer, by enacting or giving force and effect to a written or printed document, usually called a bill, so as to authorize the things to be done, or to make lawful the matters therein set forth. By what agency was that done in respect to this twenty-eighth section? Answer, the majority of the voters of Mason county who actually voted at the instance of the Maysville and Lexington Railroad Company. Therefore, the legislative power in the

actual enactment of this twenty-eighth section was exercised, not by. the legislature, but by this popular majority, to whom the legislature, without constitutional authority, actually transferred their legislative power for the time being and for the purpose stated. I cannot perceive or admit, therefore, that the twenty-eighth section, and its results, as shown by the record of this case, are the products of the actual exercise, by the legislature, of its own legislative power, or that anything more was done by that body, than to make the draft and authorize it to be enacted into a law or not, according to the discretion of said company and the popular vote as before stated. I have not been able to adopt any form of expression, or plan of grouping words into sentences, or sentences into paragraphs, or to pursue any train of reasoning or argumentation, sound or sophistical, by which the simple, plain truth of the position assumed can be so disguised or obscured as to lead my mind to doubt its correctness, or draw it to a different conclusion. The delegation by the legislature, therefore, of the legislative power, as attempted by the twenty-eighth section, is, I believe, unwarranted by the constitution, because, if allowed and drawn into precedent, and if this policy should continue to be much pursued, the citizens would be deprived of the security against encroachment, usurpation, and oppression, derived from all the valuable restraints and safeguards with which the legislative power is hedged in and surrounded, as provided in the constitution. To show how carefully the convention endeavored to protect the people from the abuse of legislative power, and as an evidence of the apprehensions of its members of the dangers to the civil and religious liberties of the people, as consequent upon unwise, oppressive, and corrupt legislation, some of those restraints and safeguards may be stated briefly—that it may appear also that they are all totally disregarded, and trampled under foot, when the legislative power is transferred or delegated to popular majorities, as done in the present instance.

1st. It requires the majority of the members of the two houses present, and the governor's sanction, to make a valid, binding law, or a majority of all the members elect in both houses against the sanction of the executive.

The law in question was not so made. Its validity and force as a law, if any, was derived from the popular vote, and a single body of people.

2d. The law-makers must be chosen and elected for that purpose by the people of the state.

The law-makers in the present instance were named and chosen by the legislature, and not by the people. They represented no man or body of men, except, perhaps, the railroad company.

3d. The constitutional legislators in the Lower House must all be twenty-four years old, have lived two years in the state and one in the counties which they respectively represent.

The unconstitutional legislators in the present case were many of them under twenty-four years of age. Some doubtless had not lived either two years in the state or one in the county.

4th. Constitutional senators serve four years, represent districts, must be thirty-five years old, have lived six years in the state, and one year in their districts.

In the passing of the act in question there was no separate body of men, possessing the qualifications of senators, whose several concurrence as a body was required in its passage.

5th. The constitutional law-givers must take a solemn oath, to be "true and faithful," &c.

The men that passed the twenty-eighth section were not sworn to be true and faithful, and they seem in fact to have evinced more fidelity to the interests of the railroad company than to the commonwealth or to the constitutional rights of the plaintiffs.

6th. The members of the two Houses in which the legislative power resides are subject to be impeached for official delinquency or misdemeanors, expelled

from their seats, and thus disqualified from holding any office of trust or profit.

The voters in whom was reposed the power to enact the twenty-eighth section, holding no civil office, were not subject to be impeached at all, expelled and degraded, as legislators, however corrupt the conduct of some of them may have been in procuring its passage.

7th. No person or persons holding other offices, (with some exceptions,) under either the state or federal government, are authorized to make or to assist in making laws; and no preacher can be a legislator in Kentucky.

Yet, doubtless, preachers and office-holders, under both governments, composed a part of the assembly which passed this act; at any rate, they were certainly not excluded from it, but allowed as qualified voters to be members.

8th. Upon the great cardinal principle of popular right and privilege, of no taxation without representation, as sanctioned by the British parliament, and maintained inviolate by British subjects, as shown by that feature in the English constitution which gives the taxing power, the power of raising and granting or withholding the subsidies and supplies of public money, in the first instance, to the House of Commons, the great representative body of that nation; and the attempted violation of which, was the main cause of a bloody civil war in England, which, in its mighty progress, struck the crown from the head, and the head from the shoulders of the most virtuous monarch who had ever sat upon the throne of England ; by which, amongst its other grand and terrible results, a commonwealth was erected and a monarchy overthrown, and which produced the American revolution, and a severance of the British empire—upon this very principle that citizens can only be taxed by their representatives, it is expressly provided in the constitution that "all bills for raising revenue shall originate in the House of Representatives;"

and of course such bills can only pass into laws by the vote of that House.

Yet this bill (the twenty-eighth section) by which it is attempted to involve Mason county in a debt to the amount of $150,000, and which authorizes revenue (if it can be so called) to be raised, and taxes to be levied without limit, except as to purpose, probably had its actual origin in the office of the railroad company, and was not enacted even by the House of Representatives with or without the concurrence of the Senate, but by a popular majority.

9th. To give to a bill the force of a law, it is indispensable that it should be formally read over three several times on three several days in each house of the general assembly, unless such rule shall be, in particular emergencies, dispensed with by four-fifths of the members.

Many of the legislators, doubtless, to whom, with others, the legislative power was transferred, to pass this bill, never read it or heard it read at all; at least the constitutional provision above stated was not regarded.

10th. No money can be drawn from the treasury, but in pursuance of appropriations made by *law*.

Yet the money exacted from the plaintiffs, by a pretended tax, *as public money*, and which, if it be so, is of course public revenue, and when collected is *public treasure*, is to be drawn from the plaintiffs' pockets and paid over to the officers of the railroad company directly, without ever having passed into any public treasury of state, city, or county, and without having been drawn from thence by regular appropriations.

In the delegation of legislative power to the regularly constituted local authorities, such as the county courts of counties, and the mayors and councils of cities, some of these important safeguards against legislative usurpation and the apprehended abuse of legislative power are still preserved, especially the fifth and sixth as stated above; and being public offi-

SLACK, &c.     cers, there is an official responsibility existing and
    *vs.*      felt by them, and what they do, is done publicly in
MAYSVILLE AND  the face of the community, to have its effect on their
LEXINGTON R. C.
               private and public destinies, and upon their public
and private characters ; and such considerations and
checks may be relied upon as a partial restraint upon
them against the abuse of their delegated authority.
But if the policy is sanctioned and the right admitted,
that the legislature, in whole or in part, to a greater
or less extent, may cast off the responsibility impos-
ed on its members, and delegate their legislative pow-
er to voting majorities of the people in different coun-
ties, towns, and districts, then all the restrictions and
safeguards enumerated, and many others that ex-
ist, to prevent encroachments upon the rights of per-
son and of property by the legislative power, will be
disregarded and overthrown.   Hence I have thought,
and still think, that the appellate court in their opin-
ions as delivered in the case from Clarke county, and
in the case of *Talbot* v. *Dent*, and the two city cases,
herein above cited, have gone to the utmost limit in
that direction, and to go farther would not, as I con-
ceive, be warranted either by the former or present
constitution, or by sound public policy.

17. The twen-   The twenty-eighth section of the act of March,
ty-eighth sec-  1850, in its substantial provisions, whether consider-
tion of the act ed as a production resulting from the exercise of ei-
of March, 1850, ther original or delegated legislative power, is believ-
is believed to
be in conflict  ed to be in direct conflict with the twelfth section of
with the four-  the tenth article of the former constitution, and the
teenth section
of the thirteenth fourteenth section of the thirteenth article of the
article of the  present one.   The section as contained in each is
present consti-
tution, which   the same, and it provides, "nor shall any man's prop-
prohibits the   erty be TAKEN, or applied to public use, without the
taking of "any
man's property  consent of his representatives, and without just com-
for public use, pensation being previously made to him."
*without the*
consent of his     Now, if it be assumed that the twenty-eighth sec-
representatives, tion was passed into a binding statute by original
and without
just compensa-  legislative power, and that the forced contributions to
tion being pre- be exacted under it, were to be actually applied for
viously made to
him."

public use, then it follows that it violates this clause of the constitution, because it has authorized the plaintiffs' money or property to be taken, and applied to the use designated, and in fact claimed to be a public use, by the advocates of the act, without requiring a just compensation to be first previously made to them. It cannot for a moment be admitted that this constitutional requisition "that adequate previous compensation shall be made," is satisfied by the provision in the act, which directs that as the money is at intervals coerced from the citizen, he shall have certificates of the amounts he has been compelled to pay; and when the aggregate sum of $50 is paid, he shall be entitled to one share of stock in the company; because, 1st, this compensation, if it be such at all, is not *previously* or even cotemporaneously made, as the citizen's money or property is taken from him against his consent.

2d. It is wholly inadequate in point of value at the time it is offered; its value is wholly uncertain and contingent; it may never afford any return at all, and if any, its amount depends upon future contingencies. So that it cannot be pretended for a moment, that by these shares which he may get, as his payments may amount to aggregate sums of fifty dollars, he receives either *previous* or *adequate* compensation for this money.

3d. This provision of the constitution, neither in its letter or spirit, is complied with by such a forced and compulsory arrangement as that proposed by the twenty-eighth section. It was designed by the constitution that if a man's property was to be taken for public use, it should be honestly and fairly valued by impartial valuers, and at the time or before he should be divested and stripped, even for actual public uses, of his own lawful property and honest earnings, that the actual full value thereof should be paid to him, or previously at least secured to be paid to him.

If, however, it be insisted that the act was not made of force and effect by original legislative power, but

by that power as delegated or transferred to the people of Mason county; or in other words, if the senators and representatives composing the legislative body should affirm, as they may with truth, that we did not pass this act—we must not be held responsible for it—we only, after it was written and published, left it to the railroad company and the voters of Mason county to do as they pleased with it—to pass it or not as they might think proper—if the measure is odious or unjust, therefore, we are not to be reproached, but let the reproach fall upon those by whom it was actually adopted.

Such being the case, then, the clause of the constitution just quoted has not only been violated in the particulars already stated, but in the further particular that the plaintiffs' property or money, which is the same thing in substance, is authorized to be taken from him *without the consent of his representatives*, expressed in the form of a final and conclusive enactment of the law under which it may be done; for in such form only can the consent of the representatives to such acts be given according to the design, and in the true sense and meaning of the constitution.

But it may be urged that this particular clause of the constitution has not been violated, because the act in question does not require or direct that the contributions to be exacted from the plaintiffs shall be applied to the *public*, but to *private* use, to-wit: to the use of a railroad company in building a railroad as its private property. This argument virtually acknowledges that the design and effect of the twenty-eighth section is to wrest by force from the plaintiffs their means, without previous adequate compensation, and to bestow them upon a private corporation; and that to do so, is a taking of the citizen's property for private, and not for public uses; that, in reason and truth no sound distinction exists between the cases of taking a man's property for the use of a railroad company, a banking company, a manufacturing company, a partnership association of merchants, me-

chanics, bankers, or manufacturers, or for the use of another favored individual; that, in each case alike, the use for which the citizen's means are taken, and to which they are applied, is a private use, as distinguished from a public use.

This argument assumes further, that, although you cannot take a man's property for *public* use, except in pursuance of laws to be passed by his representatives, and without giving him *previous* and adequate compensation, yet it may be taken for the private uses of others, without the consent of his representatives, and without adequate previous compensation, if so ordered and allowed by a majority of the people of the county in which the citizen happens to reside; that is to say, that the minority may be rightfully plundered by the majority, because to plunder the minority in that way, and in such form, especially if it is done under color of levying taxes, is not expressly prohibited by the clause in question, nor by any other express clause of the constitution. The answer is, that the said twelfth section declares that "no man's property shall be taken." This is a distinct branch of the sentence, and contains so far, and of itself, a positive prohibition, to the effect that a man's property shall not be wrongfully taken at all; he shall not be stripped of his means for the benefit of any person or collection of private individuals. The following branch of the sentence is joined to the preceding, as just quoted, by the alternative or disjunctive conjunction "*or*," as thus, "or applied to public use, without," &c.; showing that each branch of the sentence contains a distinct prohibition, prohibiting distinct things from being done; so that this clause will have the same meaning and bear the same construction as if it had been written thus: "nor shall any man's property be *wrongfully* taken from him for private use, *or* applied to public use, without," &c. Such construction is deemed reasonable and proper. If such was not intended to be its meaning, the copulative conjunction "and" would have been used in place of the

*Slack, &c.*
*vs.*
*Maysville and Lexington R. C.*

18. Private property can no more be taken for private use than for public use. (1 *J. J. Marshall*, 566–9; 7 *B. Monroe*, 167.)

disjunctive *"or."* But admit this construction to be wrong, and that the clause in question was only designed to prohibit the taking of private property for *public use,* except upon the terms specified—if the taking of a citizen's property for the use of the public is an act so arbitrary and tyrannical as to require an express constitutional prohibition, unless done upon and after compensation being made, how much more arbitrary and tyrannical would it be to take the private property of one man to give it to another, or to give it to a chartered company?

In chartering these companies, with all their exclusive privileges, their corporate powers, and exemptions from individual responsibility, by which they have been enabled, in thousands of instances, to contemn and trample upon the rights of the people, and by which they have even been led to domineer over and defy the very governments by which they have been created, it is thought by many that the provision of the constitution is violated which declares "that all freemen, when they form a social compact, are equal; and that no man or set of men are *entitled to* exclusive, separate public emoluments or privileges from the community, but in consideration of public services."

And if, amongst their corporate privileges and powers is to be included the right, whether given directly or procured by artful indirection, to seize individual property and apply it to the uses of such corporations, or to compel political corporations or private citizens, against their will, to take their stock—if such a condition of servile and abject dependence upon these privileged bodies is to be riveted upon the people, and even upon their government, it would not be very long before the freemen of the country might deem it expedient to resort to the exercise of their undoubted natural and constitutional right, and peaceably alter and reform, or abolish their present government, and adopt a new one, in which, to prevent evasion and abuse, the principles, objects, and

extent of taxation, shall be expressly provided for, fixed and defined, and by which either the creation of these corporations shall be altogether prohibited, or so limited and regulated as that they may be kept in due subordination to the government and people. If the twelfth section of the tenth article of the constitution is not to be understood as prohibiting the taking of a man's property for private use, and if such express prohibition is nowhere else to be found, as a limitation upon the powers of the government, may not the omission be easily accounted for? will not the reason of it readily occur to the reflecting mind? A certain government always refused to designate and include parricide in the catalogue of crimes embraced in their criminal code, or to prescribe any punishment for its commission, upon the ground that it was so horrible in its nature that its intentional perpetration was impossible, and could not be anticipated; so it may be inferred that to take a man's lawful property and his means of subsistence, earned by a life of toil and honest industry, against his will, to bestow it on others, was regarded as so great an outrage upon private rights, and as so subversive of the ends of justice, and the good order and peace of political society, that it was not to be believed that such power would ever be exercised by the government; and its express prohibition was therefore thought to be unnecessary. To suppose otherwise, would be to suspect and apprehend that the powers of government would be prostituted with such a spirit of vandalism, as to render that, and all other such restrictions and limitations in the constitution, useless and nugatory.

To sustain the views here presented, I refer to the opinion of the court of appeals pronounced in the case of *Davis* v. *Ballard*, by Judge Underwood, reported in 1 *J. J. Marshall*, 566–7–8–9. The construction which has been given to the twelfth section of the tenth article of the constitution, is sanctioned by the court in the opinion cited above, as also in the

opinion delivered by Chief Justice Ewing in the case of *Pierce's heirs* v. *Patton et al.*, reported in 7 *B. Monroe*, 167, in which the court say : "That section of the constitution of Kentucky which provides, 'nor shall any man's property be taken or applied to public use without just compensation being previously made to him,' has been construed by this court, and properly, to inhibit the invasion of, or the *taking* of private property, for *any purpose*, or under any PRETEXT whatever, except for *public use, and for that only* upon affording previous just compensation to the owner. This provision of the constitution affords a shield to private right, and should be so construed against any enactment of the legislature, direct or indirect. It would be a poor protection to the right of the citizen to hold and enjoy unmolested his private property, if the legislature could take it away and vest it in another in *presenti* or in *futuro*. If *even any terms could be imposed*, which would embarrass his right, or obstruct his full enjoyment of his estate, *indirect* invasions of private property should never be countenanced, *as it is easy to frame pretexts*, dictated by apparent policy, to evade and fritter down the protection intended to be afforded." In these views I concur, and consider them as applicable to the question now under consideration.

It may be proper, perhaps, to notice briefly the position assumed in argument, that the contribution exacted from the plaintiffs, as authorized by the two acts in question, as passed by the popular vote, and as provided for by the county court order of the 5th of May, 1851, is a tax authorized to be levied and collected by law, and rightfully under the general taxing power of the government, and that it does not come within the letter or spirit of the constitutional provision referred to ; that it is not a taking of private *property* for either public or private use, but that it is an authorized tax, to be exacted in *money*, and the power to impose and collect taxes from the people cannot be questioned.

19. The money to be collected under the 28th section of the act of March 1850, does not assume the character of a tax in any of its ordinary forms.

I cannot admit the soundness of this position. Let the inquiry be made and answered, what is a tax, and what is legitimate taxation? A tax may be defined to be a rate or sum of money assessed by some uniform rule upon the person or property of the citizens, or upon both, to be authorized by a law originating in the lower house of our legislature, and definitively passed by the supreme legislative power of the state, to be collected by authorized and responsible public collectors, the proceeds to be paid into the public treasury, to constitute public revenue, and to be paid out by the disbursing agents of the government only for public purposes in pursuance of regular appropriations.

Now the contribution exacted, and to be collected from the plaintiffs, possesses none of the substantial characteristics of a tax as thus defined, nor indeed, according to any correct definition of the term.

1st. The laws by which it is authorized were not enacted by the legislative body of the commonwealth, nor by any other body to whom such legislative power can be constitutionally surrendered.

2d. The money when collected is not to be paid into the public treasury of the state, or of any local county or city government in the state; and it cannot be considered as the public revenue of the general, or of any local political community.

3d. Not being first paid into any public treasury, and not being PUBLIC revenue, or subject to be applied to the PUBLIC uses and purposes of the local government of any city, town, or county, or of the government of the state at large, it is disposed of by the railroad company's officers, in their discretion, to whom the acts referred to and the county court orders direct it to be paid by the collectors, without regard to previous appropriations having been made, in the sense with which that term is used in the constitution.

4th. It is not only not paid into any public treasury; it is not only not public revenue, subject to be

appropriated by public authorities to public purposes; but the money when collected belongs to a private corporation, by which it is to be applied to its private uses and purposes.

So that in almost every essential requisite, this humiliating contribution differs from a constitutional tax. Under the mantle of taxation, and under the pretext of the taxing power of the state, or of municipal and local communities, even if they may receive that taxing power by delegation, the constitution should not be violated, and the citizen divested of his means, money or property, to be applied to private use. The form of taxation may be, often has been, adopted to coerce from the citizen his means for other's uses, against his will and without compensation, which, if stripped of that disguise and laid bare to the view, would be esteemed as little better than licensed robbery.

Even though a tax, so called, be imposed by the state, if it should be levied and collected from one man to pension or enrich another, or if one portion of the community are in the form of taxation to be compelled to surrender their money to another, or to yield up ever so small a portion of their means to build up and support chartered associations, the unjust purpose for which such pretended tax is imposed, strips it of the character of a tax altogether, and it does and can amount to nothing more than an arbitrary interference of the power of the government to enable favored individuals, classes, or corporations to make tributary political slaves of the citizens thus subjected to their avarice or rapacity. By such policy, a great principle which lies at the very foundation of political liberty, is trampled under foot; and although the delusive forms of free government may long remain unaltered, yet under such policy, and as the certain and dire results of the arbitrary principles of government upon which it rests, the true spirit of regulated freedem will vanish and disappear, and leave the country a prey to all the blighting conse-

quences of revolution, or to the merciless dominion of irresponsible popular majorities. So long as the protection of property, as well as of life and liberty, continues to be a main and important purpose to be secured by organized government; so long as the present social fabric remains, and a social state exists in and by which man is compelled, in conflict, rivalry, and competition with his fellow man, to struggle on from youth to manhood and old age, to clear out his own path and hew out his own way to competency, to fortune, and to fame ; so long as the earth itself, the common mother of us all, together with all the productions of agricultural, commercial, mechanical, and manufacturing industry, are the subjects of exclusive private ownership, each man's portion of which, in amount, depending upon the sweat, the strength and toil expended in its acquisition and preservation, I for one cannot consent to surrender the constitutional safeguards which are intended to shield and protect each citizen in the undisturbed possession and enjoyment of his own property, or sanction a principle or a policy by which the rights and estates of the minority may become the prey of an unbridled majority, which, in communities densely populated, may usually be composed mainly of those who cannot be plundered themselves, or suffer by the plunder of others. The unrestrained government by the majority of numbers in a pure, unmixed democracy, in which all power is exercised by original popular assemblies, to pass laws, order their execution, pronounce judgments, and to enforce their sentences, however just, proper, and expedient it might be, as adapted to small communities, composed of good and virtuous citizens, who held all things in common, and whose social system was based upon the principle that there should be no private, exclusive, or separate appropriation of power or property, either real or personal, yet such a government in large communities, with a social state shaped and formed in respect to its habits, customs, commerce, agriculture, manufactures, and

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

its institutions, generally, upon the principle of *meum et tuum*, that this is mine and that is thine, and in which the protection of each, in the enjoyment of his own, is necessary to the peace and happiness of society, would again, (as it has always heretofore,) prove to be the most odious and galling of all despotisms.

It is not necessary to bring up in array all the plunderings, confiscations, banishments, and bloody executions which have characterized the sway of the ancient Greek democracies in proof of the arbitrary, cruel, and despotic dominion resulting from such institutions. The causes which have produced such disastrous effects in the communities where such form of government has prevailed, are so obvious that they will readily occur to the mind; and the case under consideration is an example to show that a sense of justice or respect for personal rights, or rights of property, will not always restrain the majority from what is considered by me an encroachment upon the constitutional rights of the minority.

That the form of taxation may be used, and the taxing power be prostituted to coerce from the citizen his money or property for improper purposes, and in violation of the twelfth article of the tenth section of the constitution, cannot be reasonably questioned; and the legislative act by which such burthen is imposed is equally invalid, whether it assume the shape of taxation or that of direct spoliation. In the opinion of the appellate court, delivered by Judge Marshall in the case of *Cheany* v. *Hooser*, (9 *Ben. Monroe*, 345,) having this constitutional provision and the limitation upon the legislative discretion and power presented by it, under consideration, the court say "that limit can only consist in the discrimination to be made between what may with reasonable plausibility be called a tax, and for which, it may be assumed, that the objects of the taxation are regarded by the legislature as forming a just compensation; and that which is palpably not a tax, but is, (under the form of a tax, or in some other form,) the *taking* of private

property for the use of others, or of the public, without compensation." "The case (to make a tax unconstitutional) must be one in which the operation of the power will, at first blush, be pronounced to be the taking of private property without compensation, and in which it is apparent that the burthen is imposed without any view to the interest of the individual in the objects to be accomplished by it. If it be so, no matter under what form the power is professedly exercised, whether it be in the form of laying or authorizing a tax, or in the regulation of local divisions or boundaries, which results in a subjection to local taxes, and whether the operation be to appropriate the property of one or more individuals, without their consent, to the use of the general or local public, or to the use of other private individuals, or of a single individual, the case must be regarded as one coming within the prohibition contained in this clause, or the constitution is impotent for the protection of individual rights of property from any aggression, however flagrant, which may be made upon them, provided it be done under color of some recognized power."

The argument, that the contemplated railroad, although acknowledged to be the enterprise and the private property of a corporate society, will, when completed, promote the interest and advance the prosperity of the people of Mason county, collectively and severally, and therefore that the burthen of a county debt and the contributions exacted from the plaintiffs are authorized—the one as a public debt incurred for the benefit of the county, and the other as a legal and constitutional tax imposed for public purposes—is essentially defective, because it attempts to place the decision of a legal and constitutional question not upon principle or by the test of constitutional law, but upon the assumption of the truth of a speculative opinion or conjecture rather, as to the effects upon the general interests to be produced by the construction of this road, a matter that rests wholly in conjecture and opinion, and which is disputed and is

itself a subject of controversy. The plaintiffs deny, with a spirit of great confidence, and even of remonstrance, that this road will, in any degree, be promotive of their interests or the interests of a great portion of the people of Mason county.' They say that, instead of advancing their interests, and without, indeed, having their advantage in view at all, but in utter disregard of both their interests and their constitutional rights, the owners of valuable real estate in the cities of Maysville and Lexington, and of the farms and lands lying on the probable or contemplated line of this road, in combination with the multitude of non-tax-payers in the cities situate at the ends of the road, have brought all their weight and collective influence to bear in the consummation, by indirection, of a project by which they are to be burthened by debts and taxes, to advance the interest of these property owners, and to enrich these corporators, and to build up their road as their private property, contrary to their wishes and their interests. They say, let those whose estates will be actually greatly advanced in value, or who choose to believe so, whether erroneously or not, build their own road at their own expense, as they especially as owners, will use, and make all the profit from it which they can realize, and leave to others, who believe differently, the freedom of opinion and the liberty of choice, as to the value of an investment in the stock in this concern, and as to whether they will become joint corporators, and as such, contribute their means to the furtherance of the mere private enterprise of a private corporation.

If contributions to private railroad corporations, exacted against the consent of the contributors, can be legitimated under color of the power of taxation, upon the ground assumed that they will be benefitted, their property increased in value, and their interest promoted by the roads proposed to be constructed by such corporations, upon the same principle, (if it can be called a principle at all) the citizens, as before re-

marked, might be forced to contribute their money, with equal justice and propriety, to promote the enterprises and business of banking, commercial, agricultural, manufacturing, or mining companies, provided a speculative opinion prevails with the legislature, or the majority of the voters of the general or local communities in which they are established, that by the increased value of their estates, or in some other way, the interests of those who are compelled to contribute would be advanced; and the same rule, not varied, but merely analogically extended, would authorize the taking of the citizen's money or property against his will, and without adequate compensation, for the private uses of other individuals or partnership associations, to be applied to the advancement of their private business, provided the plausible theory can be argumentatively maintained, that the business to be pursued, and in this arbitrary manner encouraged, will benefit the citizens from whom such involuntary contributions are exacted.

All trade and commerce between the citizens of the same community, and between the people of different independent nations and countries, is carried on, encouraged and increased, because, by the exchange of commodities and by buying and selling, each party procuring what he wants, and parting with what he can spare, mutual benefit and advantage are conferred and received; yet it does not follow that commerce should be promoted, or that it can be rightfully encouraged, by abridging or limiting the liberty of the citizen to sell and buy, or not, as he may think proper, to engage in commerce or not, and to patronize this or that business, or this or that individual or corporation, or otherwise to withhold such encouragement, as he may think proper.

The principle contended for is, that the citizens can rightfully be compelled, against their wills, to contribute to the promotion of any private enterprise or business, sums proportionate to the value of their taxable estates, which, if carried on, will be of public

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

utility, and will promote the interest of the contributor, although he thinks and believes differently, and wishes to employ his means to promote his interest in a different way. I cannot approve such doctrine; and I deny that any government, whatever may be its form, whether of constitutional creation or confined by constitutional limitations, or not, can rightfully exercise such power. The appellate court say, in substance, in the case of *Talbot* v. *Dent*, that a burthen or tax imposed upon the citizen, if otherwise unauthorized and invalid, cannot be made valid by providing that the tax-payer may receive his proportion of the stock or other thing purchased and paid for with the money raised by such tax; and on the other hand, if the tax be valid and constitutional, it cannot by such arrangement be rendered invalid—the court perceiving, doubtless, that if a tax or public burthen should be sanctioned on the ground of such pretended equivalent, it would amount to the assertion of the arbitrary doctrine that the government has a right to compel the citizen to buy another's property at a fixed price, and if he should refuse to take the property, that he might, notwithstanding, be required to pay the price fixed to the owner, who, in such case, may receive the price and keep the property himself. See the case reported in 9 *B. Monroe*, on page 532–3.

If the legislative branch of the government had no right or constitutional power to impose upon the plaintiffs the burthens of which they complain, then of course no such power or authority could be delegated to, or conferred upon the railroad company, the voters of Mason county, to the county courts or city councils. If this position needed support, it would be furnished adequately in the opinion of the court given in the case of the *City of Lexington* v. *McQuillan's heirs*, 9 *Dana*, 516.

If, however, the legislature ever actually possessed the constitutional power to impose the tax or burthen in question, yet such power could not be constitutionally surrendered up or transferred, for the purpose

attempted, to the railroad company or to the voters of Mason county, either temporarily or permanently, because in either case the people would be taxed—a power which alone can be exercised by their responsible representatives—by persons who did not represent them, and who possessed no public official character as functionaries of any government, local, state, or federal.   See for authority the same case, 9 *Dana*, 517, where the court declares that "*taxation* and *representation* go together; and *representative responsibility* is one of the chief conservative principles of our form of government.   When taxes are levied, therefore, they must be imposed on the public, in whose name, and for whose benefit, they are required; and to whom those who impose them are responsible ; and although there may be a discrimination in the subjects of taxation, still persons in the same class, and property of the same kind, must generally be subjected alike to the same common burthen.   This alone is taxation, according to our notion of constitutional taxation in Kentucky; and this idea, fortified by the spirit of our constitution, is, in our judgment, confirmed by so much of the twelfth section of the tenth article as declares, 'nor shall any man's property be taken or applied to public use, without the consent of his representatives, and without just compensation being previously made to him.' "   "The object of this great guaranty was to secure every citizen against SPOLIATION BY A *dominant* FACTION, or by a *rapacious public power*, acting in obedience to the will of a *constituent body*, for *whose use* his property may be taken, and from whom no similar contribution is required.   It intended that *public responsibility*, and the *power of exaction* for public use, should be in some degree commensurable; and, therefore, it should be understood. as providing, that the public shall not take the property of any citizen, for its own use, without his consent or an equivalent, *in money*, or in similar contributions by itself.   If this be not its practical effect, it is a mere *brutum fulmen*, and may al-

ways be evaded by exactions made in the *false sem-blance* of taxation."

The position may be assumed, and is sustained by authority, that the *money* of the citizen cannot, under the forms and semblance of taxation, be taken at all for private, or for any public use, in a case and under circumstances where his *property* could not be taken without previous adequate compensation and consent of his representatives. See the same case, 9 *Dana*, 518; see also the opinion in the case of *Sutton's heirs* v. *Louisville*, (5 *Dana*, 34,) in which the court declares that "for property taken for public use, without the owner's consent, the constitution requires that he be paid IN MONEY," (not in railroad stock) "the actual value of the property, and the actual or supposed advantage to him of the appropriation, cannot be *set off* against that value: and as *money is property*, we cannot doubt that when a citizen's land could not be taken by the public for its own use, without paying him the value of it, his money cannot be taken at all, for the like purpose, without his consent, unless it be in the form of constitutional taxation; for as there could be no other compensation than money for money, the act of restoring to one pocket that which was taken from another pocket, would be idle and useless."

A reference to both the cases last cited is made also to sustain the position, that the citizens cannot be constitutionally compelled to make contributions to the public coffers of the local or state governments, much less to the private coffers of corporate associations, on the ground that they are benefitted, or that their private property is increased in value, by the public improvements, or the private enterprises, to the furtherance of which the contributions are to be appropriated. The following extract from the latter case is considered as pertinent:

"The object of so much of the twelfth section of the tenth article of the constitution as we have quoted, was to secure the citizen from the capricious

abuse of the sovereign right of eminent domain. That object would not be attained if the government, or persons identified with it, and representing its authority and interests, could take the property of a citizen, and apply it to public use, without any other compensation than an ideal advantage, which, in the opinion of the party acting, would arise to the owner from the effectuation of the object for which the appropriation is made. The public ought not to decide for any citizen how far, or whether at all, he will be peculiarly benefitted by a public work, or other thing for which his property is taken without his consent. If such an arbitrary and discretionary power can be exercised in such a case, the constitutional guaranty would be of little or no value; for it would be easy to suppose cases in which even a jury would decide that the construction of a road, or the opening or improving of a street, or canal, near or through the land of another, would incidentally benefit the owner, by its resulting facilities to him, or by a consequential enhancement of the estimated value of his property, when, in his own opinion, or even in fact, considering the use he makes or intends to make of it, such an improvement, with such a locality, would be inconvenient to him, and injurious to his interest; and when, therefore, he would sooner pay to have it made elsewhere, and further from him, or to prevent the making of it any where. Besides, the supposed or actual augmentation of the vendible value of one's estate is not only not advantageous to him, but may be positively disadvantageous and onerous, if he should be determined to keep and never sell it, and whether he will or should keep and enjoy it himself, or sell it, no one but himself can know, or have any right to decide for him." "Hence, when the property of a citizen is taken without his consent, for the use of the whole community, of which he is a member, the constitution imperiously requires, not that the public shall DECIDE whether or not he is entitled to ANY compensation, but that a just compensation shall be

paid or secured, and that compensation implies the value, at least, of the thing taken. No citizen can be compelled to give his land to the public without an equivalent," (and, I add, nor without the consent of his representatives;) "and what is that equivalent but the VALUE IN MONEY of the land surrendered to public use ?" (5 *Dana* 32–33.) These views receive additional support from the opinion of the court in the case of *Jacob* v. *The City of Louisville,* reported in 9 *Dana,* 114.

It will be observed on examination of the seventh section of the act incorporating this company, that in the election of its officers, each subscriber, by himself or proxy, may cast as many votes as he has shares of stock, and no more. This was allowed, no doubt, upon the principle, that he who owns most and risks most should have the most control and influence in the management of the concern. Yet in the twenty-eighth section of the same act this principle is wholly disregarded in determining the question as to whether the tax-payers of the cities and counties shall or not be compelled to submit to a tax on their taxable property, to pay for subscriptions of stock. Now, if such a tax is to be justified at all upon the ground assumed, that the tax-payers would be benefitted in the increase of the value of their estates and otherwise, the manifest and flagrant injustice of the scheme would, to some extent, be palliated, if not excused, if the act had provided—

1st. That as none but the owners of real and personal estates subject to taxation were to be required to submit to the imposition intended, those who were not tax-payers, inasmuch as they would contribute nothing, and would have nothing to lose or at stake by the result, and inasmuch as it was not a public question which involved in any degree the rights of life, political liberty, or their pursuit of happiness, so far at least as they were concerned, should have been excluded, and not allowed to assist in passing a law

by which others were to be taxed for the benefit of a private corporation.

2d. That the question to be actually decided should have been, not that each citizen should be required to contribute, without regard to his degree of interest in the enterprise, in proportion to the amount and value of his taxable estate, to be forced from him under the form and color merely of a tax, but in proportion to the actual extent and degree of interest of each citizen in the contemplated railroad, to be impartially estimated and ascertained, upon the principle of his proximity or remoteness from the railroad, as affecting the value of his real estate and business; so that a citizen owning a farm on the line of the road, or a valuable edifice in the cities at its terminations, which would be increased in value to the amount of $1,000, should be required to contribute ten times as much for its construction as the small farmer whose estate, situate at a remote distance, would only be increased $100 in value; so that those who should be most benefitted should be required to pay most, and all and each only to be compelled to pay their tribute in sums proportioned to the actual benefit to be received by each.

3d. That the potency of each man's voice and influence, in the decision of so grave and important a question, should be proportioned to the amounts to be by each contributed towards the enterprise in view, for the same reason and upon the same principle upon which the legislature acted, in providing for the election of the directors of the company, when they gave to a stockholder owning one hundred shares, one hundred votes, and to him owning one share, only one vote. If the project presented in the twenty-eighth section had been so limited and guarded, and been thus exempt from some of its most odious features, it would, it is supposed, never have been approved at any election, even though called by the railroad company, after and upon publication of their notices and circulars, in the midst of a most inclem-

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

ent winter. Its apparent justice would probably have defeated it, and the scheme as it is, is doubtless indebted to its manifest injustice and inequality for its success, as it brought all the influence of all the owners of real estate at the terminations and along the route of the railroad, and the numerical strength of all the non-tax-paying operatives in Maysville and Mason county, to bear upon the adoption of a scheme, by which the citizen farmers residing on the Ohio river, and in remote parts of the county, should be required, (if the amounts of their taxable estates would produce such result,) though having no interest, and although not at all benefitted by this road, would be compelled to pay as much, and frequently more, to the company, for its construction, than those living on their estates upon its margin or at its terminations, who would be benefitted probably to the extent of thousands of dollars, in the increased value of their property. But whatever shape had been given to this project, in detail, if the scheme had still continued liable to the objection that the legislative power to adopt or reject it had been transferred, as I think, without constitutional authority, to popular majorities, from whom it was to receive, if at all, the force of law ; and the further objection that it allowed, however, disguisedly and circuitously, a citizen's property or money to be taken, without his consent, for the private uses of a private corporation—with such objections presented, it could never receive the sanction of my judgment.

20. The acts of the railroad company and the voters of the county of Mason, in attempting to pursue the acts of 4th March, 1850, and the 17th February, 1851, are illegal and in violation of the constitution

Being convinced that the acts under consideration, and all the subsequent proceedings of the railroad company, the voters, and county court of Mason county, had and concluded in the attempted pursuance thereof, are in conflict with the constitution of 1799 as well as that of 1850, it would have been unnecessary, had the majority of the court concurred with me in opinion, to have made or settled the question as to whether the validity of those acts and the proceedings under them are to be tested by and un-

der the new or old constitution; in such case it would not have been at all material which of the constitutions should operate upon the questions presented, so far as regards the disposition of this particular case; but as I am constrained to non-concur with the majority of the court in the opinion confirming the decree of the circuit court, and as the court base their conclusions, partly at least, upon the ground that the questions involved should not be tested by the provisions of the new constitution, but by those of the old; and, as being thus tested, they decide that the acts and proceedings in question are not invalid or unconstitutional; and as it seems that the majority of the court, not believing it to be necessary in the decision of this particular case, have not expressed any certain opinion whether similar legislation and action under it would or would not be authorized if tested by the provisions of the present constitution; I deem it proper, therefore, to take the ground, in support of my dissent from the opinion of the majority of the court, that every step taken by the railroad, and by the voters and county court of Mason county, in the attempted pursuance of the acts of 4th March, 1850, and of the 17th February, 1851, are null and void, and of no obligatory force whatever, because they are in conflict with the provisions of the constitution of June, 1850, which went into operation, with full force and effect, before either of the said acts had the force of laws, and before the proceedings under them took place.

It is argued the former and not the present constitution should operate upon the questions presented, because—

1st. The twenty-eighth section was passed before the new constitution was adopted.

2d. That, by that twenty-eighth section, the railroad company took a vested right at the date of the section, which was not and could not be taken away by the subsequent adoption of the new constitution.

SLACK, &c.
vs.
MAYSVILLE AND LEXINGTON R. C.

of 1850, which was in operation with full effect before either the acts of the company or voters had the force of law.

It is a matter calculated to produce much surprise and regret, that the legislation of the state should assume a character and shape, so Protean, questionable and delusive as to produce a conscientious difference of opinion between members of the same court, acting upon the same data, as to the most important facts of the case.

Now, I do not concur in the statement of facts as laid down for the foundation upon which to build the conclusion that the present constitution has no application to the case. I cannot admit that there existed any law, or any binding statute, which authorized Mason county to subscribe for any stock in this railroad company, or which authorized the county court to impose any tax upon the people to pay for it, directly or indirectly, until after the present constitution was adopted. It is true that the twenty-eighth section constituted a part of the act chartering the company, approved 4th March, 1850; but what *was* passed or enacted by this twenty-eighth section? Did it authorize and direct Mason county to subscribe stock jointly or separately? No. To issue bonds? No. To impose a tax? No. It directed and authorized not the things to be done of which the plaintiffs complain in this suit. What was passed, then, by this twenty-eighth section? Nothing but a delegation or transfer of the legislative power to the popular majorities in certain cities or counties, under a certain formula, to give force and effect to this twenty-eighth section.

The law under which the mischief causing this suit was actually done, although it was previously furnished as a legislative project by the legislature, was not passed until the fourth Monday in January, 1851, by the popular vote. The new constitution went into effect in June, 1850. The company's notice to the voters was published not before December afterward. The voters, as above said, passed this twenty-eighth section into a law in January, 1851. All the orders of the county court ordering an election, directing the

subscription of stock, the issue of county bonds, and the imposition of the tax, were made after June, 1850. Now, I take the ground that if the legislature had no power on the fourth Monday in January, 1851, to pass the said twenty-eighth section and make it a binding law, it could not be done by a majority of the voters of Mason county voting on that day. Surely, if the sovereign legislative power of the state could not, consistently with the new constitution then in force, give *binding* efficacy to this twenty-eighth section at any time after June, 1850, it could not be done by any subordinate public authority in the state, much less by the voting majority of a single county. It was only a project of a law, got up in the legislature before June, 1850, but continued over to be subsequently enacted or rejected by the voters of Mason county. Suppose the sense of the voters of Mason had never been taken at all on the question, or, if taken, there had been a majority against the project, would not the twenty-eighth section remain a dead letter? Could the subscription be made, bonds be issued, or tax be levied? The answer is, no; no such things could be done at all. Then does it not follow, that as the sense of the voters was not taken until seven months after June, 1850, when, by the fundamental law of the land, no such statute could be passed and made obligatory, by any power in the state, that such taking of the sense of the voters, and the subsequent action in question, must be null and void? Suppose the legislature of 1849–50, had drawn up this twenty-eighth section, but had declined taking upon themselves the delicate responsibility of giving to it the force of law, and had therefore referred and submitted it to the ensuing legislature, to be convened in 1850–'51, to be adopted or rejected at discretion; but in the meantime, as the case stands, after the adjournment of the legislature that submits the project, and before the assembling of the legislature that adopts it, the old constitution and government are dissolved, and a new government and constitution are

adopted, by which the enactment of such a law, or the adoption of such a project, is prohibited; could the subsequent legislature, on the ground of executing an authority previously conferred, and of carrying out, as agents, under a previous appointment, a previously conceived project, in defiance of such constitutional prohibition, enact and make binding such project? Without a moment's hesitation, I answer, no! To admit that it could be so done, would be assuming that the legislature convened under the new constitution would have the right and power to repeal the provisions in the new constitution in every case where a discretionary authority to do so had been granted by a preceding legislature. This doctrine, if true, would have placed it in the power of the legislature of 1849–'50 to have prevented and defeated all the reforms intended to be brought about by the convention then in session, as they might have drawn up project after project, hostile to, and inconsistent with the contemplated reforms, and handed them over to succeeding legislatures, with leave to adopt or reject them at discretion. If such authority, then, could not be vested by a preceding in a subsequent legislature, each possessing all the law-making power of the state, to give validity to a project of a law, or a scheme of policy, condemned and prohibited by a constitution, in the meantime adopted, much less could such authority, under such circumstances, be vested in a railroad company, the popular majority of Mason county, or the Mason county court. This twenty-eighth section does nothing more, as it passed from the hands of the legislature, than to appoint a most extraordinary legislative agency, consisting of the railroad company and the voters of Mason county, to whom was delegated special legislative power to adopt or reject, as they thought proper, a special project; but before the power is executed, before the special agent acts under the appointment, with the special instructions as set forth in the letter of attorney, to-wit: the twenty-eighth section, the princi-

pal is defunct, and dead to all intents and purposes, with respect to the power in question, and the agency could not survive the death of the principal. The new constitution, by which the old government, as well as the legislature of 1849–'50 that created this agency, and that held power under the old system, were both demolished, virtually revoked this agency before the power was executed, and not only withdrew the powers and instructions from these particular agents, but it prohibited the creation of similar agents, or the exercise of similar powers, even by the legislative branch of the new government, except with peculiar limitations and restrictions as set forth.

There is no doctrine better settled than this, that neither a government nor individual can rightfully confer upon an agent power and authority to do anything, or perform any act, which such government or individual could not do or perform. Power not possessed, cannot be conferred or delegated. But of this doctrine proceeds the principle, or rather the rule, as a legitimate consequence, that though the power granted and delegated to the agent, existed in the party granting it at the time of the creation of that agency, if before the power is exercised by the agent, it has been taken and withdrawn from the principal himself, by competent authority, such agency is necessarily revoked, and the power cannot afterwards be exercised by either the principal or agent; not by the principal, because the power has been taken from him altogether; and not by the agent, or the delegate, or representative, because he cannot exercise a power derived from his principal which, at the time it is attempted, the principal does not himself possess.— These principles are, it seems to me, precisely applicable to the question under consideration; and upon them are founded the rules of reason and of law, applicable to the relation of principal and agent, as existing between private individuals. It is a general principle of law, well settled, that the authority derived by the agent from the principal, expires when

21. The power of the agent ceases with the power of the principal. The constitution of 1850 would have been violated by the legislature assuming to do that which they delegated the Mason county court to do; so the acts of the Mason county court are in violation of the constitution.

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

the authority of the principal has ceased to exist; al-
so, that the power of appointing an agent is founded
upon the *right* of the principal to do the business him-
self, and when that right ceases to exist, existing ap-
pointments of agents are revoked, and the right to
make subsequent appointments also ceases to exist.
It is upon this rule that the bankruptcy of the princi-
pal revokes the authority of his agent. Although,
previous to his bankruptcy, the principal had the
power himself to do the business entrusted to the
agent, and full power to make the appointment of the
agent, yet when the principal becomes bankrupt, the
authority of the agent is gone; because, before it is
executed by him, the power and authority of the prin-
cipal is, by his bankruptcy, transferred to others.

So with respect to a *feme covert*, who, when a *feme
sole* had power over the subject matter of the agency,
and right to appoint her agent, which she does, yet
upon her subsequent marriage, after the appointment
of her agent, but before the execution of the agency,
the authority of the agent ceases, and is revoked, be-
cause the authority of the principal has ceased, and
been transferred to the husband.

So, where an agent is vested with certain delegated
power or authority, including the right to select or ap-
point sub-agents, if the principal withdraws the au-
thority from the agent, or there is either an express
or implied revocation of the agency, the authority of
the sub-agent or substitute ceases with that of the
principal agent. (*See* 2 *Livermore on Agency*, 306,
307, 308.)

So it may be assumed, by analogy, that if the bo-
dy of the people of a political community, as princi-
pal, confer certain legislative powers upon their ap-
pointed agent, (the legislature,) with leave to that
agent to appoint sub-agents—to-wit: the majority of
the qualified voters of counties, the justices of county
courts, or the mayors and councils of incorporated
cities—yet, if before the authority is executed by the
sub-agents, the power is withdrawn by the people

from the legislature, or if there be either an express or implied revocation of the authority of the principal agent, the authority of the sub-agents, *the voters, cities, and counties,* instantly ceases, and any subsequent execution of such powers would be null, and of no binding effect.

That agencies are terminated and revoked—first, by the bankruptcy; second, by the death; third, by the lunacy of the principal, and fourth, by the coverture of a *feme sole* principal, or by express condition or limitation in the powers of attorney, or by express revocation, see 2 *Kent's Commentaries*, 642. With but a very slight indulgence of the fancy in its legitimate appropriation of metaphor and allegory in its investigations, these rules, which govern private agencies, would appear to have a reasonable and manifest application to the case in hand. It might be said that the powers and privileges of the old government, like those of a bankrupt, were delivered over into the hands of the assignee, *the convention,* carrying with them in their surrender the revocation of all outstanding and unexecuted powers and agencies; or that, by the adoption of the new constitution, the former government, a department of which had delegated the power and constituted the agency referred to, had become extinct and was dead, and hence all its powers were dissolved and its agencies all revoked, except such as were expressly retained; or that the whole people of the commonwealth, having appointed the legislature under the former government as principal agent, and having by their letter of attorney, *the old constitution,* given to them certain legislative power, with permission (for argument sake) to appoint sub-agents, conclude to expressly revoke such agencies, and make new appointments of agents by a new power of attorney, the new constitution, by which the power in question was withdrawn, before it had been executed, and the former agencies and sub-agencies expressly revoked.

SLACK, &c.
*vs.*
MAYSVILLE AND
LEXINGTON R. C.

22. The twenty-eighth section of the act of March, 1850, gave no vested right to the company: First, because no company was then organized; and second, if organized in January, 1851, by acceptance by the voters, the rights claimed are in conflict with the constitution of 1850.

The validity of the measures and proceedings, then, under review, all bearing date subsequent to the adoption of the existing constitution, should, I think, be tested by its provisions.

The second ground relied upon, that the railroad company took a vested right under the twenty-eighth section, cannot, I believe, be available; because, first, when it passed the legislature on the 4th March, 1850, no company was organized and none existed then to take any vested right, and the act, not being obligatory, could confer none ; second, if the company was organized on the fourth Monday in January, 1851, when the act was, as assumed, adopted by the voters, it was too late to confer or receive such vested right, because it was then prohibited (if not by the former) by the present constitution, which was then in full force; and third, I cannot understand how a discretionary authority granted to certain cities and counties to take or not to take stock in a projected railroad enterprise, as the voters of such cities and counties might choose to determine, can be called or shown to be a vested right in a company subsequently organized to prosecute such enterprise.

The privilege to take or not to take stock in such company was one that appertained to all persons, and the right, if it may be so called, belonged to whoever chose to exercise it, to attend when and where the books were opened, and subscribe for stock ; and how the right of privilege to subscribe for stock, either by individuals, corporations, cities, or counties, can be considered to be a right vested in the company undergoing, by that very process and in that way, its own formation, I acknowledge I cannot conceive—unless, indeed, the true nature of the case, as, undisguised, is admitted and confessed to be this—that this company, having organized under a charter to carry out an enterprise in which the existing *voluntary members* and subscribers, have each and all a deep personal interest, and from which they are to derive great personal advantage, but finding that the amount of

their voluntary subscriptions are wholly insufficient to accomplish the purpose, and knowing or believing that the stock, as an investment merely, will be of such little value that others, who have no personal interest in the project at all, and who are not to be personally benefitted or enriched by it, will not subscribe for such stock and invest their capital in such concern, or give their means and money to advance the interest of others—that this company, under such circumstances, shall have a vested right granted to them through the instrumentality of certain voters, themselves amongst the number, to compel certain cities and counties to take large amounts of their stock at par, and to compel the inhabitants thereof to furnish the money to pay up the subscriptions, willing or not willing—this, in the opinion of others, may be considered in the nature of a vested right in this corporation so sacred and inviolable as that it may not even be touched or divested by the constitution of the state ; but it seems to me to be a right or power vested in this corporation to commit outrageous wrong and injury upon the sacred and unalienable rights of man, and the constitutional rights of the citizens of this commonwealth, which no state or government upon earth can rightfully or justly confer upon favored individuals, or upon corporations, through any instrumentality whatever, whether that of municipal or county public authorities, or that of local popular majorities. No government possesses, or can rightfully exercise such power, or delegate it to others ; and having this view of the subject, I do not understand how the argument in favor of the decree of the circuit court can derive any force from the assumption that the railroad company acquired, by this twenty-eighth section, an inviolable vested right. It does not seem to me that any wrong is done to this company by not subscribing for its stock. If the counties had not been forced by voting majorities to take stock, or the citizens to pay for it, it would have remained to be taken and paid for by those interested, and such

others as could be induced without force or fraud to subscribe for it willingly; and if the amount of voluntary subscriptions should be insufficient to build the road, the enterprise would only have to be abandoned, and by deferring or abandoning the enterprise, no man's rights would be infringed. The voluntary subscribers would not be required to pay their subscriptions, and would have no ground of complaint against others, who, because their interests would not be advanced, had refused to subscribe. If their stock was valuable, and would have proved to be a good investment of money, they could have sold it without difficulty at any time, either during the progres or after the completion of the work; if the stock was worthless, or of but inconsiderable value, compulsory subscriptions could not be justified, either by correct principle or sound policy; and instead of this corporation having a *vested* right to compel such contributions from the citizens, each citizen had a prior vested right not to be compelled to yield up his substance to promote the private interests of this corporation, or the personal advantage of its members.

By the first section of the schedule of the present constitution, it is provided, "that all the laws of this commonwealth, in force at the time of the adoption of this constitution, AND NOT INCONSISTENT THEREWITH, and all rights, actions, prosecutions, claims, and contracts, as well of individuals, as of bodies corporate, shall continue as if this constitution had not been adopted."

By this provision, the twenty-eighth section of the act of March, 1850, (even had it then taken effect as a law; and had it not been even required, and necessary to give it the force of law, that it should be subsequently adopted by the qualified voters, &c., of Mason county,) was repealed and annulled, if it is *inconsistent* with the present constitution, and if, at its adoption, the said section had not been executed or carried into effect.

The twenty-eighth section and the subsequent act of February, 1851, are in my opinion inconsistent with the following provisions of the present constitution, to-wit: the first, second, and part of the third sections of the thirteenth article—1st: "That all freemen when they form a social compact are equal, and that no man or set of men are entitled to exclusive, separate public emoluments or privileges from the community, but in consideration of public services.

"Section 2d: That absolute, arbitrary power over the lives, liberty, and property of freemen, exists no where in a republic—not even in the largest majority.

"Sec. 3d: The right of property is before and higher than any constitutional sanction."

Second Art., 33d Section: "The credit of this commonwealth shall never be given or loaned in aid of any person, association, municipality, or corporation."

Art. 2d, Sec. 40: "The general assembly shall have no power to pass any act or resolution, for the appropriation of any money, *or the creation of* ANY DEBT, exceeding the sum of one hundred dollars, at any one time, unless the same, on its FINAL PASSAGE, shall be voted for by a majority of all the members then elected to each branch of the general assembly, and the yeas and nays thereon entered on the journals."

Art. 2d, 36: "No act of the general assembly shall authorize any debt to be contracted on behalf of the commonwealth, (except for the purposes mentioned in the thirty-fifth section of this article,) unless provision be made therein, to lay and collect an annual tax sufficient to pay the interest stipulated, and to discharge the debt within thirty years; nor shall such act take effect, until it shall have been submitted to the people at a *general election*, and shall have received a majority of all the votes cast for and against it."

The Mason county subscription of stock, and the bonds issued to the railroad company, are embraced

23. The powers and privileges claimed by the company are inconsistent with the first, second, and third sections of the thirteenth article, and the thirty-third, thirty-sixth, and fortieth sections of the second article, of the constitution.

SLACK, &c.
vs.
MAYSVILLE AND
LEXINGTON R. C.

within the above provision, and not within the exceptions referred to therein.

Now, I will not assert that the precise letter of all or either of the constitutional provisions above quoted have been expressly violated by the acts and proceedings of which the plaintiffs have complained; but this I will say, if those acts and proceedings are allowed to be established as precedents, and if they are sanctioned as valid and binding upon the cities and counties and the minorities of the inhabitants residing therein, then the obvious design and purpose of each and all of those provisions will be defeated, overthrown, and shamefully evaded, by a resort to puerile contrivances and unworthy subterfuges, discreditable to the legislative department of the government, and by which the deluded, nay, defrauded, citizens of the state can be, and in the end will be, deprived of all the checks, limitations and guards intended to furnish to them protection against onerous public debts, against the loss and destruction of the credit and honor of their country, and against merciless and grinding public exactions and corporate oppressions, which they honestly and confidently believed they were securing for themselves and their posterity by the adoption of the present constitution, in which they are recorded.

It will not be controverted, that by the thirty-sixth section of the second article, the legislature would be prohibited from incurring a public debt, on behalf of the people of the state, by a subscription of stock in this railroad company, or by the issue of state bonds in aid of the enterprise in view, directly or indirectly, unless the law by which it was authorized should provide for the imposition of a tax sufficient to pay all accruing interest, and the principal in thirty years, and unless such law should receive the approbation of a majority of the voters of the state, expressed at a *general election.* If the legislature could not then authorize such public burthens to be imposed upon the citizens of the whole state, then, inasmuch as all the

24. To impose upon the people of a county a debt, (for purposes not named in the thirty-fifth section of article second of the constitution,) by the vote of a majority of the qualified voters of such county, is in violation of the spirit of the thirty-sixth section of article second of

citizens of the state are necessarily citizens of the counties into which it is divided, and many of them of the towns and cities within the counties; as the whole state includes all its parts, and as the fact that being a citizen of a city, town, or county, does not deprive the party of any of his constitutional privileges and rights as a citizen of the entire commonwealth, then it follows that no power exists in the government to authorize such debts to be contracted by the towns, cities, or counties, or by any fractional part of the state, so as to bind the citizens of the state resident therein; for if this power is admitted to exist, and if it should be exercised, the result would be, that the inhabitants of that portion of the commonwealth, thus saddled with public burthens, would be deprived of all the benefits and advantages which they believed they had secured for themselves, in common with the other citizens of the state, by the said thirty-sixth section, and those advantages still would remain and be enjoyed for the time being by the residue of the citizens of the other parts of the state unimpaired; and in this view, the extraordinary state and condition of things would be presented of a commonwealth having a constitution adopted nominally and formally for the government and protection of *all* its citizens, which furnished most valuable privileges and secured most important protection against injury and oppression to a favored portion of the people, but which it denies to other portions of the inhabitants less favored, and who are left without such protection and security a prey to the unchecked and irresponsible dominion of local majorities. If, on the other hand, local burthens of like character with those imposed upon the plaintiffs and the citizens of Mason county should be imposed through the agency of local majorities, or of the local county and municipal authorities, upon the people of the whole state as included within the one hundred counties composing it, then the pernicious example is presented of a whole community having been deprived,

the constitution, which requires that it shall be voted for at *a general election;* and that provision shall be made for the annual payment of the interest and the extinguishment of the principal within thirty years, by the imposition of a tax.

by legislative usurpation, of the protection which they thought they had secured by the thirty-sixth section of the second article of the constitution, which they had chosen for their government by an almost unprecedented majority. In the one case, the constitution would be efficient only for the protection of a *part* of the citizens of the commonwealth, leaving the residue unprotected and subject to burthens and taxes without limit, from which the favored and protected portion would be exempt: in the other case, the constitution, in respect to the thirty-sixth section, would be a dead letter, and every citizen in the state would be deprived of its protection; and millions upon millions of public debt, and taxation piled on taxation, may be riveted upon all the present inhabitants of the state, and their posterity, for an indefinite period of time to come, severally incurred and imposed by each and all the counties, towns, and cities, in the same manner and by the same authority as pursued in the instance of Mason county, and the constitutional design thus would be wholly defeated. A retrospective view of the history of Kentucky for a few years preceding the meeting of the convention which formed the present constitution, would furnish a most satisfactory clew to the purposes intended to be secured by the insertion therein of the said thirty-sixth section; it was to save the credit and honor of the state, already much involved and likely to be endangered by a profligate recklessness in contracting public debts for the further prosecution of visionary and unproductive schemes of internal improvements, and to save the citizens from heavy and oppressive taxation, tending alike as an incumbrance upon landed property, thus greatly diminishing its value, and as a draw upon productive industry, thus absorbing its proceeds, to reduce the population, to prevent immigration to the country, and to impair the general prosperity of the state. If the cities and counties are severally allowed to contract debts and levy taxes upon their inhabitants to pay the interest and principal thereof, at the

will of the local majorities, regardless of the restrictions in the thirty-sixth section, it may, and I think would, soon produce all the disasters indicated, and inflict, moreover, unjustly upon the minority of the citizens residing in towns and counties that prudently avoided this reckless policy, the wrong and injury of compelling them to bear their portion of the burthens of an indebtedness created exclusively by other counties and cities, for their own peculiar benefit. If forty or fifty of the large counties shall in this way incur debts, and issue their county bonds, amounting in the aggregate to ten or twelve millions of dollars, (and the tendency is speedy and onward toward this result, as is manifest from the late legislation upon this subject,) then, under the enormous load of taxation upon the inhabitants, and under the apprehension of county bankruptcy, and repudiation entertained by the individual and corporate bond-holders, a great cry would be raised, and an overwhelming influence, indirect, combined and corrupt, would be brought to bear in favor of the assumption, by the state, of all the county debts, consolidated into one mass with the existing state debt; and the numbers and influence would thus soon become sufficient to fasten upon the whole state the debts of all the cities and counties, by a law containing the provisions required by the thirty-sixth section, because the majority of the counties, and the majority of the voters resident therein, would be deeply interested to render their power available, in order that the other counties in the state and the inhabitants thereof should be compelled to assist them in bearing and meeting their liabilities; and in this way, (when perhaps it could be effected in no other,) the great object intended to be secured by the present constitution may be defeated, the sinking fund exhausted, the people oppressively burthened with taxes, the public debt enormously increased, and, finally, the credit and honor of the state impaired, if not destroyed.

The argument upon this branch of the subject, as presented in the published opinion of the majority of the court, it appears to me, is conclusive and unanswerable. I will not attempt further to add to, or enlarge upon that argument; but, approving, I adopt it as part of this dissent, as furnishing some of the grounds upon which I have based the conclusion to which I have arrived, and from which it may be hoped that the majority of the court, in a case which, in their judgment, should be embraced by the provisions of the present constitution, would deduce a similar conclusion. The argument to which I refer commences as follows: "II. In approaching the question of the constitutional validity of the legislative acts under which this tax has been levied, we are met," &c.; and concludes as follows, to-wit: "and with a full view of the burthen of taxation which was to accompany it."

It is regretted by me that the court should have been prevented, in the present case, from deciding the question as to whether counties, cities, and towns, as local communities, since the adoption of the present constitution, can or not be authorized, directly or indirectly, in any form, to incur public local debts, by legislative acts which do not contain the provisions prescribed by the thirty-sixth section of the second article thereof, and which should not be ratified in the manner required by that section. It being the opinion of the majority of the court that the provisions of the present constitution do not apply to this case, it was not necessary that the question above referred to should have been decided by them. Differing in judgment, however, with the majority, with respect to the applicability of the thirty-sixth section of the second article of the constitution of June, 1850, to the present case, I conceived it to be my privilege and duty to express my opinion upon that question, and, briefly, to offer some of the reasons upon which it is founded.